**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KENNETH FITCH, *et al.*,                         *

               *Plaintiffs*,          *

        v.                              *          No. 1:18-cv-02817-PJM

STATE OF MARYLAND, *et al.*,              *

               *Defendants*.          *

   *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS
THIRD AMENDED COMPLAINT AND AMENDED COMPLAINT IN
INTERVENTION**

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER (BAR NO. 25723)
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

August 13, 2020          Attorneys for Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................................... 1

    Early History of Retiree Prescription Drug Benefits ................................................ 1

    Congress Enacts Medicare Part D and Federally Financed Retiree
    Prescription Drug Benefits, But With the "Donut Hole" ........................................ 2

    Maryland Considers Benefits Reform, While Congress Enacts the
    Affordable Care Act, Which Begins to Close the Donut Hole ............................... 3

    With the "Donut Hole" Closing, Maryland Prepares to Transition Retirees to
    Federally Provided Prescription Drug Benefits ....................................................... 4

    The Federal Government Accelerates the Closing of the "Donut Hole" and
    the State Follows Suit .............................................................................................. 5

    This Litigation ......................................................................................................... 5

    Maryland Enacts 2019 Legislation Supplementing Retiree Prescription Drug
    Benefits Available Under Medicare Part D .............................................................. 6

    The Funds Used to Finance Postretirement Health Benefits .................................... 8

    The Third Amended Complaint .............................................................................. 10

    AFSCME's Amended Complaint in Intervention ................................................... 11

ARGUMENT .................................................................................................... 12

I.    THRESHOLD ISSUES WARRANT DISMISSAL OF CLAIMS AND PARTIES
    RELATED TO THE FUNDING OF THE TRUST FUND. .................................................. 13

    A.    None of the Plaintiffs Has Standing to Bring Claims Related to the
        Funding of the Trusts. ................................................................................. 14

    B.    The Trustee Defendants Are Entitled to Dismissal Because They Are
        Not Proper Parties to This Action. .............................................................. 15

i

C.     All of the New Claims Related to the Funds Are Barred by Legislative
       Immunity. ................................................................................................. 19

II.    PLAINTIFFS' CONSTITUTIONAL CONTRACT CLAUSE CLAIMS MUST BE
       DISMISSED.................................................................................................... 20

       A.     No Statute, Whether Related to Retiree Prescription Drug Benefits or
              Either Fund, Creates a Contract Between the State and Plaintiffs. ............. 20

       B.     Cases Applying *Atchison* Hold that Benefit Programs, Unlike
              Pensions, Are Not Enforceable as Contracts.............................................. 27

III.   PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THE EXISTENCE OF A
       CONTRACT UNDER STATE LAW, PRECLUDING THEIR NON-CONSTITUTIONAL
       CONTRACT CLAIMS......................................................................................... 34

       A.     Maryland Has Not Waived Sovereign Immunity for Contract
              Claims or Declaratory Judgment Actions Seeking Interpretation of a
              Contract. ................................................................................................. 34

       B.     None of the Plaintiffs Has Adequately Alleged the Existence of a
              Non-Statutory Contract Right. .................................................................. 36

       C.     There Is No Free-Standing Vested Contractual Right to Retiree
              Prescription Drug Benefits or Funding of those Benefits Under
              Maryland Law. ........................................................................................ 37

       D.     Even If There Were Some Right to Prescription Drug Coverage, There
              is No Allegation That Supports the Existence of Such a Right After
              2011. ...................................................................................................... 39

IV.    PLAINTIFFS' CLAIMS FAIL EVEN IF THE RETIREE PRESCRIPTION DRUG
       BENEFIT PROGRAM HAD CREATED A CONTRACTUAL RIGHT. .............................. 41

       A.     Plaintiffs' Claims Fail Because, by Enacting New Prescription Drug
              Programs in 2019, the State Has Fulfilled Any Purported Contractual
              Obligation. ............................................................................................... 41

       B.     Plaintiffs' Claims Fail Because Medicare Part D and the Additional
              Benefits Provided by Chapter 767 Together Constitute a "Reasonable
              Modification" of that Program. ................................................................. 42

V.      PLAINTIFFS' OTHER CONSTITUTIONAL CLAIMS FAIL TO STATE A CLAIM. ............ 44

    A.      Plaintiffs' Takings Claims Under State and Federal Law Must Be Dismissed For Failure To Allege a Compensable Property Interest........... 44

    B.      Plaintiffs Fail to State a Claim for Equal Protection. .................................. 47

    C.      The Legislative Process Provided Plaintiffs With All the Process that Is Due Under Federal and State Law. ........................................................... 48

VI.     PLAINTIFFS' FIDUCIARY AND BREACH OF TRUST CLAIMS MUST BE DISMISSED BECAUSE DEFENDANTS DO NOT OWE ANY FIDUCIARY DUTY TO ENSURE THE ADEQUACY OF THE TRUST FUND TO FINANCE THE STATE'S POSTRETIREMENT HEALTH BENEFIT SUBSIDY. ....................................................... 50

VII.    COUNTS XII THROUGH XIV DO NOT STATE SEPARATE LEGAL CLAIMS, AND THEIR REQUESTS FOR REMEDY HAVE NO LEGAL BASIS. ....................................... 54

CONCLUSION ............................................................................................................. 57

## INTRODUCTION

Defendants State of Maryland, Governor Larry Hogan, Secretary of the Department of Budget and Management David R. Brinkley, Treasurer Nancy Kopp, Comptroller Peter Franchot, and the Board of Trustees of the Maryland State Retirement and Pension System ("Board of Trustees"), by undersigned counsel and under Federal Rules of Civil Procedure 12(b)(1) and (6), and 21, submit this memorandum in support of their consolidated motion to dismiss the third amended complaint, ECF 123, and the first amended complaint in intervention, ECF 131.  Because the State's decision to offer its retirees the opportunity to enroll in a prescription drug benefit program did not create a contractual obligation, the State's decision to discontinue that program for retirees eligible for Medicare Part D, and instead provide prescription drug benefits to supplement those provided under Medicare Part D, does not give rise to the contract and constitutional rights that plaintiffs and intervenors claim.  Moreover, the complaint fails to allege any cognizable legal claim with regard to the two funds related to retiree prescription drug benefits.  Accordingly, the complaints should be dismissed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### Early History of Retiree Prescription Drug Benefits

The General Assembly has long provided health care benefits for retired public employees as part of the State Employee and Retiree Health and Welfare Benefits Program. *See* Md. Code Ann., State Pers. & Pens. ("SPP") §§ 2-501–2-517.  The first statutory provision specifically for retiree health benefits appeared in 1984. 1984 Md. Laws ch. 290 (codified at Md. Ann. Code, Art. 64A, § 48B). That provision set forth the amount by

which the State would subsidize benefits and stated that the retiree "shall pay the part of the cost of the program that is not provided for" under the provision describing the state subsidy.  *Id.* (codified at Art. 64A, § 48B(d)).   The statute replaced a plan through which the state contributed a flat $1.5 million annually to fund state  *employee* health benefits, without mentioning retirees specifically.  *See* Art. 64A, §§ 48, 48A (1983 Repl. Vol.).

### Congress Enacts Medicare Part D and Federally Financed Retiree Prescription Drug Benefits, But With the "Donut Hole"

In 2003, Congress enacted Medicare Part D, which created a federal program for retiree prescription drug benefits.  For the first time, all retirees over the age of 65 were eligible to obtain outpatient prescription drug coverage by enrolling in one of the plans offered under Medicare Part D and by paying the premium, copay, coinsurance, and deductible that the plan required.  The Medicare Part D program included, however, the coverage gap known as the "donut hole," whereby retirees would no longer receive any coverage once their benefit amount exceeded a certain level, with coverage resuming once their out-of-pocket expenses reached a higher "catastrophic" level.   In reaction to the limitations of the Medicare Part D plan at its initial roll-out, the Maryland General Assembly enacted legislation directing that, "notwithstanding the enactment of [Medicare Part D]," the State "shall continue to include a prescription drug benefit plan in the health insurance benefit options" available to retirees.  2004 Md. Laws ch. 296 (codified at SPP § 2-509.1).  The legislation did not, however, mandate any specific level of benefits to be provided in any such plan.

2

**Maryland Considers Benefits Reform, While Congress Enacts the Affordable Care Act, Which Begins to Close the Donut Hole**

In 2010, the Maryland General Assembly convened a "Public Employees' and Retirees' Benefit Sustainability Commission" to evaluate the fiscal health of Maryland's public employee benefit system and the affordability of its current retiree health and prescription drug plans in light of other options. *See* Public Employees' and Retirees' Benefit Sustainability Commission, 2010 Interim Report, iii (Jan. 2011), http://dls.maryland.gov/pubs/prod/TaxFiscalPlan/2011-Sustainability-Commission-2010-Interim-Report.pdf.[1]  Soon before the Commission convened, Congress had enacted the Affordable Care Act, which altered Medicare Part D so as to close the "donut hole" by 2020.[2]  In response, the Commission recommended that Maryland phase out its retiree drug plan by that date and require Medicare-eligible retirees to obtain coverage under Medicare Part D, just as they do for medical benefits. *Id.* at 26.

The Commission described how transitioning retiree prescription drug benefits to Medicare Part D would improve the fiscal integrity of the State's finances.  Although the

---

[1] When information is contained on a publicly accessible government website, it can be considered in resolving a Rule 12(b)(6) motion. *Shapiro v. McManus*, 203 F. Supp. 3d 579, 606 n.5 (D. Md. 2016); *see also United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

[2] Closing the "donut hole" refers to the gradual lowering of the percentage of a drug's cost that the retiree is responsible for paying.  Before the enactment of the Affordable Care Act, retirees were required to pay 100% of the drug's cost within the coverage gap, and by 2020, that percentage had been reduced to 25%, which is the coinsurance amount that the standard Medicare drug plan requires a retiree to pay before they enter the "donut hole."

3

move would save the State millions of dollars in annual benefit costs, the far larger fiscal consideration was how the cost of benefit programs appeared on the State's books.  In 2004, the Governmental Accounting Standards Board (GASB) had altered the accounting standards that govern the way in which state and local governments account for and report the fiscal liabilities associated with providing retiree health benefits and other non-pension post-employment benefits—known as "other post-employment benefits" or "OPEB."  *Id.* at 20.  Instead of reporting those obligations as an annual liability, the new standards required governments to report the present value of the cost of providing those benefits into the future.  *Id.*  For Maryland in 2010, that figure stood at $15.9 billion, *id.* at 27, which had the potential to jeopardize the State's AAA bond rating, thereby "resulting in higher costs to borrow money for important infrastructure projects and other State needs," *id.* at 25.

**With the "Donut Hole" Closing, Maryland Prepares to Transition Retirees to Federally Provided Prescription Drug Benefits.**

In 2011, the Maryland General Assembly acted on the Commission's recommendation and enacted legislation sunsetting the retiree prescription drug program in fiscal year 2020.  2011 Md. Laws ch. 397.   The language of the 2011 legislation was clear: "The State shall discontinue prescription drug benefits for Medicare-eligible retirees in fiscal year 2020," *id.* (codified at SPP § 2-509.1(b)), which in Maryland begins on July 1, 2019.  Instead, all Medicare-eligible retirees would, on that date, transition to obtaining their prescription drugs directly through the federal Medicare Part D system.

In 2014 the State began providing retiree prescription drug benefits through Medicare Part D, with the State augmenting that coverage through a State-funded wrap-

around plan.  *See* Department of Budget and Management, "Guide to Your Health Benefits: January 2014 to December 2014," at 3, https://dbm.maryland.gov/benefits/Documents/ Benefits%20Guide.pdf ("Effective January 1, 2014, our current prescription drug benefit will 'wrap around' the Medicare Part D Standard prescription drug plan.  This is called an Employer Group Waiver Plan—or EGWP.").  The State retiree, however, saw no change in how benefits were provided, as the State's coordination with Medicare occurred seamlessly "behind the scenes."  *Id.*

### The Federal Government Accelerates the Closing of the "Donut Hole" and the State Follows Suit

By 2018, the federal government had enacted new measures that required manufacturers to provide increased discounts in the Medicare program, which had the result of accelerating the closure of the donut hole to January 1, 2019, i.e., six months earlier than initially projected.  *See* Bipartisan Budget Act of 2018, codified in relevant part at 42 U.S.C. § 1395w-114A.  On April 5, 2018, the General Assembly adjusted Maryland's plan accordingly, enacting legislation that moved up to January 2019 the date by which all Medicare-eligible retirees would transition to receiving benefits directly from Part D.  2018 Md. Laws ch. 10 (codified at SPP § 2-509.1(b)).  The legislation required DBM to notify retirees of the six-month change in the transition period, *id.* (codified at SPP § 2-509.1(d)), which it did in a series of three mailings in May, June, and July of 2018.

### This Litigation

On September 10, 2018, plaintiffs filed suit and sought preliminary relief, alleging that the planned transition to Medicare Part D violated their contractual and constitutional

right to receive State-funded retiree drug benefits.  ECF No. 1-1.  After the defendants removed the case, this Court on October 16, 2018, entered a preliminary injunction barring the State from enforcing the provisions of SPP § 2-509.1(b).  ECF 31.  In accordance with the preliminary injunction, the State has continued to provide retiree prescription drug benefits through the State-administered program.

### Maryland Enacts 2019 Legislation Supplementing Retiree Prescription Drug Benefits Available Under Medicare Part D

In its 2019 session, the Maryland General Assembly enacted three new prescription drug benefits designed to replace the previously provided benefit in the event that the injunction in this case is dissolved.  2019 Md. Laws ch. 767 (effective May 25, 2019, § 6).

The first program—the Maryland State Retiree Prescription Drug Coverage Program—is available to those retirees who "retired on or before December 31, 2019," SPP § 2-509.1(d)(1)(ii).  Under this program, a Medicare-eligible retiree's out-of-pocket costs will be capped at the same level as a *non*-Medicare-eligible retiree's out-of-pocket costs, currently $1,500 for individuals and $2,000 for families.  *Id*. § 2-509.1(d); *see also id.* § 2-508(d)(2)(iii).

The second program—the Maryland State Retiree Catastrophic Prescription Drug Assistance Program—is available to retirees who entered into State service on or before June 30, 2011, and retire on or after January 1, 2020.  *Id.* § 2-509.1(e)(1)(ii).  It would cover any additional out-of-pocket costs once a Medicare-eligible retiree enters the "catastrophic" phase of Medicare Part D coverage.  *Id.* § 2-509.1(e)(2).

6

The third program—the Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program—is available to any retiree who participates in either of the first two programs. *Id*. § 2-509.1(f)(1)(i). It reimburses retirees for *any* out-of-pocket costs for life-sustaining medications that are covered through the State's health insurance benefit options but are not covered under the Medicare Part D program in which the retiree is enrolled. *Id*. § 2-509.1(f)(2)(i). The legislation specified that none of the three programs will be implemented unless and until the injunction in this case is dissolved. 2019 Md. Laws ch. 767, § 2.

The addition of these supplemental benefit options prompted AFSCME to intervene in this litigation. *See* ECF 91-1, 105. AFSCME alleged that the offering of these supplemental programs forced upon some of its members a difficult choice: retire before the end of 2019 and continue receiving benefits similar to those they had received as employees, or continue working and risk receiving less generous benefits if the Court ruled in the State's favor in this litigation. AFSCME alleged that its members were "confused and frustrated by the options presented" by the State, ECF 91-1, ¶ 38, and that "they do not know whether it is best, prudent, and/or in their interest" to take advantage of those options, *id.*, ¶ 39.

As for the plaintiffs, they filed a second amended complaint, in which they expanded the putative class to include active employees, ECF 106 at 2, and alleged that the new options offered to employees merely "altered" the Legislature's "reaffirmation" of its intent "to discontinue the prescription drug benefit . . . for current or future Medicare eligible

state employees," *id.*, ¶ 42.  Both parties sought preliminary relief, which this Court denied. ECF 105.

**The Funds Used to Finance Postretirement Health Benefits**

The State has established two funds to support the provision of benefits under the retiree prescription drug program.  The first is the Postretirement Health Benefits Trust Fund ("Trust Fund"), which is a tax-exempt *investment* fund, the returns on which are available to defray the State's cost of providing retiree prescription drug benefits.  The second fund is the State Employees and Retirees Health and Welfare Benefits Fund ("Benefits Fund"), which is the *operating* fund through which retiree prescription drug benefits have been and are currently funded.

The General Assembly established the Trust Fund in 2004 as an investment vehicle "to assist the State in financing the postretirement health insurance subsidy."  *See* 2004 Md. Laws ch. 466 (codified at SPP § 34-101(c)); *see also* Department of Legislative Services, Fiscal and Policy Note (Revised) for H.B. 72, at 12 (2011), http://mgaleg.maryland.gov/2011rs/fnotes/bil_0002/hb0072.pdf ("H.B. 72 Fiscal Note"). The Trust Fund consists of "any funds appropriated to [it], whether directly or through the budgets of any State agency."  SPP § 34-101(d).   The Board of Trustees are the trustees of the Trust Fund, with the responsibility to invest and manage the assets the Legislature chooses to place there.  SPP § 34-101(f).  Under separate statutory authority, *see* SPP § 21-108, the Board of Trustees manages the administration and operation of the several retirement and pension systems that comprise the Maryland State Retirement and Pension System ("System").  *See id.* §§ 21-101 and 21-102.  Treasurer Kopp and Comptroller

8

Franchot are *ex officio* members of the Board of Trustees, *id*. § 21-104(a)(2) and (3), and they currently serve as the Chair and Vice-Chair of the Board of Trustees, respectively.

Between 2007 and 2009, federal subsidies offered under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 were deposited into the Trust Fund to assist the State in funding future years' benefits expenditures.  H.B. 72 Fiscal Note at 13.  In all other years, however, the federal subsidies were deposited directly into the Benefits Fund to pay for the *current* year's expenditures.  *Id.*  In 2011, the General Assembly permanently redirected the subsidy to the Benefits Fund.  *Id.* at 12.

The Benefits Fund, for its part, was established in 2005 as a "special reserve fund" that is "continuing" and "nonlapsing," SPP § 2-516(b)(2), and "consists of money appropriated for State Employee and Retiree Health Insurance or authorized to be transferred to that purpose in the State budget, *id*. § 2-516(c).  *See* 2005 Md. Laws ch. 444, § 1.  The Benefits Fund is the only fund from which the State draws funds to cover the annual cost of the retiree prescription drug benefit program; it "holds State subsidies to employee and retiree health care coverage plans, as well as the required employee and retiree contributions to the plans."  H.B. 72 Fiscal Note at 12; *see also* SPP § 2-516.  The Benefit Fund is funded on a pay-as-you-go basis and therefore it is not intended to hold an accumulating balance.  *See* Maryland Budget Highlights, Fiscal Year 2021, Appendix O, https://dbm.maryland.gov/budget/Documents/operbudget/2021/proposed/FY2021 MarylandStateBudgetHighlights.pdf; Department of Legislative Services, Fiscal and Policy Note (Revised) for S.B. 192, at 18 (2020) ("S.B. 192 Fiscal Note").

**The Third Amended Complaint**

On June 30, 2020, plaintiffs amended their complaint a third time, adding allegations related to the Board of Trustees' administration of the Trust Fund.  ECF 123, ¶¶ 55-91.  Specifically, plaintiffs alleged that the State had diverted money earmarked for the Trust Fund and that the Board of Trustees' "complicity in allowing the State of Maryland to underfund" the Trust Fund "violated its fiduciary duty to the members of the putative Class."  ECF 123, ¶ 151.  Plaintiffs did not, however, add any new allegations identifying the source of their alleged contractual right to receive State-funded retiree drug benefits, and they continue to rely solely on statutory and regulatory language.  *See, e.g.*, ECF 123, ¶ 33 (stating that SPP §§ 2-502.1 and 2-508 and "COMAR 17.13.05(c)(1)"[3] "created a contract between Plaintiffs and Defendants . . . that obligated the State of Maryland to provide health benefits that included a prescription drug benefit plan").

Almost all of the third amended complaint's fifteen[4] counts are premised on the existence of a contract:

- Count I seeks a declaratory judgment that the retiree prescription drug statute created a "contractual obligation," ECF 123, at 21-22, ¶ 99;

---

[3] The regulation plaintiffs cite, "COMAR 17.13.05(c)(1)," does not exist.  Plaintiffs presumably intended to cite COMAR 17.*04*.13.05C(1), but that regulation adds nothing to the statutory basis of their claim.  In fact, the same regulation now echoes what the statute has provided since 2011, stating that, "Beginning on July 1, 2020, Medicare-eligible retirees will cease to be eligible for the prescription drug benefit option provided under the State Employee and Retiree Health and Welfare Benefits Program."  COMAR 17.04.13.05D.

[4] Although the counts are numbered I-XIV, there appear to be two count XIIs.  ECF 123, at 30-31.

- Count III alleges that the State's steps toward transitioning retirees to Medicare Part D constitute anticipatory breach of contract, *id.* at 24;

- Count IV appears to allege a breach of contract related to the Trust Fund, *id.* at 25-26;

- Count IX and X allege breach of contractual fiduciary duty and breach of trust, *id.* at 29-30;

- Both Counts labeled XII seek mandamus or injunctive relief requiring specific performance of the contractual right that plaintiffs claim they possess, *id.* at 30-32.

Five other counts (II, V, VI, VII, and VIII) plead contractual claims as constitutional violations:

- Count II seeks a declaratory judgment that an alleged diversion of State funds allegedly payable to the Trust Fund violates plaintiffs' constitutional rights, *id.* at 22-24;

- Counts V and VI allege that the State's "reducing the availability of previously promised retiree health benefits," *id.* ¶ 129, and "systematic underfunding of the plan," *id.* ¶ 139, constitute takings under the Fifth Amendment and the analogous provision of the Maryland Constitution, *id.* at 26-28; and

- Counts VII and VIII allege an "unconstitutional impairment of contracts" under the Contracts Clause of Article I, § 10 of the United States Constitution, *id.* at 28, as well as a violation of § 24 of the Maryland Declaration of Rights, *id.* at 28-29.

Counts XII through XIV do not appear to allege additional causes of action at all, and merely set forth remedies plaintiffs seek for their contract-based claims. *Id.* at 30-33. Only Count XI, which alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, has no apparent connection to a contractual claim. *Id.* at 30.

### AFSCME's Amended Complaint in Intervention

AFSCME's amended complaint in intervention adds no new factual allegations about the source of the asserted contractual right; its claims still rest solely on the allegation

11

that the statutory provisions set forth at "SPP §§ 2-501 *et seq.*" and "representations made by the State to its employees in various communications," ECF 131, ¶ 46, "create a contract between Plaintiffs the State of Maryland that obligate the State to provide a prescription drug benefit plan" that is "is coextensive with that benefit received by current State employees," *id.* ECF 131, ¶ 15.  Count I seeks a declaratory judgment regarding "the rights, duties, privileges and obligations of the parties under applicable laws, including . . . the validity or constitutionality" of SPP § 2-509.1(d).  ECF 131, ¶ 50.  Count II claims anticipatory breach, *id.* at 10, while Count III alleges an unconstitutional impairment of contracts under the Contract Clause, *id.* at 11.  AFSCME's amended complaint does not join plaintiffs in alleging any claims under the Takings Clause or related to the Trust Fund.

## ARGUMENT

Both the third amended complaint and AFSCME's amended complaint in intervention are based almost entirely on the alleged existence of a vested contractual right to the continuance of some level of prescription drug benefits.  That is, both the individual plaintiffs and AFSCME claim that the 2004 statute, by which the General Assembly directed the State to "continue" to provide a prescription drug "plan" in light of Medicare Part D's original coverage gaps, created a contract between the State and its employees.

The law is clear; statutes cannot create contracts absent the clear and unequivocally expressed intent of the legislature to do so, and no such intent is evident in the laws at issue here.  Nor has either set of plaintiffs adequately pleaded an alternative source of the contractual rights they claim.  Although AFSCME alludes to "representations" made by the State in "various communications," ECF 131, ¶ 46, it does not identify those

12

representations or allege with any specificity how they give rise to the contract right that they claim. Moreover, any contract claim based on such "representations" would be barred by sovereign immunity, because the State has waived its immunity only for those contracts that are reduced to writing and approved by officers with actual authority. Finally, any claim plaintiffs have to retiree prescription drug benefits does not amount to a compensable property interest that can form the basis of a takings claim under federal or State law.

Nor is there any legal merit to plaintiffs' new claims related to the Trust Fund. Plaintiffs misunderstand the Board of Trustees' role in relation to the Trust Fund and they misconstrue routine budget adjustments that have no effect on the level of retiree prescription drug benefits provided to retirees. Plaintiffs and AFSCME have therefore failed to state a claim for which relief can be granted.

## I.   THRESHOLD ISSUES WARRANT DISMISSAL OF CLAIMS AND PARTIES RELATED TO THE FUNDING OF THE TRUST FUND.

All parties agree that the fate of this case hinges on whether plaintiffs are able to establish that they have a contractual right to continue receiving retiree prescription drug coverage despite the State's efforts to transition to Medicare Part D. *See* ECF 1-2 at 8 ("The claims alleged in the complaint all arise out of a purported contractual relationship between the Plaintiff and the Defendants."); ECF 92-1 at 12.

But before addressing those core contract claims, various aspects of plaintiffs' claims relating to the funding of the Trust Fund, added in the third amended complaint, require their dismissal: Plaintiffs do not have standing; the parties they added as defendants

have no role with respect to funding the Trust Fund; and claims relating to budgetary actions are barred by legislative immunity.

### A.     None of the Plaintiffs Has Standing to Bring Claims Related to the Funding of the Trusts.

Plaintiffs lack standing to challenge the funding level within the Trust Fund because they have suffered no injury, so long as they continue to receive the same prescription drug coverage that they received prior to the announced transition to Medicare Part D.  The Supreme Court recently considered a case where pension plan participants in a defined benefit plan sought to challenge the plan's investment decisions.  *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020).  The Court found that the plan participants could not demonstrate the injury in fact necessary to establish standing, when they had "received all of their monthly pension benefits so far," and when, because they were vested in the plan, they "will receive those same monthly payments for the rest of their lives."  *Id.* at 1619. As the Court observed, "a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan and the employer would both fail."  *Id.* at 1622. This is doubly so where the employer is the State, and is not at risk for default on its debts.

*Thole* has direct application here.  Plaintiffs claim that they possess vested rights in retiree prescription drug benefits that entitle them to those benefits for the rest of their lives. If they are correct that they are entitled to those benefits, there is no controversy generated by underfunding of the Trust Fund.[5]   When plan benefits are provided pursuant to a

---

[5] And if, as the defendants contend, the plaintiffs do not have a vested contractual right, all parties agree that defendants must prevail, as the Legislature then would be permitted to discontinue retiree prescription drug benefits.

contractual right—which is the plaintiffs' main contention in this case—the amount of those benefits "will not change, regardless of how well or poorly the plan is managed," and "the employer, not plan participants, is on the hook for plan shortfalls." *Id.* at 1620. Because they have asserted their entitlement to benefits no matter the financial status of the State, plaintiffs cannot now claim harm from the perceived underfunding of the Trust Fund without also alleging a failure to provide coverage. Because the plaintiffs continue to receive the benefits they claim, all of the newly added funding claims in the third amended complaint must be dismissed for lack of jurisdiction as required by *Thole*.

**B.    The Trustee Defendants Are Entitled to Dismissal Because They Are Not Proper Parties to This Action.**

Even if plaintiffs had standing to contest the Trust Fund's balance, the Trustee Defendants—the Board of Trustees, Treasurer Kopp, and Comptroller Franchot—should be dismissed because they do not determine the level of funding in the Trust Fund or play any role in the provision of prescription drug benefits. Their only role is to *invest* and *manage* the assets once they are in the Trust Fund; they do not determine whether to appropriate money into or out of the Trust Fund; and they are under no statutory or trust obligation to maintain the assets of the Trust Fund—much less prescription drug benefits— at any particular level. The Legislature, not the Trustee Defendants, made the decision not to appropriate any more money for the Trust Fund after 2009, which is the basis of the new claims added in the third amended complaint.

The Trust Fund's governing legal authorities confirm that the Trustee Defendants do not make the benefit or budgeting decisions of which plaintiffs complain. Instead, the

Trustee Defendants are charged merely with "invest[ing] and manag[ing]" the assets of the Trust Fund, SPP § 34-101(f)(2)(i), as a tax-exempt trust for the benefit of the State, *id.* § 34-101(b).  The General Assembly authorized the Board of Trustees to "adopt a trust document" to carry out the Trust Fund's purpose, *id.* § 34-101(k), and in exercise of that authority, the Board of Trustees adopted a Trust Agreement that sets forth the governing terms of the Trust Fund.  *See* Ex. 1, State of Maryland Postretirement Health Benefits Trust Agreement, and Ex. 2, Amendment One to the Maryland Postretirement Health Benefits Trust, both available at https://sra.maryland.gov/post-retirement-health-benefits-trust.  The Board of Trustees has also obtained a private letter ruling from the Internal Revenue Service confirming the Trust Fund's tax-exempt status and clarifying that the income of the Trust Fund "is derived from the exercise of an essential governmental function."  *See* Ex. 3, Internal Revenue Service, Private Letter Ruling No. 142169-07 (Dec. 20, 2007);[6] *see also* 2007 Md. Laws ch. 355, § 2; SPP § 34-101(b).

The Trust Fund is separate and distinct from the System that the Board of Trustees also oversees, and the individual State systems that comprise it.  The System consists of statutorily identified State systems that provide retirement and other benefits under Division II of the State Personnel and Pensions Article.  *See* SPP §§ 20-101(mm), (pp), 21-102; *see also* COMAR 22.07.01.01 (stating that each individual State system that comprises the System "is established as a qualified defined benefit plan pursuant to 26

---

[6] The private letter ruling is published as PLR 200814104 and is available on Westlaw, though in an anonymized format.  *See* 2008 WL 905377.  We will cite to the unredacted version, attached hereto as Exhibit 3.

16

U.S.C. §§ 401(a) and 414(d)").   Each individual State system provides retirement allowances and other defined benefits, whereby participants contribute to the plan and receive statutorily defined benefits from the plan funded, in part, by other participants' contributions.

In contrast to the individual State systems that comprise the System, the Trust Fund is not a qualified retirement or pension plan under 26 U.S.C. §§ 401(a) and 414(d), but is established under the authority of 26 U.S.C. § 115, which permits the tax-exempt treatment of income derived from an essential government function and accruing to a State or political subdivision.   State employees and retirees do not "participate" in the Trust Fund; they pay no contributions to the Trust Fund; and they receive no health benefits or other benefits from the Trust Fund.   "No private interests participate in or benefit from the operation of the Trust [Fund]," and any benefit to State employees or retirees is merely "incidental to the public benefit."   Ex. 3 at 3. The Trust Fund is instead established for the purpose of helping the *State* cover the cost of providing the State's post-retirement health benefits subsidy, *see* SPP § 34-101(c), and the Board of Trustees' duties with respect to the Trust Fund reflect that fact. As discussed above, those duties are limited to "invest[ing] and manag[ing]" the assets of the Trust Fund, *id.* § 34-101(f)(2)(i), and transferring those assets to DBM for the payment of benefits, along with the usual accounting requirements that accompany management of such funds, *see* Ex. 1, § 3.01(b).

The Board of Trustees does not, moreover, have any role to play in the payment of benefits and, importantly, "shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities of the State."   *Id.*   Instead, the Board of Trustees is

"responsible only for the money and property actually received by the Trust, and then to the extent described in th[e] Trust Agreement." *Id.*, § 6.01(c). The Trust Fund therefore is not subject to any actuarial or other requirements that it maintain a certain level of funding, and the Board of Trustees' role is limited to investing the money appropriated to the Trust Fund. As noted above, that amount consists of the specific amounts deposited between 2007 and 2009 and their associated investment returns, which currently total approximately $350 million. S.B. 192 Fiscal Note at 18; *see generally* Maryland State Retirement and Pension System, "Post-Retirement Health Benefits Trust: Quarterly Investment Update," https://sra.maryland.gov/post-retirement-health-benefits-trust (collecting investment statements from 2009 through 2019); SPP § 34-101(d).

The Trust Defendants' limited role of investing the assets of the Trust Fund makes sense, as the Trust Fund is an *investment* fund, designed to generate returns to "assist the State in financing the postretirement health insurance subsidy paid by the State." H.B. 72 Fiscal Note at 12. It is the Benefits Fund that actually holds the State subsidies and the required employee and retiree contributions, *see id.*, and the Trust Defendants do not have, and are not alleged to have, a role to play with respect to that fund.

Courts routinely dismiss defendants that have no connection to the acts of which the plaintiff complains. Under such circumstances, courts have found dismissal appropriate under both Rule 12 of the Federal Rules of Civil Procedure and Rule 21, which provides, in pertinent part, that "the court may at any time, on just terms . . . drop a party" or "sever any claim against a party." *See, e.g.*, *Harris v. Young,* 718 F.2d 620, 622 (4th Cir. 1983) (dismissing state prison official under Rule 21 when he "had no discernible legal

obligation" regarding county jail); *Taccino v. Ford Motor Co.*, 2019 WL 1429263 at *5 (D. Md. Mar. 29, 2019) (dismissing Ford Motor Co. when "Ford Motor and Ford Credit are independent corporate entities" and actions by Ford Credit formed basis of complaint), *aff'd*, 789 Fed. App'x 373 (4th Cir. 2020); *Jimenez v. Wells Fargo, Nat'l Ass'n*, 2017 WL 1230823 at *3 (D. Md. Apr. 4, 2017) (dismissing corporate defendant when there was "no uncontradicted allegation showing that [defendant] was involved with" the disputed investment).

### C.   All of the New Claims Related to the Funds Are Barred by Legislative Immunity.

Even if the claims in the third amended complaint about inadequate funding of the Trust Fund had been brought against an appropriate party, they still would be barred by legislative immunity. "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (citation omitted). The Fourth Circuit has had "no trouble concluding that enacting a budget is a legislative act." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery County, Md.*, 684 F.3d 462, 471 (4th Cir. 2012). Absolute legislative immunity extends even to non-legislators, when they are "sued based on their actions associated with the budgetmaking process." *Id.*

Here, the only action that plaintiffs complain of is the 2020 passage of Senate Bill 192—that year's Budget and Reconciliation Financing Act—which they allege "divert[s]" from the Trust Fund the money that should be used to fund the retiree prescription drug benefit program. ECF 123 at 2, ¶ 76. Although the third amended complaint does not

19

specifically allege which defendants are responsible for the budgetary process, for the reasons explained above, the newly added Trustee Defendants clearly are not.  And while Governor Hogan and Secretary Brinkley *do* play a role in the budgetary process, they are immune from suit, as the Trustee Defendants would be even if they were proper parties. For these threshold, jurisdictional reasons, all of plaintiffs' claims related to the Trust Fund should be dismissed.

## II.    PLAINTIFFS' CONSTITUTIONAL CONTRACT CLAUSE CLAIMS MUST BE DISMISSED.

As explained in *Cherry v. Mayor and City Council of Baltimore City*, the first step of the Contract Clause analysis is determining "whether there has been an impairment of a contract."  762 F.3d 366, 371 (4th Cir. 2014).  Plaintiffs have not identified any impairment of a contract, because the statutory enactments that they cite as the basis for their contract claim do not, as a matter of law, constitute a contract.

### A.    No Statute, Whether Related to Retiree Prescription Drug Benefits or Either Fund, Creates a Contract Between the State and Plaintiffs.

Plaintiffs and AFSCME have repeatedly admitted that all of their claims hinge on the existence of a contractual right to the prescription drug benefits they currently receive. ECF No. 1-2 at 8; *see also* ECF No. 92-1 at 12.  But no such right can be found in the statutes that govern the retiree prescription drug benefit program.

The Supreme Court has set a high bar for establishing that a legislature intends to bind a state in contract:  "For many decades, this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is

that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *National R. Passenger Corp. v. Atchison, Topeka*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Board of Education*, 302 U.S. 74, 79 (1937)). To construe a law as a contract, the legislature's intent to bind the state contractually must be "clearly and unequivocally expressed." *Id.* at 466; *see also United States v. Winstar Corp.*, 518 U.S. 839, 875 (1996) (reiterating that a purported government contractual obligation must "unmistakably appear" on the face of a statute); *Rhode Island Council 94 v. Rhode Island*, 705 F. Supp. 2d 165, 178 (D.R.I. 2010) (holding that Rhode Island statute created no contractual right to retiree health benefits and stating that the "'party asserting the creation of a statutory contract must prove that the legislation is intended to create private contractual or vested rights'" (citation omitted)).

The "unmistakability doctrine," as this principle has come to be known, rests on important public policy grounds. Construing a law as an immutable contractual obligation would "limit drastically the essential powers of a legislative body." *Atchison*, 470 U.S. at 466. Requiring a purported government contractual obligation to "unmistakably appear" on the face of a statute "thus serve[s] the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." *Winstar*, 518 U.S. at 875; *see also Puckett v. Lexington-Fayette Urban County Gov't*, 833 F.3d 590, 600 (6th Cir. 2016); *Rhode Island Council 94*, 705 F. Supp. 2d at 178. These concerns do not arise where the legislature explicitly invokes the language of contract. *Compare Baltimore Teachers Union, Am. Fed'n of Teachers Local 340, AFL-CIO v. Mayor & City*

21

*Council of Baltimore*, 6 F.3d 1012, 1015 (4th Cir. 1993) (having "little trouble" concluding a contract had been formed when the council "formally ratified the essential agreement between the City and its employees"), *with Puckett*, 833 F.3d at 601 (no contracting language specific to COLAs when only the provision governing the main pension benefit itself contained vested rights language).

In *Atchison*, the Court gave examples of statutory language that would be sufficiently clear to create a contractual obligation binding the state—language that is absent from the statutes and regulations at issue here.  For example, if a statute "'provides for the execution of a written contract on behalf of the state[,] the case for an obligation binding upon the state is clear.'"  470 U.S. at 466 (quoting *Dodge*, 302 U.S. at 78) (emphasis omitted).  Or if a statute explicitly provided that two states "'covenant and agree with each other,'" that too would be a sufficient indication of "the intent to make a contract."  *Id*. at 469-70 (quoting and discussing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 9-10 (1977)).

By contrast, even the repeated use of the term "contract" throughout the statute at issue in *Atchison* was not "'an adequate expression of an actual intent' of the State to bind itself."  470 U.S. at 466-67 (quoting *Wisconsin & Mich. Ry. Co. v. Powers*, 191 U.S. 379, 386-87 (1903)).  Instead, the Court looked for, and did not find, "language of contract" by which the state "explicitly bound" itself in a "covenant."  470 U.S. at 470.  For example, even where legislation "directs state officials to fund [a] plan as it exists," such legislation "falls at least a step short of clearly expressing a contractual commitment not to change benefit levels or other plan variables by legislation."  *National Educ. Assoc. R.I. v.*

*Retirement Bd. of R.I Employees' Ret. Sys.*, 172 F.3d 22, 28 (1st Cir. 1999), *cert. denied*, 528 U.S. 929 (1999). The absence of a contract is particularly clear where continued funding of a benefit is expressly contingent on variable appropriations, as in this case. *See Parella v. Retirement Bd. of R.I. Employees' Ret. Sys.,* 173 F.3d 46, 61 n.11 (1st Cir. 1999).

Plaintiffs have not identified any language in the statutes or regulations they cite that could be construed as unmistakably creating a contractual right to prescription drug coverage for retirees. Section 2-508—which plaintiffs cite as a basis of their claim, ECF 123, ¶ 33—provides that the "health insurance benefit option for retirees shall include a prescription drug benefit that . . . has the same co–payments, coinsurance, and deductible that apply to the prescription drug benefit for active State employees." SPP § 2-508(d)(2). But that provision cannot be a source of the plaintiffs' asserted rights because it was added by the same bill that expressly provided that the prescription drug benefit would be phased out in 2020. 2011 Md. Laws ch. 397, § 1 ("The State shall discontinue prescription drug benefits for Medicare-eligible retirees in fiscal year 2020.").

Nor does the 2004 version of SPP § 2-509.1 establish a clear and unmistakable contractual right. It provides in its entirety:

> The State shall continue to include a prescription drug benefit plan in the health insurance benefit options established under the Program and available to retirees under §§ 2-508 and 2-509 of this subtitle notwithstanding the enactment of the federal Medicare Prescription Drug, Improvement, and Modernization Act of 2003 or any other federal law permitting states to discontinue prescription drug benefit plans to retirees of a state.

2004 Md. Laws ch. 296. Although this provision directs the State to continue offering a prescription drug benefit, it does not use the language of contract. It describes the

23

prescription drug benefit plan as an "option" available to retirees, who must elect it and pay the premium, deductible, and co-pay.  Retirees are not required to elect that option, and they do not pay in advance—as State employees do for their pensions—to ensure that the option is available at retirement.  There is no mention of contract, contracting parties, or consideration.

Under Maryland law, "[i]t is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract." *Cochran v. Norkunas*, 398 Md. 1, 14 (2007).  But § 2-509.1, as it existed prior to the General Assembly's 2011 announcement of the transition to Medicare Part D, did not evidence any "mutual assent" or "intent to be bound." *Id.*  Instead, the General Assembly in 2004 simply directed the State—here the Secretary of the Department of Budget and Management—to continue offering a prescription drug benefit plan despite the 2003 enactment of Medicare Part D, because of concerns that the "donut hole" made that federal option a poor substitute for the benefits offered by the State.  The enactment of the Affordable Care Act in 2010, however, addressed that concern, as it promised to reduce a retiree's out-of-pocket expenditures significantly by closing the "donut hole" in 2020.  Accordingly, the General Assembly altered its instructions to the Department, directing it to continue offering some form of coverage until those federal provisions took effect, which was initially projected to happen in July 2019, but was later accelerated to January 2019.

None of the legislation on which plaintiffs rely contains the type of clear and unmistakable statement necessary to rebut the presumption against the statutory formation of enforceable contractual rights.  Instead, the statutory provisions set up a series of

24

programs that unilaterally provide some prescription drug benefit as part of health benefits offered to state employees upon retirement in exchange for payment of premiums at that time. Plaintiffs have never explained, and in fact appear not to contend, that some contractual obligation to state retirees "unmistakably appear[s]" on the face of this, or any other statute, yet it is exactly that level of statutory certitude that is a necessary precondition to their claim. *See Winstar Corp.*, 518 U.S. at 875.

The legislation on which plaintiffs rely for their "contract" not only lacks the necessary clear and unmistakable intent to bind the State contractually, it also lacks the essential terms and basic attributes of a legally-enforceable contract. "[A] contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable." *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 551 (D. Md. 2019) (citations omitted); *see also County Comm'rs for Carroll County v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377 (2008) (stating that "an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations"). Here, even if the statute can be read to impose an obligation on the State, that obligation is simply to "include" a "plan" as an "option." SPP § 2-509.1(a)(1). But the scope of such a "plan" is not fixed or definite, nor does it contain even the most basic description of what such a plan must include. Instead, the Legislature has given the Secretary of the Department of Budget and Management broad discretion to design the type and level of benefits available under the plan. *Id.* § 2-503(b)(1) (providing that "[t]he Secretary may arrange as the Secretary considers

25

appropriate any benefit option").  This delegation of discretion, along with the fact that these benefits have varied over time pursuant to that discretion, weighs heavily against contract-formation.

As the Fourth Circuit has held in the analogous ERISA context, an "express reservation" of the right to modify benefits is "plainly inconsistent with any alleged intent to vest those benefits." *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 856 (4th Cir. 1994), *cert. denied*, 514 U.S. 1057 (1995).  Here, not only do retiree prescription drug benefits vary from year to year, after 2014 they were provided through Medicare Part D, with the State only augmenting that coverage through a State-funded wrap-around plan.  *See* Department of Budget and Management, "Guide to Your Health Benefits: January 2014 to December 2014," at 3.  The General Assembly's modification of the prescription drug benefit and its funding over time are inconsistent with any claim that those benefits were fixed and vested.

Nor is there any statutory language that could possibly be construed as establishing a contractual relationship between the plaintiffs and the Board of Trustees.  Plaintiffs allege that they "have a contract" related to the Trust Fund based solely on SPP §§ 2-502.1 and 2-508, ECF 123, ¶¶ 33, 115, but neither provision imposes any duty upon, or even mentions, the Board of Trustees.  Section 2-502.1 requires the *Department of Budget and Management* to establish a prescription drug program for retirees, SPP § 2-502.1(b), while § 2-508 provides that "*the State* may establish separate health insurance benefit options for retirees that differ from those for active State employees," *id.* § 2-508(d)(1) (emphasis added).  Neither vests any duty or authority whatsoever in the Board of Trustees.  Similarly,

plaintiffs rely on regulatory provisions in Title 17 of the Code of Maryland Regulations, but that regulatory Title applies to the Department of Budget and Management, not the Board of Trustees. *Cf.* SPP § 21-110; COMAR Title 22.

Nor could SPP § 34-101 form any "contract" between the Board of Trustees and plaintiffs. As discussed above, that provision—though it governs the Trust Fund and applies to the Board of Trustees—establishes the Trust Fund "to assist *the State* in financing the postretirement health insurance subsidy," SPP § 34-101(c), with no contractual duties, either express or implied, flowing therefrom to individual State employees or retirees. *See* SPP § 34-101(f). In fact, the Trust Agreement that governs the Trust Fund expressly states that the Board of Trustees "shall not be responsible" for the specific aspect of the Fund that forms the basis of plaintiffs' claim, namely, "the adequacy of the Trust Fund to meet and discharge any liabilities of the State." Ex. 1, § 3.01(b). And, like the retiree prescription benefit, the Trust Fund itself has undergone "numerous legislative amendments" over the years, as plaintiffs acknowledge. ECF 123, ¶ 79. None of this supports the conclusion that either the retiree prescription drug benefit or the Trust Fund was intended to constitute an immutable contractual commitment.

**B.     Cases Applying *Atchison* Hold that Benefit Programs, Unlike Pensions, Are Not Enforceable as Contracts.**

*Atchison* represented a sea change in the law governing when public benefit programs give rise to contract rights. Before *Atchison*, many courts had held that statutes or ordinances setting forth pension benefits constituted contractual obligations because they provided rights to a defined benefit, often promised in exchange for contributions from

27

employee salaries.  All the pre-*Atchison* cases cited by the Court in its bench ruling on plaintiffs' motion for preliminary relief fall into this category; none involved eligibility to participate in health or prescription drug benefits upon further payment after retirement. *See Yeazell v. Copins*, 98 Ariz. 109, 115 (1965) (right to pension vested on acceptance of employment); *Jones v. Cheney*, 253 Ark. 926, 932 (1973) (contract formed when employee "received his full salary" and was then required to return "a part to meet his share of the contribution to the retirement fund"); *Singer v. City of Topeka*, 227 Kan. 356, 363 (1980) (contributions made to pension funds constituted deferred compensation); *Hickey v. Pension Bd. of City of Pittsburgh*, 378 Pa. 300, 311 (1954) (prior contributions created vested contractual right); *Bakenhus v. City of Seattle*, 48 Wash. 2d 695, 698 (1956) (en banc) (pension is deferred compensation).  In all these pre-*Atchison* cases, the clear structure of the pension plans (funded by employee contributions and returned as a defined benefit only after fulfillment of conditions precedent like service requirements) was the focus of the inquiry rather than the statutory language, as *Atchison* subsequently required.

The post-*Atchison* cases cited in this Court's bench ruling applied the reasoning of pension fund cases to *non*-defined benefits like health insurance, and all have been called into question.  *See, e.g.*, *Omer v. Tagg*, 235 Neb. 527, 530 (1990) (health insurance), *disapproved of by Livingston v. Metropolitan Utilities Dist.*, 269 Neb. 301, 308 (2005) (rejecting conclusion that "health insurance is akin to deferred compensation" and pensions).  For example, *Thorning v. Hollister School District* relied on a pre-*Atchison* case, *California League of City Employee Associations v. Palos Verdes Library Dist.* 87 Cal. App. 3d 135, 139 (Ca. Ct. App. 1978), in holding that the general rule that pension

28

rights begin vesting on the first day of employment "extends to other types of benefits." 11 Cal. App. 4th 1598, 1606 (Cal. Ct. App. 1992). The Ninth Circuit later found *California League* unpersuasive because it did not address the plaintiffs' "heavy burden" to demonstrate that a legislature had bound itself contractually through "clear and unmistakable" terms, or make any analysis of the intent of the legislature to so bind itself. *San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.*, 568 F.3d 725, 740, 737 (9th Cir. 2009). And, with regard to the New York case cited by this Court, the regulations of the municipality at issue there "provide[d] that 'coverage will be maintained until the employee's or official's death.'" *Emerling v. Village of Hamburg*, 680 N.Y.S. 2d 37, 37 (N.Y. App. Div. 1998). Where no such express language exists, subsequent New York courts have refused to find a contractual right to benefits. *See Weaver v. Town of N. Castle*, 153 A.D.3d 531, 533-34 (N.Y. App. Div. 2017) ("Nothing in the language" of the resolution at issue evidenced an intention to create contractual right.).

The out-of-state decisions cited in the Court's bench ruling thus do not support the conclusion that, after *Atchison*, a state statute can create a contractual obligation in the absence of clear and unmistakable language to that effect. And, many post-*Atchison* decisions support the conclusion that retiree health benefits and retiree prescription drug benefits are welfare benefits that do not create vested contractual rights. For example, in *Davis v. Wilson County*, 70 S.W.3d 724, 728 (Tenn. 2002), the county law at issue "established requirements for eligibility, but contained no clear and express language stating that the health care benefits were intended to vest or could never be amended or terminated," and thus were insufficient to create a contractual right. And in *Sacramento*

29

*County Retired Employees Ass'n v. County of Sacramento*, 975 F. Supp. 2d 1150 (E.D. Cal. 2013), retirees argued that an implied contract arose from the government employer's "enacting resolutions providing" a subsidy for health benefits and expressing an "intent to use excess earnings to provide a subsidy." *Id.* at 1158. The court rejected this argument, holding that plaintiffs failed to establish any vested right through express contractual commitment, funding arrangements, legislative language, GASB provisions, or otherwise. *See id.* at 1162-66. And just last year, a North Carolina court rejected the same argument plaintiffs make here, concluding that "health care insurance benefits were not vested benefits, unlike pensions." *Lake v. State Health Plan for Teachers & State Employees*, 825 S.E.2d 645, 652 (N.C. Ct. App.), *review dismissed*, 825 S.E.2d 254 (N.C. 2019*), and appeal dismissed, review allowed*, 837 S.E.2d 887 (2020) After surveying other states' experiences, the *Lake* court concluded that there was no basis for finding that "an express and unalterable contractual relationship exists, on any basis, for the State to provide static and non-contributory health care insurance benefits to retirees." *Id.* at 653.

There is no judicial analog to *Lake* here in Maryland, and no Maryland court has had the same opportunity to address the issues that this case and *Lake* present, but there is a relevant and persuasive 2005 Opinion of the Attorney General. *See* 90 Md. Op. Att'y Gen. 195 (2005); *Dyer v. Board of Educ. of Howard County*, 216 Md. App. 530, 536 (2014) (stating that, while not binding, "opinions of the Attorney General are, nevertheless, generally entitled to careful consideration") (internal quotation marks and citation omitted). The Attorney General's Opinion, issued after the 2004 legislation continuing retiree prescription drug benefits but before the 2011 legislation phasing them out,

30

explained that the Maryland retiree health benefit plan does *not* create a contractual right. In reaching this conclusion, the Attorney General followed the instruction in *Atchison* that, because of the "strong presumption that statutes do not create contractual rights," to create such a right the statute must contain "'an adequate expression of an actual intent' of the State to bind itself" in a contractual relationship with the other party.  90 Md. Op. Att'y Gen. 195, *7 (citing *Atchison*, 470 U.S. at 465-67).  The Attorney General then reviewed the 2004 statute at issue here, found that it "does not expressly create a contractual right," *id.* at *8, and thus concluded that "there is no contractual right to retiree health care benefits that could be impaired if the General Assembly were to amend the statute to change the level of benefits or subsidy," *id*. at *9.

The Attorney General reached that conclusion through the same sound analysis that led the *Lake* court to conclude that the North Carolina program similarly did not create a contractual right.   First, the Attorney General compared the language of the retiree prescription drug program to that of the pension statute, which *does* create "rights [that] are contractual in nature."  *Priester v. Board of Appeals of Baltimore County*, 233 Md. App. 514, 547 n.19 (2017).  Whereas the pension statute states that the payment of pension benefits is an "obligation[] of the State," SPP § 21-302(a), the retiree health benefits statute contains no similar language.  90 Op. Md. Att'y Gen. 195 at *12.  To the contrary, the statute makes funding of the health and welfare benefits program, of which the retiree

prescription drug plan is a part, discretionary. SPP § 2-504 ("Each year the Governor shall include money in the State budget to pay the State share of the costs of the Program.").[7]

The Attorney General pointed out that, in other respects as well, the retiree prescription drug benefit—like all other employee health and welfare benefits in Maryland—does not share the contractual features of the state employee pension plan. Pension benefits are a form of deferred compensation, in which salary withheld from State employees during their working years is returned to them in the form of a monetary pension after they retire. *Frank v. Baltimore County*, 284 Md. 655, 662 (1979) ("A . . . sensible description of the pension is that each monthly payment represents a prorated return of the employee's contributions augmented by employer generated funds."). Eligible State employees are automatically enrolled in the pension system "as a condition of employment," SPP §§ 23-203, 24-204, 25-202, 26-202, and they contribute financially to future pension benefits while employed. SPP § 21-312; *see* 90 Op. Md. Att'y Gen. 195 at *12. The same is not the case for retiree prescription drug benefits. Retirees are not required to participate, but instead they "may enroll and participate" in the health and prescription drug plan, SPP § 2-508, *see* 90 Op. Md. Att'y Gen. 195 at *8 n.16, and then only if they pay the requisite premium and copays, *see* SPP § 2-508(d)(2).

---

[7] Although the General Assembly directed the Governor to pay the State's share of the program, the Secretary retains the discretion under SPP § 2-502(a) and (b)(ii) and (iii) to define the scope of the program and what the State's share will be in any given year. By contrast, the Legislature grants other state insurance programs mandatory, non-discretionary funding amounts. *See, e.g.*, Md. Code, Ann., Ins. Art. § 31-107.2(a)(2).

As the Attorney General described in 2005, another clear indication of the non-contractual nature of the retiree prescription drug statute is the wide discretion that the General Assembly granted to the Secretary of the Department of Budget and Management to set the conditions regarding the state health and welfare benefit program, including its extension to retirees. *See* SPP § 2-502(a) (general grant of authority to the Secretary); 90 Md. Op. Att'y Gen. 195 at *3, *13 (discussing General Assembly's direction to Secretary to provide for prescription drug coverage).

The Attorney General's analysis remains persuasive under the current state of the law, and as to the legislature's intent. *See Chesek v. Jones,* 406 Md. 446, 463 (2008) (stating Attorney General's Opinions deserve "great consideration in determining the legislative intention") (citation and internal quotation marks omitted). All of the legislative history in this area indicates that the General Assembly intended for the state retiree prescription drug program to be administered according to its direction, which might change from time to time as the landscape for the provision of prescription drug benefits to seniors changed. There is no clear language in any statute indicating the General Assembly's intent to contractually bind the state, and therefore the plaintiffs' Contract Clause claims must be dismissed, as must AFSCME's statutorily based Contract Clause claims.[8]

---

[8] Even if plaintiffs had adequately pleaded a contractual obligation on behalf of the State, the potential availability of other contract remedies further undermines their Contract Clause argument. The Fourth Circuit has stated that, "[i]f the plaintiffs retain the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause." *Cherry*, 762 F.3d at 371. Here, the State does not argue that the statutory

### III. PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THE EXISTENCE OF A CONTRACT UNDER STATE LAW, PRECLUDING THEIR NON-CONSTITUTIONAL CONTRACT CLAIMS.

That the relevant statutes do not establish a contractual right to prescription drug benefits disposes of the plaintiffs' Contract Clause claims because they do not allege any other basis for the rights that they assert. AFSCME bases its constitutional claim on these same statutes and those claims fail by the same standard. But to the extent that either group of plaintiffs seeks to base their contract claims on anything other than the statutes governing retiree prescription drug benefits, they are subject to dismissal on several grounds additional to those described above.

### A. Maryland Has Not Waived Sovereign Immunity for Contract Claims or Declaratory Judgment Actions Seeking Interpretation of a Contract.

The doctrine of sovereign immunity bars actions in contract against the State of Maryland absent fulfillment of specific conditions that have not been fulfilled here, and it independently entitles the defendants to dismissal of all non-constitutional contract counts. All the defendants are entitled to the protections of sovereign immunity, because they are either the State, State entities, or State officials alleged to be acting in their official capacity or within the scope of their assigned duties.

Plaintiffs' non-constitutional claims based on the existence of an alleged contract are foreclosed by *Stern v. Board of Regents*, 380 Md. 691 (2004). The Court of Appeals

---

changes in 2011 and 2018 "extinguished any remedy that the [plaintiff] would otherwise have had." *Id.* (quoting *Horwitz-Mathews, Inc. v. City of Chicago*, 78 F.3d 1248, 1252 (1996)). There is nothing about the statute that altered or changed the nature and availability of the contractual remedies to the plaintiffs.

there "emphasized that 'the dilution of the doctrine' of sovereign immunity should not be accomplished by the judiciary, and that any direct or implied diminution of the doctrine falls within the authority of the General Assembly." *Id.* at 700 (quoting *ARA Health Services, Inc. v. Department of Public Safety and Corr. Servs.*, 344 Md. 85, 92 (1996)). Maryland's statutory waiver of sovereign immunity regarding contracts is limited to "written contract[s] that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." Md. Code Ann., State Gov't § 12-201(a). Maryland has not waived sovereign immunity for any form of contract that does not bear "a signature of a duly authorized person." *Stern*, 380 Md. at 723. Because neither the third amended complaint nor the amended complaint in intervention identifies any written contract capable of waiving the State's immunity under *Stern*, their non-constitutional contract claims must be dismissed.

That goes for plaintiffs' declaratory judgment claims as well, as Maryland has not waived sovereign immunity for declaratory judgments "where the stated claim is based upon an alleged contract." *Id.* at 725. While declaratory relief possibly could be awarded against the State as a remedy for a constitutional claim, *see id.*, *Stern* bars declaratory relief that would merely declare rights and duties under an alleged contract. That is the case here, where both sets of plaintiffs seek a declaration that a statute created a binding contract between them (or their members) and the State.

**B.**    **None of the Plaintiffs Has Adequately Alleged the Existence of a Non-Statutory Contract Right.**

Even if plaintiffs' non-constitutional claims were not barred by sovereign immunity, they would still be subject to dismissal because plaintiffs have failed to sufficiently allege the factual basis for their claims.   To the extent that AFSCME alleges that "various communications" between State officials and its members gave rise to an enforceable contract right, ECF 131, § 46, that allegation is insufficient, because to set forth a contract claim, a complaint must set forth "*facts* showing a contractual obligation owed by the defendant to the plaintiff." *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655 (2010). In *RRC*, the Maryland Court of Appeals held that the allegations of the complaint were not sufficiently specific when the various documents, proposals, responses, which plaintiff offered in support of its claim, did not expressly identify the contract term that was allegedly breached. *Id.* at 658.   AFSCME's contract claims fall by that same standard, as they identify no documents or any written materials of any kind to support their allegation of contract. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (stating that, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations").

The same holds true for the plaintiffs' allegations about the Trustee Defendants' purported contractual obligation to deposit money into the Trust Fund.   Plaintiffs do not and cannot point to any language in the trust documents to support their claim, because the Trust Fund agreement has specific language disclaiming any such obligation:   "The Trustees, Custodian and Trust Administrator shall not be responsible for the adequacy of

36

the Trust Fund to meet and discharge any liabilities of the State."  Ex. 1, § 3.01(b).  Section 6.01 of the same governing document provides that "the Trustees shall be responsible only for money and property actually received by the Trust, and then to the extent described in this Trust Agreement."

The IRS private letter ruling confirms that "[n]o private interests participate in or benefit from the operation of [the Trust Fund]"; and "[t]he benefit to participating employees is incidental to the public benefit."  Ex. 3 at 3.  "If for any reason the State discontinues [the] Program, the assets of Trust will be transferred to the State general fund," not disbursed to participants in the program.  *Id.* at 2.  All of these statements belie plaintiffs' factually insupportable allegations that the establishment or management of the Trust Fund created an enforceable contract.  For that additional reason, plaintiffs' claims sounding in contract should be dismissed.

## C.    There Is No Free-Standing Vested Contractual Right to Retiree Prescription Drug Benefits or Funding of those Benefits Under Maryland Law.

Nor has AFSCME alleged a non-statutory *legal* basis for its claim that "various communications" from the State gave rise to a contract.  AFSCME appears to contend that the intermediate appellate court in *City of Frederick v. Quinn*, 35 Md. App. 626 (1977), created a new form of "vested right" under Maryland law that would extend to the mere offering of eligibility for participation in a partially-subsidized prescription drug benefit plan to retirees.  For several reasons, *Quinn* did no such thing.

First, *Quinn* is a pension case.  The Maryland Court of Appeals described the lower court's holding in *Quinn* as recognizing nothing more than that, "[u]nder Maryland law,

*pension* plans create contractual duties toward persons with vested rights under the plans."
*Board of Trustees of Emps.' Ret. Sys. of City of Baltimore v. Mayor & City Council of Baltimore City*, 317 Md. 72, 100 (1989) (emphasis added), *cert. denied*, 493 U.S. 1093 (1990). Neither *Quinn*, nor any other Maryland decision, says anything about whether the opportunity to enroll in a prescription drug benefit plan is a vested right.

Second, *Quinn* addressed a City of Frederick charter provision that stated certain retired police officers, specified in the statute, "shall be paid, for life, a sum of money." 35 Md. App. at 628. The statute itself memorialized the City's obligation to a specific class of people over a definite time period, using language that unmistakably made a contractual commitment. With respect to the specific provision at issue in *Quinn*, the intermediate appellate court stated that "[t]he future benefits vested as they were prorately earned, just as the employees' rights to their salary vested as it was earned." 35 Md. App. at 630. But, unlike a set sum of money to be paid "for life," *id.* at 628, the retiree prescription drug program here is not, and never has been, a defined entitlement. Although there are certain eligibility criteria that must be fulfilled involving years of service, *even when* those criteria are complete and *after* the retiree has retired, steps remain before a retiree can obtain prescription drug benefits. Specifically, the retiree must opt to receive the coverage and, most importantly, pay a premium before any prescription drug benefit can be paid.

Third, *Quinn* was decided eight years before *Atchison*, whereas in its post-*Atchison* decisions, the Maryland Court of Appeals has recognized the importance of unmistakable contractual language when construing a statute as creating a vested right. For example, in *Board of Trustees*, the Court found it significant that "the Baltimore City Code expressly

38

recognizes the existence of a contractual relationship."  317 Md. at 100.  The Baltimore City pension plan was again at issue in *Cherry*, where no parties contested that the cost-of-living-adjustment provisions at issue established "contract or vested rights."  762 F.3d at 372.  Here, by contrast, the statutory language at issue does not establish an express contractual obligation under Maryland law, because it does not promise any class of retirees any defined benefit.  *Quinn* simply does not effect the fundamental alteration of governmental benefits law that AFSCME suggests that it does.

### D.    Even If There Were Some Right to Prescription Drug Coverage, There is No Allegation That Supports the Existence of Such a Right After 2011.

Even if there were some source of contractual right for some group of retirees, any of the plaintiffs who were still State employees after the 2011 amendments announced the end of the prescription drug program—including all of AFSCME's members—certainly could not lay claim to any such right.  It is uncontroverted under Maryland law that claims to pension benefits are subject to "reasonable modifications of a pension plan at any time before the happening of the defined contingencies."  *Saxton v. Board of Trustees of Fire & Police Emp. Ret. Sys. of City of Baltimore*, 266 Md. 690, 694 (1972).  "[W]hen a right is created in a pension plan, i.e., death-disability, etc., that right accrues at the time of the occurrence," i.e., when the "injuries occurred."  *Davis v. Mayor & Alderman of City of Annapolis*, 98 Md. App. 707, 719 (1994).  Here, no retiree had the option to enroll in a prescription drug benefit plan before he or she retired from State service.  Therefore, even if the existence of that option had created a right, that right could be modified under Maryland law "at any time before the happening" of the retirement of the employee,

39

*Saxton*, 266 Md. at 694, one of the defined contingencies of a retiree prescription drug benefit plan.

AFSCME alleges that it represents the interests of various categories of "current State employees" in this litigation.   ECF 131, ¶¶ 9, 10, 11.   It has not alleged that it represents the interests of any State *retiree*, retiree dependent, or beneficiary who was eligible to purchase *retiree* prescription drug coverage on November 1, 2019, when it filed its complaint in intervention.   And yet it points to the 2011, 2018, and 2019 legislation governing the transition to Medicare Part D—all of which affect only retirees—as the source of its members' alleged harm.   *Id.*   ¶¶ 17, 18, 20, 38-39.   AFSCME has not articulated how any of its members, all of whom are current State employees, could possibly have a vested right in a retiree prescription drug plan, when the option to enroll in it is contingent on the unfulfilled condition precedent that the employee must be *retired*.

"[A] justiciable controversy is one where there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded."   *Maryland State Admin. Bd. of Election Laws v. Talbot County*, 316 Md. 332, 339 (1989).   AFSCME asserts a non-justiciable controversy concerning a state of facts that has not yet accrued for its members, and AFSCME's complaint in intervention should therefore be dismissed in its entirety.

40

IV.   **PLAINTIFFS' CLAIMS FAIL EVEN IF THE RETIREE PRESCRIPTION DRUG BENEFIT PROGRAM HAD CREATED A CONTRACTUAL RIGHT.**

      A.   **Plaintiffs' Claims Fail Because, by Enacting New Prescription Drug Programs in 2019, the State Has Fulfilled Any Purported Contractual Obligation.**

As discussed above, Plaintiffs derive their claims of a contractual right to continued prescription drug benefits, in part, on SPP § 2-509.1 (enacted as 2004 Md. Laws ch. 296), which provides that the State "shall continue to include a prescription drug benefit plan in the health insurance benefit options" available to retirees.  Plaintiffs' claims, however, ignore the fact that the State *has* provided such a plan.  As set forth above, in 2019 the Legislature enacted new prescription drug benefits that were designed to replace the benefits that had previously been provided.  2019 Md. Laws ch. 767.  Depending on when the employee retires, these benefits can include reimbursement for (1) out-of-pocket costs above the same caps that apply to non-Medicare-eligible retirees under the State plan; (2) out-of-pocket costs incurred once a Medicare-eligible retiree enters the "catastrophic" phase of Medicare Part D coverage; and (3) out-of-pocket costs incurred for life-sustaining medications that are covered through the State's health insurance benefit options but are not covered under the Medicare Part D program in which the retiree is enrolled.  *Id.* (codified at SPP § 2-509.1(d)-(f)).  A program whereby costs associated with prescription drugs are reimbursed by the State is, unquestionably, a "prescription drug benefit plan." Accordingly, even if § 2-509.1(a)(1) had established a binding contractual obligation, the plans offered under the 2019 legislation would satisfy that obligation.

**B.**     **Plaintiffs' Claims Fail Because Medicare Part D and the Additional Benefits Provided by Chapter 767 Together Constitute a "Reasonable Modification" of that Program.**

The plan options offered under Chapter 767 also defeat plaintiffs' Contract Clause claim because that legislation, along with the benefits provided by Medicare Part D, constitute a "reasonable modification" of any purported contract. "[T]he government may unilaterally modify" even contractual pension benefits, "so long as the changes do not adversely alter the benefits, or if the benefits are adversely altered, they are replaced with comparable benefits." *Davis v. Mayor & Alderman of City of Annapolis*, 98 Md. App. 707, 715 (1994). "To qualify as a 'reasonable modification,' a revised plan must provide the employees with 'substantially the program [they] bargained for and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare.'" *Cherry*, 762 F.3d at 372 (quoting *Quinn*, 35 Md. App. at 631; alteration in original).

Here, retirees retain prescription drug benefit coverage through a menu of options under the Medicare Part D program, which will result in some retirees experiencing lower costs. Department of Legislative Services, Fiscal & Policy Note Senate Bill 946 (2019), http://mgaleg.maryland.gov/2019RS/fnotes/bil_0006/sb0946.pdf. And those who see their costs rise are protected from the large expenditures caused by the federal "donut hole"— the Legislature's concern when enacting the original 2004 legislation—because the federal government has taken action to reduce the impact of those costs. *Id.* at 6. Finally, the enactment of Chapter 767 in 2019 provided additional benefits to help defray the prescription drug costs of retirees whose medication needs push them into "catastrophic"

42

coverage under Medicare or who otherwise require access to "life-sustaining" medications that are available under the State program but not Medicare.  SPP § 2-509.1(e), (f).  And Medicare-eligible employees who chose to retire before the end of 2019 could elect to receive a prescription drug coverage that limits their out-of-pocket expenses to the same levels that apply to *non*-Medicare-eligible retirees under the State plan.  SPP § 2-509.1(d). For that category of retirees, there is no significant difference between the coverage offered by Chapter 767 and the plan available to retirees who, because they are not Medicare-eligible, continue to receive benefits through the State plan.[9]

Together, the suite of benefits offered under Medicare Part D, as augmented by Chapter 767, are "substantially" the same as those that were previously available under Maryland's prescription drug benefit program.  *Cherry*, 762 F.3d at 372.  This is not to say that the two are equivalent for all retirees.  Depending on their medication needs and which Medicare plan options they select, some retirees will see costs go up, while others will see their costs go down.  But the Contract Clause does not require a perfect one-to-one fit; variations in benefits are constitutionally permissible if they are "'justified by countervailing equities for the public's welfare.'"  *Id.* (quoting *Quinn*, 35 Md. App. at 631). The "countervailing equities" here are the fiscal impacts of new accounting rules, which otherwise would require the State to carry future retiree prescription drug costs on its books as a $15.9 billion accounting liability, thereby threatening the State's AAA bond rating and

---

[9] AFSCME claims that the co-pays for some drugs are lower under the existing State prescription drug benefit, but acknowledges that this plan caps an eligible retiree's out-of-pocket expenses at the same level as a non-Medicare-eligible retiree's expenses under the existing State plan.  ECF 131, ¶ 26.

the fiscal and budgetary havoc that a rating downgrade would cause. *See* Public Employees' and Retirees' Benefit Sustainability Commission, 2010 Interim Report, at 27; *see also* ECF 12-1 (Moody's investor service publication discussing the same). Because the decision to discontinue the full retiree prescription drug benefit program would avert these budgetary difficulties, the "countervailing equities" support the conclusion that that decision does not impair any contract under the Contract Clause or Article 24, even if one existed.

## V.   PLAINTIFFS' OTHER CONSTITUTIONAL CLAIMS FAIL TO STATE A CLAIM.

In addition to their Contract Clause claims, plaintiffs also allege other federal constitutional violations, including a violation of the Takings Clause, an equal protection violation, and possibly even a due process violation. None states a claim.

### A.   Plaintiffs' Takings Claims Under State and Federal Law Must Be Dismissed For Failure To Allege a Compensable Property Interest.

Plaintiffs contend that the State's transition to Medicare Part D and its budgetary decisions about the funding of the Trust Fund constitute uncompensated takings under the Fifth Amendment and its State-law analog, Article III, Section 40 of the Maryland Constitution.[10] ECF 123 (Count V, VI). As explained above, prescription benefits for Maryland retirees have never been a contractual right; whether any individual retiree even received the benefits was entirely contingent on the retiree electing the benefit and paying

---

[10] Article III, § 40 "has been equated with the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment." *Ellis v. McKenzie*, 457 Md. 323, 332 (2018) (citing *Erb v. Maryland Dep't of Env't*, 110 Md. App. 246, 262 n.2 (1996)).

all amounts necessary to obtain coverage. Under Takings Clause analysis, retiree prescription benefits are a governmental benefit as opposed to a compensable property right.

There are four principal questions in a claim based on the Takings Clause: (1) is there a compensable property interest?; (2) is there a taking?; (3) is the taking for public use?; and (4) is just compensation paid? *See* Erwin Chemerinsky, *Constitutional Principles and Policies*, § 8.4 (Aspen Publishers 2015) (discussing the Federal Takings Clause). As the Maryland Court of Appeals has explained, "[i]n order to make a successful claim under the Takings Clause, appellants must establish first that they possess a constitutionally protected property interest." *Neifert v. Department of Env't*, 395 Md. 486, 522 (2006) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000-01 (1984)).

In evaluating takings claims, courts frequently must "sort among various, sometimes overlapping, claimed interests, some of which may be in the nature of property compensable under the Fifth Amendment and others of which not." *Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 369 (2004). In sorting these interests, courts distinguish between interests that trigger procedural protections under the Due Process Clause, and "property" under the Takings Clause. For an interest in a governmental benefit to trigger due process protections, the claimant must have "a legitimate claim of entitlement to it." *Nelson v. Colorado*, 137 S. Ct. 1249, 1264 (2017) (citing *Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)). But federal courts reject as "without foundation" the argument that a "legitimate claim of entitlement" to a valuable governmental benefit "rises to the level of 'property' protected by the takings clause." *Kisaz v. Webster*, 707 F.2d 524, 539

45

(D.C. Cir. 1983); *see also Arctic King Fisheries*, 59 Fed. Cl. at 372-73; *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995) (stating that "property" as used in the Takings Clause "is defined much more narrowly than in the due process clauses").

"Private property" as used in the Takings Clause typically "encompasses real property and personal property, including intellectual property." *Pittman*, 64 F.3d at 1104. It does not, however, include claims to statutory entitlements, and for good reason: "If a statutory benefit could not be rescinded without the payment of compensation to the beneficiaries, it would be extremely difficult to amend or repeal statutes," creating a "ratchet effect" that would "enormously curtail the operation of democratic government." *Id.* at 1104-05.

Although valid contracts are property that can be subject to a takings claim, *Lynch v. United States*, 292 U.S. 571, 579 (1934), here there is no contract, for the reasons set forth above. And in the absence of a contractual right to healthcare benefits, prescription drug coverage is merely a governmental benefit, not a property interest protected under the Takings Clause. *See AFT Michigan v. State of Michigan*, 497 Mich. 197, 225 (2015) (noting in the context of retiree health benefits that "[i]ndividuals . . . have no constitutional right to receive any particular governmental benefits"); *see also Pineman v. Fallon*, 842 F.2d 598, 602 (2nd Cir.), *cert. denied*, 488 U.S. 824 (1988) (when Connecticut changed eligibility, making it harder for women to qualify for retirement benefits, the legislature's "adjustment of the benefits and burdens of economic life" was "not a taking requiring government compensation").

46

Furthermore, even in the case where a contractual right to a pension benefit is set forth plainly in statute, there is no corollary constitutional right in the funding of that benefit. *See Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1619 (2020) (holding that the absence of an injury-in-fact implies no taking of a property right); *accord Board of Trs. of Emps.' Ret. Sys. of Balt. v. Mayor of Balt.*, 317 Md. 72, 111 (1989), *cert. denied*, 493 U.S. 1093 (1990) (stating that the "right to receive benefits does not, however, give" a concomitant "right to direct or control the investment of funds").

As plaintiffs have acknowledged from the outset of this case, the lack of contractual obligation to provide retiree prescription drug benefits or to fund those benefits in any particular manner or at any particular level forecloses all of their claims, including their takings claims. *See* ECF No. 1-2 at 8. Because a non-contractual right to prescription drug benefits does not rise to the level of "property" for purposes of the Takings Clause, plaintiffs' takings claim must be dismissed.

### B.    Plaintiffs Fail to State a Claim for Equal Protection.

Count XI fails to state a claim because it asserts only a bare, one-sentence allegation that defendants "deprived the Plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution." ECF 123, ¶ 158. Because plaintiffs do not allege that they belong to a suspect class, rational basis review applies, and courts have applied that deferential standard to uphold benefit reductions for public employees against equal protection challenges, even when based on distinctions that do not exist here, for example, between unionized and non-union employees. *See Sacramento County Retired Employees Ass'n*, 975 F. Supp. 2d at 1167-70. Nor can these defendants

47

be held accountable for the General Assembly's rationally based decision to contain the rising cost of retiree health care benefits by modifying the retiree prescription drug benefit, or the General Assembly's budgetary decision about how best to cover the cost of its benefits program.  Accordingly, Count XI should be dismissed.

### C.    The Legislative Process Provided Plaintiffs With All the Process that Is Due Under Federal and State Law.

It is unclear whether plaintiffs allege a due process claim, as none of their fifteen claims is styled as such.  But to the extent that any of plaintiffs' claims allege, in substance, a violation of due process, *see* ECF 123, ¶ 147, the claim must be dismissed because the process by which the General Assembly enacted the legislation at issue here satisfies due process.  As discussed above, due process protections are triggered by an individual's interest in a governmental benefit if the claimant has "'a legitimate claim of entitlement to it.'"  *Nelson*, 137 S. Ct. at 1264 (citation omitted).  Accordingly, if the State had made an individualized determination that one or more of the plaintiffs did not qualify for retiree prescription drug benefits, that determination might have triggered the need for pre- or post-deprivation procedural protections.  But those same individualized protections do not restrict the wholesale legislative decision to stop offering a benefit altogether.

The procedural component of the Due Process Clause does not "'impose a constitutional limitation on the power of [the legislature] to make substantive changes in the law of entitlement to public benefits.'"  *Atkins v. Parker*, 472 U.S. 115, 129 (1985) (quoting *Richardson v. Belcher*, 404 U.S. 78, 81 (1971)).  Legislatures have "plenary power to define the scope and the duration of the entitlement to . . . benefits, and to increase, to

decrease, or to terminate those benefits based on its appraisal of the relative importance of the recipients' needs and the resources available to fund the program." *Id*.

With respect to such programmatic changes in a benefit program, "the legislative determination provides all the process that is due." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33 (1982). Thus, State employees and retirees affected by the legislation transitioning from the State program to the Medicare Part D program "had no greater right to advance notice of the legislative change . . . than did any other voters." *Atkins*, 472 U.S. at 130. Because the transition to Medicare Part D "was the direct consequence of the statutory amendment, they have no basis for challenging the procedure that caused them to receive a different . . . property interest after the amendment became effective," even if that different interest was "less valuable." *Id.* "All citizens are presumptively charged with knowledge of the law." *Id.* Thus, to satisfy due process, "'a legislature [generally] need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *Othi v. Holder*, 734 F.3d 259, 270 (4th Cir. 2013) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). With seven months between enactment and the start of the Medicare Part D open enrollment period, plaintiffs had the "reasonable opportunity" required by law and thus do not have a viable due process claim.

VI.   **PLAINTIFFS' FIDUCIARY AND BREACH OF TRUST CLAIMS MUST BE DISMISSED BECAUSE DEFENDANTS DO NOT OWE ANY FIDUCIARY DUTY TO ENSURE THE ADEQUACY OF THE TRUST FUND TO FINANCE THE STATE'S POSTRETIREMENT HEALTH BENEFIT SUBSIDY.**

Counts IX and X—which allege that the Board of Trustees' "complicity in allowing the State of Maryland to underfund the OPEB Trust fund . . . violated its fiduciary duty to the" plaintiffs, ECF 123, ¶ 151, and constituted a "breach of trust," *id.* ¶ 156—fail to state a claim because no defendant, as a matter of law, owes a fiduciary duty to the plaintiffs with respect to any of the funding allegations in the complaint.

Fiduciary duty is not an omnibus concept; a fiduciary as to one function is not necessarily a fiduciary as to others.  Instead, a party "'is a fiduciary only as to the activities which bring the person within the definition.'"  *Corbett v. Marsh & McLennan Cos., Inc.*, No. CIV. JFM-04-0883, 2006 WL 734560, at *1 (D. Md. Feb. 27, 2006) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992)).   "'In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue.'" *Id.*

Here, the Board of Trustees is not a fiduciary with respect to the particular activity at issue, namely the adequate funding of the Trust Fund to subsidize the prescription drug benefits to the level that plaintiffs desire.  The governing statute and trust document vest no obligation or authority in the Board of Trustees to set funding levels for the Trust Fund; as discussed above, the governing trust documents expressly state that the Board "shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities of

the State." Ex. 1, § 3.01(b).  Instead, the Board of Trustees "shall be responsible only for money and property actually received by the Trust."  *Id.* § 6.01(c).

The Board of Trustees does have a fiduciary duty to "invest and manage" the funds that are appropriated to the Trust Fund, SPP § 34-101(f)(2)(i), but it owes that duty to the State, not the plaintiffs.  As the IRS concluded in reviewing the relevant plan documents, the income within the Trust Fund "accrues to the benefit of the State" and "[n]o private interests participate in or benefit from the operation of the Trust."  Ex. 3 at 3.  Although the money within the Trust Fund might be used to "assist [the] State in providing health and welfare benefits to eligible retirees," *id.* at 2, the benefit to those retirees "is incidental to the public benefit,"  *id.* at 3.  That is underscored by the fact that, "[i]f for any reason the State discontinues [the] Program, the assets of [the Trust Fund] will be transferred to the State general fund," not disbursed to participants in the program.  *Id.* at 2; *see also* Ex. 2, ¶ 1 (same).

Plaintiffs allege more broadly that the Board of Trustees has "a duty to properly administer and enforce" *all* of "the statutes in the Div. II articles of the State Personnel and Pensions Code," ECF 123, ¶ 84, but the statute that they cite as the source of the Board of Trustees' alleged fiduciary duty is far narrower.  Section 21-111(a)(1) of the State Personnel and Pensions Article[11] merely authorizes the Board of Trustees to require, as it "considers necessary," certified copies of records and issue subpoenas and other process for the attendance of witnesses and production of documents before the Board.  It does not

---

[11] Plaintiffs' citation to "SPP § 21-1119a)(1)" is presumably a typographical error.

establish any fiduciary duty, much less a duty to enforce all aspects of Division II of the pensions article.

Nor does Count IX plausibly allege that any of the other defendants owes plaintiffs a fiduciary duty to appropriate any particular amount of money into the Trust Fund.  When a plaintiff claims that a defendant acted in breach of fiduciary duty, "there are two means by which [the plaintiff] can establish that a defendant had the fiduciary authority to engage in such activities." *Corbett*, 2017 WL 532353 at *1.  First, the plaintiff can "demonstrate that the defendant is a named Plan fiduciary that was assigned such authority." *Id.*  Second, the plaintiff can "plead specific facts that show the defendant performed specified discretionary functions with respect to the Plan's investment options such that it was a *de facto* fiduciary." *Id.*  Neither applies here, however, because business and budgetary decisions about how much money to allocate to the Trust Fund do not give rise to fiduciary duties.

The Sixth Circuit's decision in *Sengpiel v. B.F. Goodrich Co*., is instructive on this point.  *Sengpiel* affirmed a district court judgment disposing of certain retirees' ERISA-based fiduciary duty claims against B.F. Goodrich.  156 F.3d 660, 662-63 (6th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999).  The appellate court concluded that the company "did not act in a fiduciary capacity when it transferred [its] pension and welfare plan liabilities" to a new company.  *Id.* at 662.  As the court explained, fiduciary duties do not necessarily attend every step affecting an employee benefit program.  It distinguished "between employer actions that constitute 'managing' or 'administering' a plan"—which give rise to fiduciary duties—"and those that constitute merely 'business decisions,'" which do not.

52

*Id.* at 665.  The decision whether "to amend or terminate a welfare benefits plan," the Sixth Circuit concluded, was a "business decision" that did not give rise to fiduciary duties.  *Id.* That a decision "may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties."  *Id.* at 666.

The reasoning of *Sengpiel* applies with equal force to public employers and beyond ERISA, and it establishes that, like the Board of Trustees, the other defendants do not owe plaintiffs a fiduciary duty to ensure that the Trust Fund contains any particular amount of money.  Budgetary and "business decisions" regarding the Trust Fund or the benefits that the fund's proceeds help pay do not give rise to fiduciary duties or claims.  To hold otherwise would impose virtually limitless fiduciary duties—and limitless potential liabilities—on any State entity connected in any way, however remotely and ministerially, with the issue of public employee health and welfare benefits.  Because the law does not support that remarkable premise, Count IX should be dismissed.

Count X, though styled as a claim for breach of trust, fails to state a claim for these same reasons.  As discussed above, the IRS's conclusion that "[n]o private interests participate in or benefit from the operation of Trust," Ex. 3 at 3, confirms that plaintiffs are not the beneficiaries of the Trust Fund.  That fact is critical to the Trust Fund's tax-exempt status, as the IRS relied on it to conclude "that the income of [the Trust Fund] is derived from the exercise of an essential governmental function and will accrue to a state or a political subdivision thereof for the purposes of § 115(1) [of the Internal Revenue Code]. Accordingly, [the Trust Fund's] income is excludable from gross income under § 115(1) of the Code."  *Id.*  To hold, as plaintiffs' urge, that the Fund is intended to benefit *plaintiffs'*

private interests, would not only jeopardize the Trust Fund's tax-exempt status, but would also fail to give the IRS tax decision the deference it is owed. *See Dennis v. Fire & Police Emps.' Ret. Sys.*, 390 Md. 639, 660 (2006) ("[I]n a case . . . where the resolution of an issue of Maryland law depends in part on the resolution of an issue of federal tax law," an IRS determination under its regulations "should be afforded a degree of deference similar to the deference we afford to the decisions of Maryland administrative agencies."); *Board of Physician v. Banks*, 354 Md. 59, 69 (1999) ("[A]n administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.").

Defendants cannot be liable for a breach of trust to plaintiffs, who are not beneficiaries of the Trust Fund, for complying with the IRS public letter ruling setting forth the conditions for maintaining the Trust Fund's tax-exempt status—conditions that the General Assembly specifically mandated. *See* SPP § 34-101(b). Plaintiffs state no cognizable claim in either Counts IX or X, which the Court therefore should dismiss.

## VII. COUNTS XII THROUGH XIV DO NOT STATE SEPARATE LEGAL CLAIMS, AND THEIR REQUESTS FOR REMEDY HAVE NO LEGAL BASIS.

As explained above, plaintiffs have not pleaded sufficient factual allegations to support their contract-based claims, their constitutional claims, or any other legal claim against any of the defendants. The four counts that appear at the end of the third amended complaint—the two Counts XII, Count XIII, and Count XIV—merit dismissal because they are derivative of the earlier claims and state no claim on their own.

54

The two counts labeled as Count XII seek injunctive or mandamus relief to prevent the transition to Medicare Part D and to prevent what they describe as "the seizure and diversion of the employer contributions" from the Trust Fund. ECF 123, ¶ 167. But as discussed above and in the opposition to motion for preliminary injunction, ECF 125, neither of these demands are based on a plausible legal claim that would merit such relief.

The other two counts must be dismissed because they state a remedy, not a claim. Count XIII demands that "a constructive or resulting trust" be impressed on the Trust Fund, ECF 123, ¶ 172, but "constructive trust" is a form of remedy, not a cause of action. *See Chassels v. Krepps*, 235 Md. App. 1, 15-16 (2017) ("A constructive trust is an equitable remedy, not a cause of action in itself," and dismissal of such a count is appropriate because "there is no standalone cause of action for 'constructive trust'"), *cert. denied*, 457 Md. 677 (2018); *see also Lyon v. Campbell*, 33 Fed. Appx. 659, 663 (4th Cir. 2002) ("A constructive trust is an equitable remedy, not a cause of action in and of itself.") (citing 21 Maryland Law Encyclopedia Trusts § 61 (1997)), *cert. denied*, 537 U.S. 1000 (2002).

The same is true with respect to Count XIV. It alleges that the Board of Trustees "is under a legal duty pursuant to Maryland law, to accurately account for money and property that was or should have been allocated to, maintained by, or distributed to and from the [Trust Fund]," ECF 123, ¶ 174, but an accounting is a remedy, not an independent cause of action. *See 1899 Holdings, LLC v. 1899 Ltd. Liability Co.*, 2013 WL 142303 (D. Md. Jan. 8, 2013) ("[A] demand for an accounting is generally not an independent cause of action in Maryland but rather a remedy to another cause of action. If the court dismisses all other causes of action upon which a claim for an accounting could depend, then a claim

for accounting should also be dismissed.") (citation omitted); *accord Neal v. Pentagon Fed. Credit Union*, 2018 WL 5786119 at *16 (D. Md. Nov. 5, 2018) ("Although an independent cause of action for accounting has not been entirely abolished in Maryland, it is no longer necessary in most cases and is rarely recognized.").

Even if such an action were still available in Maryland, it would be available only in the rare case where there is no adequate remedy at law *and* "one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relation between the parties, and" there is a corresponding duty of accounting. *P.V. Properties, Inc. v. Rock Creek Vill. Assocs. Ltd. P'ship*, 77 Md. App. 77, 89 (1988). Here, plaintiffs do not allege facts sufficient to support the conclusion that an accounting is necessary.  Nor is this a situation where the facts, information, or records related to retiree prescription drug coverage are not "known and kept exclusively" by the plaintiffs such that they could give rise to the remedy.  *Id.*  Investment statements of the Trust Fund are published on the Board of Trustees' website, *see* https://sra.maryland.gov/post-retirement-health-benefits-trust, and information related to retiree health benefits funding is available as part of the operating budget and the audited financial statements of the State, all of which are available online or upon request.  *See, e.g.*, Maryland Budget Highlights, Fiscal Year 2021, Appendix O; Comptroller of Maryland, *Comprehensive Annual Financial Report*, https://www.marylandtaxes.gov/forms/CAFR/cafr2019.pdf.  There is therefore no more relief this Court could grant with respect to an accounting.  These remaining counts should also be dismissed in their entirety.

56

**CONCLUSION**

Plaintiffs' third amended complaint and AFSCME's amended complaint in intervention should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

_____/s_____

ADAM D. SNYDER (Bar No. 25723)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

August 13, 2020                    Attorneys for Defendants

57