# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KENNETH FITCH, *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:18-cv-02817-PJM |
| STATE OF MARYLAND, *et al.*, | * | |
| *Defendants*. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

# REPLY IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS THIRD AMENDED COMPLAINT AND AMENDED COMPLAINT IN INTERVENTION

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER (BAR NO. 25723)
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

Attorneys for Defendants

September 24, 2020

# TABLE OF CONTENTS

Page

REPLY ARGUMENT ............................................................................................. 1

I.   THE FITCH PLAINTIFFS' TRUST FUND CLAIMS SHOULD BE DISMISSED FOR
     LACK OF STANDING AND FOR FAILURE TO STATE A CLAIM ................................... 2

     A.   The Fitch Plaintiffs Lack Standing under *Thole* to Challenge
          Legislative Funding Decisions ...................................................... 2

     B.   The Fitch Plaintiffs' Trust Fund Arguments Fail to State a Claim on
          the Merits ................................................................................. 3

     C.   Even if Plaintiffs' Trust Fund Claims Had Merit, Legislative
          Immunity Would Bar Them and the Trustee Defendants Would Still
          Be Improper Parties ................................................................... 5

II.  THE HOLDING IN *QUINN* THAT PENSIONS ARE CONTRACTS DOES NOT
     ESTABLISH A CAUSE OF ACTION FOR REDUCTION OF RETIREE HEALTH
     BENEFITS ....................................................................................... 8

III. PLAINTIFFS' CONTRACT CLAUSE CLAIMS MUST BE DISMISSED REGARDLESS
     OF WHETHER A CONTRACT EXISTS ...................................................... 18

CONCLUSION ............................................................................................. 20

## REPLY ARGUMENT

Two things are clear from the plaintiffs' responses to the State's motion to dismiss. First, the Fitch plaintiffs give no good reason why their claims about the Trust Fund should not be dismissed.  They continue to misunderstand the nature of that fund, and they ignore the many reasons this Court gave in its August 25, 2020 ruling as to why the balance in the Trust Fund has no bearing on retirees' continued receipt of prescription drug benefits.  Both for lack of standing and on the merits, the Fitch plaintiffs' Trust Fund allegations fail to state a claim and must be dismissed.

AFSCME's claims fare no better.  Its response on the underlying contractual claim reveals that AFSCME is asking this Court to break new jurisprudential ground, by extending *City of Frederick v. Quinn*, 35 Md. App. 626 (1977), beyond its pension context to lock in welfare benefits that the Legislature has long regarded as non-contractual and subject to change.  In urging this extension, AFSCME dismisses as irrelevant the many important differences between pensions and health benefits, and it ignores entirely *National R. Passenger Corp. v. Atchison, Topeka*, 470 U.S. 451 (1985), which held that courts may not read into a state's legislation the intent to contractually bind itself absent a clear statement to that effect.  Because the 2004 legislation to which both sets of plaintiffs trace their contract claims does not use words of contract or otherwise clearly and unmistakably indicate an intent to be bound, those claims should also be dismissed.  And because everyone agrees that all of plaintiffs' claims depend on the assumption that the 2004 legislation created a contractual obligation, both the third amended complaint and the amended complaint in intervention should be dismissed in their entirety.

I.   THE FITCH PLAINTIFFS' TRUST FUND CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING AND FOR FAILURE TO STATE A CLAIM.

A.   The Fitch Plaintiffs Lack Standing under *Thole* to Challenge Legislative Funding Decisions.

Plaintiffs do not persuasively rebut the State's arguments that they lack standing under *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020), to challenge the funding of the Trust Fund.  As the State explained in its motion, retirees have suffered no injury so long as they continue to receive prescription drug coverage despite the announced transition to Medicare Part D.  And, as the Court pointed out in its August 25, 2020 ruling, "Plaintiffs concede that they are not alleging eligible retirees and their dependents have not received benefits."  ECF 141 at 4.  Plaintiffs, in their opposition, do not contest that critical fact.

Instead, plaintiffs argue that, "[i]f the Court allows the continued diversion of appropriations away from the Trust Fund, a *guarantee* exists that Plaintiffs will"—at some unspecified point in the future—"suffer injury regardless of the outcome of this case."  ECF 144 at 5 (emphasis added).  That is plainly not the case, both because plaintiffs have continued to receive benefits even though the Trust Fund has not been augmented since the 2008 fiscal year, ECF 141 at 4, and because the Trust Fund does not pay retiree health benefits in any event.  As plaintiffs elsewhere acknowledge, the Trust Fund is only an "investment vehicle" created to assist the State in covering the cost of benefits at issue here.  ECF 144 at 4.  Those benefits are actually *paid* out of the State Employees and Retirees Health and Welfare Benefits Fund ("Benefits Fund"), which the State funds on a pay-as-you-go basis.  *See* ECF 141 at 3-4.

2

For similar reasons, plaintiffs have not shown that the relief they request would redress any injury they claim.  Because retiree prescription drug benefits continue to be paid out of the Benefits Fund on a "paygo" basis, plaintiffs have not established that additional appropriations to the Trust Fund would have any bearing on whether retiree health benefits are provided.  The payment of those benefits depends on whether they are statutorily or judicially required, not on the amount of money in the Trust Fund.  *See Thole*, 140 S. Ct. at 1618 (observing that plaintiffs lacked standing because their pension "payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions").  And the $25 million that plaintiffs seek to have appropriated to the Trust Fund is only a fraction of the much larger amount projected to be deposited into the Benefits Fund.  ECF 141 at 6.  The Court thus rightly observed that "it is not clear that . . . ultimately ruling in Plaintiffs' favor on the merits of the diversion of funds from the Trust Fund would impact the receipt of [their] benefits."  *Id.* at 7.

Because the alleged "diversion" of money from the Trust Fund has not injured plaintiffs, and a ruling in their favor would not alter their continued receipt of benefits, *Thole* compels the dismissal of the Fitch plaintiffs' Trust Fund claims for lack of standing.

**B.    The Fitch Plaintiffs' Trust Fund Arguments Fail to State a Claim on the Merits.**

Even if the Fitch plaintiffs had standing to challenge the funding of the Trust Fund, their substantive arguments fail to state a claim.  Plaintiffs argue that the State's budgetary decision not to appropriate money to the Trust Fund constitutes a "violation of Maryland Code State Personnel & Pensions § 34-101(c)," ECF 144 at 6, but that provision only states

3

that the "purpose" of the Trust Fund "is to assist the State in financing the postretirement health insurance subsidy."  Plaintiffs do not allege that the money in the Trust Fund, when it is used, is not used for that purpose.

Nor is there any merit to plaintiffs' assertion that the failure to appropriate money to the Trust Fund "circumvent[s] the will of the State Legislature."  ECF 144 at 1.  After all, the Legislature *approved* the budgetary measures that discontinued the funding, as the Fitch plaintiffs acknowledge.  *See id*. at 5 (stating that "the Legislature made numerous efforts to pre-fund the Trust Fund" and that those efforts were "thwarted by the State of Maryland, acting through the Governor and the State Legislature").  Of course, the Legislature can establish binding funding mandates, as plaintiffs contend, *see id.* at 11-12, but it can do so only by "'prescrib[ing] a dollar amount or an objective basis from which a level of funding can be easily computed.'"  *Judy v. Schaeffer*, 331 Md. 239, 269 n.20 (1993) (quoting 65 Md. Op. Att'y Gen. 108, 110 (1980)); *see also* Md. Const., Art. III, § 52(11), (12) (requiring "a level of funding required by law" in order to bind the Governor's budget submission).  The legislation creating the Trust Fund, by contrast, provides only that the Fund will consist of "any funds appropriated" to it.  Md. Code Ann., State Pers. & Pens. ("SPP") § 34-101(d).  And, even if the Legislature *had* established a binding funding mandate, that mandate would "appl[y] only to the Governor's proposed expenditures in the initial budget," *Judy*, 331 Md. at 269 n.20; the Legislature remains free to alter it.  There is thus no basis on which to contend that the legislation creating the Trust Fund constituted a binding legislative commitment to appropriate funds into the Trust Fund, much less an enforceable contract.

4

Finally, the Fitch plaintiffs suggest that their reliance on "[t]he creation of the Trust Fund" independently created a contract, because it gave them "the confidence to continue working for the State." ECF 144 at 4. Plaintiffs do not, however, cite any authority for the proposition that an employee's reliance on state funding decisions might create a contractual obligation, and for good reason. "Were the recognition of constitutional contract rights to be based on the importance of benefits to individuals rather than on the legislative intent to create such rights, the scope of rights protected by the Contracts Clause would be expanded well beyond the sphere dictated by traditional constitutional jurisprudence." *San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.*, 568 F.3d 725, 740 (9th Cir. 2009).

Ostensibly, plaintiffs' real statutory and constitutional argument is, as they say, "derivative" of their underlying contract claim, ECF 144 at 12, but that too does not save their Trust Fund claims from dismissal. As the Court concluded in its recent ruling, even "[a]ssuming arguendo that there is such a contractual right," the fact that "the Trust Fund does not fund [retiree prescription drug] benefits" means that "there is no basis for the assertion that the State caused a 'substantial impairment of contract' by 'extinguishing the funds statutorily mandated to bear its cost.'" ECF 141 at 6 (quoting ECF 123, ¶ 88).

### C. Even if Plaintiffs' Trust Fund Claims Had Merit, Legislative Immunity Would Bar Them and the Trustee Defendants Would Still Be Improper Parties.

In addition to the grounds for dismissal of the Trust Fund claims discussed above, the State established several other, independent grounds for dismissal that Plaintiffs have not meaningfully addressed and thus essentially have conceded. *See Stevenson v. City of*

5

*Seat Pleasant, Md.*, 743 F.3d 411, 416 (4th Cir. 2014) (holding arguments not briefed in opposition to dismissal motions were waived).

First, the conduct that plaintiffs complain of—the "diversion of appropriations" from the Trust Fund, ECF 144 at 4—is quintessentially legislative and subject to absolute legislative immunity. The manner of appropriating funds is governed by the legislative process set forth in the Budget Amendment, Article III, § 52. 76 Md. Op. Att'y Gen. 59, *1 (1991). As the State described in its motion, absolute legislative immunity applies to all actions taken "'in the sphere of legitimate legislative activity,'" and the process of "'enacting a budget is a legislative act.'" ECF 140-1 at 19 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), and *Kensington Volunteer Fire Dep't, Inc. v. Montgomery County, Md.*, 684 F.3d 462, 471 (4th Cir. 2012)). That conclusion immunizes all State officials against claims—like the Fitch plaintiffs' Trust Fund claims—that are "based on their actions associated with the budgetmaking process." *Kensington Volunteer Fire Dep't*, 684 F.3d at 471.

Second, the Trustee Defendants—the Board of Trustees, Treasurer Kopp, and Comptroller Franchot—are separately entitled to dismissal because, even if legislative immunity did not shield budgetary decisions, the Trustee Defendants have no role to play in the process of funding the Trust Fund. As the State described in its motion, the Trustee Defendants only have a duty to manage and invest the money that is actually in the Trust Fund, *see* ECF 140-1 at 15-19, and plaintiffs do not allege that the Trustee Defendants have not fulfilled that duty. In the absence of any such allegations or facts to support them, the Trustee Defendants are entitled to the "'strong presumption'" under Maryland law that

6

"'public officers properly perform their duties.'" *Anne Arundel County v. Halle Dev., Inc.*, 408 Md. 539, 565 (2009) (citation omitted).  And while it is true that "[a] fiduciary has a duty to act in the best interests of the beneficiary," *Attorney Grievance Comm'n of Md. v. Storch*, 445 Md. 82, 90 n.8 (2015), the direct, intended beneficiary of that duty with respect to the Trust Fund is the State, not the plaintiffs.  *See* ECF 144 at 7 (acknowledging that the alleged legislative "diversion" of funding "is from an investment vehicle created to *assist the State* in continuing to provide the benefit." (emphasis added)).

In response, the Fitch plaintiffs argue that the Trustee Defendants are appropriate parties because "a defined benefit plan and public retirement health benefits . . . are both referred to as a retirement benefit and administered by the Board of Trustees of the State Retirement and Pension System."  ECF 144 at 9.  That assertion is flatly wrong because the Board of Trustees does *not* administer retirement health benefits; that responsibility lies squarely with the Secretary of the Department of Budget and Management.  *See* SPP § 2-502(a).  Moreover, the health benefits at issue here are not even addressed in the portion of the State Personnel and Pensions Article that covers pensions (namely Division II, consisting of Titles 20 through 34), and the two types of benefits are definitionally different.  *Compare id.* §§ 2-501 and 2-502 (defining State Employee and Retiree Health and Welfare Benefits Program and its scope, respectively) *with* § 20-101(*ll*) (defining "retirement allowance" without reference to health benefits).  In fact, Maryland law expressly separates the two types of benefits, prohibiting the Secretary from including within the health benefit program "any of the benefits provided under Division II."  *Id.* § 2-502(b)(2).  There is thus no viable allegation or claim that the Trustee Defendants, in

7

carrying out their responsibilities under the pension provisions of the law, had any role in the alleged "diversion" of funds from the Trust Fund.  Accordingly, the Trustee Defendants should be dismissed from this case regardless of how the Court disposes of plaintiffs' other claims.

## II.   THE HOLDING IN *QUINN* THAT PENSIONS ARE CONTRACTS DOES NOT ESTABLISH A CAUSE OF ACTION FOR REDUCTION OF RETIREE HEALTH BENEFITS.

The oppositions filed by AFSCME and the Fitch plaintiffs clarify that neither party is asserting an implied contract, as any such claim would be barred by sovereign immunity. *See, e.g.*, ECF 143 at 11 (AFSCME acknowledging that the statutory waiver of immunity for contract claims in § 12-201(a) of the State Government Article "does not apply to implied contracts").  The question that remains before the Court, then, is whether the language of the 2004 legislation now codified at SPP § 2-509.1(a)(1) creates a contract enforceable against the State, as both plaintiffs argue, and whether the collectively bargained memorandum of understanding (MOU) between AFSCME and the State does so, as AFSCME contends, ECF 143 at 12.

Starting with AFSCME's claim, the MOU does not create a contractual right to prescription drug benefits.  By law, the MOU is temporary only, lasting for no more than three years or until superseded by a subsequent MOU.  SPP §§ 3-601(b), 3-603(b).  And the MOU is between the State and its employees, not retirees, and only the employees of specific "bargaining units" at that.  *Cf. Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 166 (1971) (the collective-bargaining obligations of the National Labor Relations Act cover only active employees,

not retirees).  This is confirmed by the terms of the provision of the MOU on which

AFSCME relies.  Article 25, Section 1 provides that the State will pay 80 percent of the

"prescription drug plan" premium, but that refers to the amount the State will pay for

*employees*, as the State, by statute, is only required to pay 75% of the prescription drug

premiums for retirees.  *See* SPP § 2-508(d)(2)(ii) (providing that retirees must pay 25%);

*see also* MOU For Bargaining Units A, B, C, D, and F, at 1 (Dec. 31, 2017) (preamble,

stating that, "in the event of a conflict between this Agreement and the law, the law shall

prevail"),       available       at       https://dbm.maryland.gov/employees/Documents/Collective

Bargaining/MOU%20for%20Bargaining%20Units%20ABCDF.pdf.  None of this supports

the conclusion that the MOU amounts to a written contract for retiree prescription benefits.[1]

As for the legislative contract claims that both plaintiffs bring, the Supreme Court's

decision in *Atchison* sets forth the analytical framework for determining whether legislation

---

[1] The State's motion to dismiss should not, as the Fitch plaintiffs argue, ECF 144 at 2, be treated as a motion for summary judgment.  The external documents on which the State relies are appropriate for judicial notice because they either are contained on a publicly accessible government website or merely supplement the allegations of the complaint and are not controverted.  *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (stating that courts "routinely take judicial notice of information contained on state and federal government websites"); *Chebotnikov v. LimoLink, Inc.*, 150 F. Supp. 3d 128, 130 (D. Mass. 2015) (court may, without converting motion to dismiss to motion for summary judgment, consider the service-provider agreement attached to motion to dismiss when it "appears to be the relevant contract" and "the parties do not dispute the authenticity of the agreement").  Nor do disputes of material fact exist concerning the grounds for the State's motion.  Although plaintiffs are correct that the Court, in its October 2018 ruling, identified several outstanding factual issues, ECF 144 at 12, those issues relate to whether Medicare Part D and the plans created in 2019 are "substantially" equivalent to the pre-existing benefit program and whether the differences between the two are "justified by countervailing equities for the public's welfare," *Quinn*, 35 Md. App. at 631—issues that arise only *after* the plaintiff has established the existence of a contract.  That threshold issue of contract presents a question of law, which is properly resolved on a motion to dismiss.

creates a contract.  Its clear statement rule compels the conclusion that the General Assembly, by enacting SPP § 2-509.1(a)(1) in 2004, did not enter into a contractual relationship with State employees or retirees.  The absence from the statute of any contracting terms compels that conclusion.

Both sets of plaintiffs know that, which explains why neither mentions, or even cites, *Atchison* or its clear statement rule.  AFSCME suggests that federal precedents are "not relevant" here, ECF 143 at 13, because the Court of Special Appeals' decision in *Quinn* instead controls.  And that might be the case, if the principle announced in *Atchison* were one of contract law, where state law controls and could diverge from federal precedents.  But that is not the case.

The principle that animates *Atchison* is one that flows from the nature of legislatures within our constitutional system.  It is an "elementary proposition" of our system that "the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state," and "to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body."  470 U.S. at 466.  For that reason, state high courts routinely apply *Atchison* in evaluating whether public sector benefits give rise to contractual obligations. *See, e.g.*, *Studier v. Michigan Pub. Sch. Employees' Ret. Bd.*, 472 Mich. 642, 661 (2005) (applying *Atchison* to conclude that state statute establishing health care benefits for public school retirees did not create contract); *Lake v. State Health Plan for Teachers & State Employees*, 264 N.C. App. 174, 180, *review dismissed*, 372 N.C. 301 (2019), *and appeal dismissed, review allowed*, 373 N.C. 591 (2020) (citing *Atchison* and holding that non-

10

contributory health care insurance benefits provided by statute were not vested contract rights under the Contract Clause); *Retired Employees Assn. of Orange County, Inc. v. County of Orange*, 52 Cal. 4th 1171, 1188 (2011) (quoting *Atchison*'s command to "'proceed cautiously . . . in identifying a contract within the language of a . . . statute,'" 470 U.S. at 466).

Although the Court of Appeals of Maryland has not yet had a similar opportunity to apply the principle that one Legislature may not bind a successor, it has repeatedly recognized the principle more generally. *See, e.g.*, *Boitnott v. Mayor & City Council of Baltimore*, 356 Md. 226, 242 (1999) ("[I]t is clear and well settled that one legislative enactment does not, and indeed cannot, bind or preempt another legislative enactment."); *State v. Fisher*, 204 Md. 307, 315 (1954) ("[O]ne legislature cannot prohibit repeal or modification by its successors, even where it purports to do so."). Maryland's highest court has also recognized that the formation of legislative contracts is in derogation of that principle. *See Wright v. Wright's Lessee*, 2 Md. 429, 449 (1852) (observing that the General Assembly's decision to bind itself contractually is an exception to the principle that "there is no constitutional power residing in one legislature to limit the power of succeeding legislatures").

That said, the holding of *Quinn* is consistent with the established rule that pension benefits are contractual, and the provision that the state court construed there would have satisfied the rule applied in *Atchison*. Like all pension provisions governing public employers, the plan at issue in *Quinn* committed the government to pay retirees, for a defined period of time (i.e., "for life"), a defined amount of money keyed to the salary that

11

they earned while actively employed.  35 Md. App. at 628.  But legislative contracts are exceptions to the general rule that a Legislature cannot bind its successors, which means that the holding of *Quinn* cannot be extended beyond the pension context to include, as AFSCME puts it, any "unreasonable diminution of public employee benefits."  ECF 143 at 1.  Such an expansion would not only intrude on the Legislature's reserved powers, but it would overlook the significant differences between the two types of benefits:

### *Defined vs. Variable Benefit*

Pensions are defined benefits.  They pledge the payment of a calculable amount of money, keyed to the employee's period of service and compensation, for a defined period of time (i.e., the life of the employee).  *See, e.g.*, SPP § 23-401 (specifying eligibility requirements for normal service retirement for members of the Employees' Pension System); *see also National Educ. Ass'n-Rhode Island v. Retirement Bd. of R.I. Employees' Ret. Sys.*, 172 F.3d 22, 26 (1st Cir. 1999) (stating that the "typical [pension] plan contemplates a stream of payments to be received by the employee starting upon retirement; both the terms and the payment formula are normally stated in the plan.").  And precisely because a pension is a defined benefit, the State's ultimate liability for paying—and thus funding—that benefit is reasonably quantifiable, with actuarial assistance.  *See* SPP § 21-125.  That is why pension benefits *can* be guaranteed.

Prescription drug benefits, by contrast, are highly variable, even volatile. Formularies change from year-to-year as medications evolve, and coverage options, copays, and out-of-pocket limits change with the rising cost of pharmaceuticals.  This variability distinguishes health and prescription drug benefits from pensions:

12

> Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs.

90 Md. Op. Atty. Gen. 195, *9 (2005). That variability is important in two respects: it explains why the Secretary of the Department of Budget and Management is given nearly "unfettered discretion to set benefit and subsidy levels," *id.* at *7, and why the State would not be able to guarantee payment without exposing itself to open-ended liability.

*Vesting*

Maryland law specifically refers to the "vesting" of pension benefits. *See, e.g.*, SPP § 20-101(tt) (definition of "vested allowance"); § 21-112(2)(ii) (annual reports showing "vested benefits"); §§ 29-302, 29-303 (computation of vested allowance); §§ 29-304, 29-305 (immediate vesting for heads of units and other officials). By contrast, the provision that governs health care benefits, SPP § 2-508, mentions vesting only when establishing eligibility requirements by reference to "the age at which a vested retirement allowance normally would begin." *See* SPP § 2-508(b)(2)(i), (c)(2)(ii); *see also* SPP §§ 20-101(*ll*) (defining "retirement allowance") and 20-101(tt) (defining "vested allowance"). And while employees "earn" a subsidy in the sense that it increases with years of service, *see* SPP § 2-508(b)(4), that subsidy does not entitle the employee to any particular type of benefit. Instead, the subsidy applies to whatever "health insurance benefit options" are "established under the Program," *id.* (b)(2), which can include health, dental, vision and "any other benefit option that the Secretary considers appropriate," *id.* § 2-502(b)(1)(iii). Thus, even if retirees did hold "vested" rights to the subsidies that they earn, as AFSCME

13

claims, ECF 143 at 6, the elimination of the retiree prescription drug program would not extinguish that right, as the subsidy would continue to be applicable to the many benefits that remain available.

*Condition of Employment vs. Optional Benefit*

With few exceptions, membership in the pension system is mandatory for State employees.[2]  It is a form of deferred compensation that is a "condition of employment." SPP §§ 23-203; *see Priester v. Board of Appeals of Balt. County*, 233 Md. App. 514, 547 (2017) ("[A] pension is a form of deferred compensation—compensation earned during the time of employment, but paid after the term has ended.").  Health benefits, by contrast, are elective; retirees are not required to participate in the program, but "may enroll and participate," SPP § 2-508(b)(2), and only if they pay the necessary premium.  If they do so, *then* they become entitled to the benefit, but not before.

The Fitch plaintiffs concede the importance of these distinctions.   They acknowledge that the prescription drug benefit plan at issue here qualifies as a "welfare benefit plan," and not a form of "pension benefits," and that the two types of benefits are "separate and distinct."  ECF 144 at 9.  They further recognize that welfare benefit plans like the one at issue here are provided "at the employer's largess."  *Id.*  And while plaintiffs also assert that, under ERISA, a retiree can receive welfare benefits "by . . . vesting," *id.*, elsewhere they acknowledge precisely the opposite, that "ERISA does not establish any

---

[2] For example, membership in the Maryland State Retirement and Pension System can be optional for certain narrowly defined categories of State employees, *see* SPP § 23-204, and other narrowly defined categories of State employees are eligible to elect participation in the Optional Retirement Program, *see* SPP Title 30.

minimum participation, vesting or funding requirements for welfare plans, including retiree health benefits, as it does for pension plans," *id.* at 10.  Although ERISA does not apply directly to government benefit plans, *see* 29 U.S.C. § 1003(b)(1), plaintiffs' recognition that the prescription drug benefit at issue here would not be treated as a contractual pension benefit under ERISA underscores why *Quinn'*s holding in the pension context should not be extended to welfare benefit plans like this one.

AFSCME, for its part, also acknowledges the distinction between pension benefits and health benefits, but argues that "[t]here is no support in Maryland law" for the proposition that the distinction "matters."  ECF 143 at 7.  While no Maryland *court* may have had the opportunity to address the distinction, Maryland *statutory* law draws the distinction clearly.  It expressly states that the payment of pension benefits under Division II of the State Personnel and Pensions Article is an "obligation[] of the State," SPP § 21-302(a)(1).  Precisely the opposite is true with respect to retiree health benefits.  Not only does SPP § 2-508 not characterize any portion of the health benefit program as an "obligation of the State," but the law establishing the Trust Fund expressly contemplated that retiree health benefits may be eliminated altogether.  That law provided that, "if for any reason the State *discontinues the postretirement health insurance subsidy* specified in [§ 2-508], the assets of the [Trust Fund] shall be transferred to the General Fund."  2004 Md. Laws ch. 466 (then codified at SPP § 33-101(i)) (emphasis added); *see also* 90 Md. Op. Atty. Gen. 195, *13.  If contracts are formed through "mutual assent," *Cochran v. Norkunas*, 398 Md. 1, 14 (2007), the General Assembly's express recognition that it could discontinue the health care subsidy altogether is further evidence that it did not intend to

15

contractually bind itself. *See also Advance Telecom Process, LLC v. DSFederal, Inc.*, 224 Md. App. 164, 181 (2015) ("We hold that the terms of . . . any . . . contract, are enforceable only if the parties demonstrate mutual assent, i.e., the intent to be bound and definite terms.").

That conclusion is borne out by the larger context of the 2004 legislation that forms the basis of plaintiffs' claims.  In requiring the State to "continue" to offer a retiree prescription drug benefit, 2004 Md. Laws ch. 296 (codified at SPP § 2-509.1), the General Assembly was speaking to the Department of Budget and Management and directing how that agency was to exercise its discretion to determine the contours of the State benefit plans.  In fact, as the 2005 Attorney General opinion points out, the General Assembly gave similar direction the following year, requiring the Department to follow "specific criteria for designing the Program for fiscal years 2006 and 2007."  *See* 90 Md. Op. Atty. Gen. 195, *3 (describing 2005 Md. Laws ch. 444, § 7).  These enactments do not use words of contract; instead, they speak to the agency charged with devising the benefit program.

The Court, in its remarks during the October 2018 preliminary injunction hearing, expressed the view that these enactments could also be read as speaking to employees, ECF 29 at 47, but that is why the clear statement rule announced in *Atchison* is so important. Legislatures routinely command that some measure "shall" be implemented, and it is easy to read such commands as a *commitment* that could, outside the legislative context, give rise to a contractual obligation.  The purpose of *Atchison*'s clear statement rule is to avoid that interpretive guesswork and "ensure that neither the governing body nor the public will

16

be blindsided by unexpected obligations" created by inadvertent contracts. *Retired Employees Assn. of Orange County*, 52 Cal. 4th at 1188-89 (internal citation omitted).

The arguments that the Fitch plaintiffs make with respect to the Trust Fund testify to the risk of such "blindsid[ing]." They argue that, because the Legislature, in establishing the Trust Fund, stated that funds "shall" be appropriated to the Trust Fund, the Legislature made a "commitment" to prefunding the Trust Fund. ECF 144 at 18. And because the plaintiffs allegedly relied on that "commitment"—giving "Plaintiffs the confidence to continue working for the State," *id.* at 4—it allegedly "created a contractual obligation on the part of the State" such that "any change" in the funding would trigger scrutiny under the Contract Clause, *id.* at 10. But *Atchison*'s clear statement rule is designed to prevent the creation of governmental liability every time that the Legislature directs that something "shall" be done and a group of plaintiffs relies on that commitment.

*Atchison*'s clear statement rule also avoids statutes acting as "ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred." *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995). As Arizona's highest court observed, "[i]f statutes were routinely treated as establishing contractual rights, the legislature might well be discouraged from addressing pressing public needs, for fear that any law could not thereafter be modified without the consent of those for whose benefit it was passed." *Proksa v. Arizona State Sch. for the Deaf & the Blind*, 205 Ariz. 627, 629 (2003) (citing *Atchison*). Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and

17

presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" *Atchison*, 470 U.S. at 466 (citation omitted).

## III.   PLAINTIFFS' CONTRACT CLAUSE CLAIMS MUST BE DISMISSED REGARDLESS OF WHETHER A CONTRACT EXISTS.

Because *Quinn* cannot be extended beyond the pension context to include the retiree health benefits at issue here, plaintiffs' State-law contract claims must be dismissed.  And, contrary to the union's view, ECF 143 at 13-14, that conclusion also disposes of their Contract Clause claim, because that claim too depends on the existence of an enforceable contract.  *See Atchison*, 470 U.S. at 465 (observing that the "first question" in the Contract Clause analysis is whether the State is subject to a "contractual arrangement").

But even if the Court were to conclude that *Quinn* recognizes a contract here, the plaintiffs' Contract Clause claims should still be dismissed, as plaintiffs would, in that circumstance, "retain the right to recover damages for breach of contract."  *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014).  As the Fourth Circuit made clear in *Cherry*, "[a] state . . . does not 'impair the obligation of contracts' merely by breaching one of its contracts or by otherwise modifying a contractual obligation."  *Id.*  Indeed, "'[i]t would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution.'"  *Crosby v. City of Gastonia*, 635 F.3d 634, 642 n.7 (4th Cir. 2011) (quoting *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996)).

Plaintiffs would have a Contract Clause claim independent of their allegations of breach only if the 2011 legislation sunsetting the retiree prescription drug benefit program

had *itself* "'extinguished any remedy that the [plaintiff] would otherwise have had,'" *Cherry*, 762 at 371 (citation omitted), which neither set of plaintiffs argues here. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537, 545 (E.D. Va. 1999) ("Those courts that have parsed the phrase 'obligation of contracts' consistently have held that it refers not to the general benefit that a private party hopes to derive from a contract but to 'the means which, at the time of its creation, the law affords for its enforcement.'" (quoting *State of Louisiana ex rel Nelson v. Police Jury of the Parish of St. Martin*, 111 U.S. 716, 720 (1884)).

AFSCME concedes that the Fourth Circuit in *Cherry* "denied the plaintiffs relief under an unconstitutional impairment of contracts claim in similar circumstances," ECF 143 at 13, but it maintains that the Court cannot do so here without first learning whether the plaintiffs ultimately "will succeed" in their claims, *id.* But the Fourth Circuit made clear in *Cherry* that plaintiffs' Contract Clause claim hinges not on whether plaintiffs actually recover, but on whether the offending enactment—here the 2011 legislation—"has erected a *legal* barrier 'that [has] prevented the [plaintiffs] from obtaining damages, or some equivalent remedy, for [any] breach.'" 762 F.3d at 371 (quoting *Horwitz-Matthews*, 78 F.3d at 1251). After all, the Fourth Circuit pointed out that the government "is permitted to raise any defense to breach of contract" in a state-law contract action without implicating the Contract Clause, even if plaintiffs obtained no recovery as a result. *Cherry*, 762 F.3d at 471. The only "except[ion]" that would implicate the Contract Clause would be if the government raised "'a defense that even if there was a contract and it was broken the [government] cannot be liable because the repealing ordinance extinguished any remedy

19

that the [plaintiff] would otherwise have had.'" *Id.* (quoting *Horwitz-Matthews*, 78 F.3d at

1252).  That is a question of law that can be decided on a motion to dismiss.[3]

**CONCLUSION**

Plaintiffs' third amended complaint and AFSCME's amended complaint in

intervention should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

    /s                         

ADAM D. SNYDER (Bar No. 25723)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

September 24, 2020                          Attorneys for Defendants

---

[3] And because plaintiffs' contract claim fails, so does their takings claim, as they acknowledge that the latter is "derivative" of the former.  ECF 144 at 14; *see also Cranston Firefighters, IAFF Local 1363, AFL-CIO v. Raimondo*, 880 F.3d 44, 51 (1st Cir. 2018) ("The lack of any allegation that the current benefits provided by the State fall below the present value of the contributions made by the . . . pensioners, coupled with the absence of the alleged contract, also eliminates the basis for a claim under the Takings Clause.").

20