## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KENNETH FITCH**, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil No. **18-2817 PJM** |
| **STATE OF MARYLAND**, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## MEMORANDUM OPINION

This case arises from the State of Maryland's attempt to transition certain retired state employees and certain active employees from a state-subsidized prescription drug benefit program to drug benefit programs available under Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, 117 Stat. 2066 (codified at 42 U.S.C. § 1395w-101 *et seq.* ("Part D")).  Suit has been brought against various state defendants[1] in two separate complaints, one by currently retired employees[2] and a second by active employees,[3] all of whom started their service with the State on or before June 30, 2011.  *See* ECF Nos. 123, 131. Plaintiffs claim contractual and constitutional rights to participate in the state-subsidized drug benefits program. All retirees either receive the benefits currently or submit they would otherwise

---

[1] Defendants include the State of Maryland, Governor Larry Hogan, Secretary of the Department of Budget & Management David R. Brinkley, State Treasurer Nancy Kopp, State Comptroller Peter Franchot, and the State and Retiree Pension Systems Board of Trustees (collectively, "Defendants").

[2] Retired Plaintiffs include Kenneth Fitch, Phylis Reinard, Deborah Heim, Mary Frye, Michael Bridgett, Deborah Monroe, Alan Rivkin, Howard Kilian, Mark Henry, and Deborah Garlitz, who sue on behalf of themselves and others similarly situated (collectively, "Fitch Plaintiffs"). Third Amended Complaint, ECF No. 123 ("Fitch Compl."). The Court notes that one of the Fitch Plaintiffs, Ms. Garlitz, is in fact alleged to be an active state employee. *See* Fitch Compl. ¶ 10.

[3] Active state employees are represented by their organizational representative, the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"). First Amended Complaint, ECF No. 131 ("AFSCME Compl.").

qualify for the benefits if and when they retire.  Defendants have moved to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 21. For the following reasons, Defendants' Motion is **DENIED IN PART** and **GRANTED IN PART**.

**I.**
**A.**

For many years, Maryland offered certain of its retired employees healthcare subsidies coextensive with those available to active employees. Thus, as of October 1, 1993, with the establishment of the State Employee and Retiree Health and Welfare Benefits Program, for retirees who would have started their service on or before June 30, 2011, the State provided that:

> (4)(i) If a retiree receives a State disability retirement allowance or has 16 or more years of creditable service, the retiree or the retiree's surviving spouse or dependent child is entitled to the same State subsidy allowed a State employee.
> (ii) In all other cases, if a retiree has at least 5 years of creditable service, the retiree or the retiree's surviving spouse or dependent child is entitled to 1/16 of the State subsidy allowed a State employee for each year of the retiree's creditable service up to 16 years.

1993 Maryland Laws Ch. 10 (S.B. 50), codified at Md. Code Ann., State Pers. & Pens. ("SPP") § 2-508(b). *See also* SPP § 2-509.  Restated: As of June 30, 2011, any retired employee receiving a disability retirement allowance or who had 16 or more years of creditable service or who had retired with at least 5 years of creditable service would be "entitled" to receive all or at least some portion of the benefit available to active employees.

In July 2004, following the creation of Medicare Part D, 42 U.S.C. § 1395w-101 *et seq.*, Maryland opted to "reaffirm" its commitment to providing its own prescription drug benefit plan for retirees. Thus, the General Assembly expressly declared that, "notwithstanding the enactment of [Part D] or any other federal law permitting states to discontinue prescription drug benefit plans to [state] retirees," Maryland "shall continue to include a prescription drug benefit plan in the health insurance benefit options . . . available to retirees under §§ 2-508 and 2-509 of this subtitle."

2004 Md. Laws ch. 296 (codified at SPP § 2-509.1). The measure was apparently motivated by concerns over a significant gap that existed in Part D's prescription drug coverage, colloquially known as the "doughnut hole." As of that time, Part D participants would receive *no coverage* once they received a certain benefit amount—before their out-of-pocket expenses would otherwise qualify for "catastrophic" coverage.

1.   Maryland's Eventual Transition to Part D

In 2010, the U.S. Congress took steps to increase prescription drug discounts for Medicare Part D beneficiaries, aiming to close the "doughnut hole."[4] With this development, in June 2011 Maryland's General Assembly decided to enact legislation seeking to transition *all* Medicare-eligible retirees to Part D. The legislation provided, in pertinent part, that: "the State shall discontinue prescription drug benefits for Medicare-eligible retirees in fiscal year 2020 [i.e., beginning on July 1, 2019]." 2011 Md. Laws ch. 397 (codified at SPP §2-509.1(b)). On that date, Medicare-eligible retirees would have to obtain their prescription drugs directly through Part D, in effect ending their participation in the state-subsidized prescription drug program. At the same time, the General Assembly also revised § 2-508(d) to provide that, "Notwithstanding subsections (b) and (c) of this section and §§ 2–509 and 2–509.1 of this subtitle, the State may establish separate health insurance benefit options for retirees that differ from those for active State employees."  The revisions went on to provide that starting "on or after July 1, 2011, the health insurance benefit option for retirees shall include a prescription drug benefit that" would still "ha[ve] the same co-payments, coinsurance, and deductible that apply to the prescription drug benefit for active State employees;" but modified certain premium and out-of-pocket payment levels.  *See* 2011 Md. Laws ch. 397 (codified at SPP §2-508.1(b)).

---

[4] *See* Paula Span, "Medicare's Part D Doughnut Hole Has Closed! Mostly. Sorta." *The New York Times* (Jan. 17, 2020), https://www.nytimes.com/2020/01/17/health/medicare-drug-costs.html.

By 2018, the federal government had further mandated greater discounts for Part D participants. As a result, the "doughnut hole" was anticipated to close on January 1, 2019—six months earlier than expected. In view of this, Maryland's General Assembly decided to advance the date by which all Medicare-eligible retirees would have to switch to Part D to January 1, 2019. *See* 2018 Md. Laws ch. 10 (codified at SPP § 2-509.1(b)). Notices regarding the imminent change were mailed to retirees in May 2018.

2.   <u>Maryland's Investment Funds</u>

To support its existing healthcare programs, Maryland has established two tax-exempt investment funds. The first, the State Employees and Retirees Health and Welfare Benefits Fund ("Benefits Fund"), "consists of money appropriated for State Employee and Retiree Health Insurance or authorized to be transferred to that purpose in the State budget." SPP § 2-516(c). The Benefits Fund is used to pay for healthcare subsidies of active and retired employees. *See id.* § 2-516(b)(1) ("A special reserve fund is established to retain certain State revenues and State general and special funds for the purpose of funding the State Employee and Retiree Health and Welfare Benefits Program established under this subtitle.").

The second investment fund, the Postretirement Health Benefits Trust Fund ("Trust Fund"), was formed "to assist the State in financing the postretirement health insurance subsidy." SPP § 34-101(c). Like the Benefits Fund, the Trust Fund consists of "any funds appropriated to [it], whether directly or through the budgets of any State agency." *Id.* § 34-101(d). The Trust Fund's Board of Trustees ("Board") is responsible for investing and managing funds appropriated to it. *Id.* § 34-101(f).

Plaintiffs argue that these Funds assure them of a right to receive a health benefit plan with a prescription drug benefit.

4

The Fitch Plaintiffs allege that in 2007 federal Medicare subsidies were deposited directly into the Trust Fund to pay for future healthcare liabilities.  Fitch Third Amended Compl. ¶ 66. However, in other years, they contend, the federal subsidies were re-directed to the Benefits Fund to pay more general annual liabilities.  *Id.* ¶ 67.  The Fitch Plaintiffs also contend that the State failed to make necessary contributions to the Trust Fund, both actions impairing their claimed right to the promised prescription drug benefits.

**B.**

1.  Procedural History

On September 10, 2018, the Fitch Plaintiffs filed suit in the Circuit Court for Baltimore City, alleging that the State's attempted transition to Medicare Part D violated their contractual and constitutional rights to receive state-subsidized prescription drug benefits.  As a result of the change in coverage, the Fitch Plaintiffs allege, their out-of-pocket prescription drug costs would drastically increase, despite their belief that their "right" to more favorable state-subsidies had already "vested."  *See* Fitch Compl. at 2.

After Defendants removed the state case to this Court, the Fitch Plaintiffs filed a Motion for Preliminary Injunction, seeking to enjoin Defendants from enforcing the provisions of SPP § 2-509.1, which in effect would have terminated the Fitch Plaintiffs' state-funded prescription drug benefits.

At the close of a hearing on October 10, 2018, the Court orally granted Plaintiffs' Motion for Preliminary Injunction.  The Court's oral ruling was subsequently transcribed and filed as part of the Court record.  ECF No. 30.  A written Order was subsequently entered, directing that the State continue providing prescription drug benefits to current retirees and to any eligible

employees who might retire during the pendency of this case. ECF No. 31.  Maryland appears to have continuously complied with that Order.

## 2.  Response to Litigation

On May 25, 2019, the General Assembly enacted three new drug benefit programs designed to replace the plan currently under injunction in this case, should the injunction be lifted. 2019 Md. Laws ch. 767. Those programs include:

(1) The Maryland State Retiree Prescription Drug Coverage Program, available to retirees who "retired on or before December 31, 2019." SPP § 2-509.1(d)(1)(ii). Under the program, Medicare-eligible retirees' out-of-pocket costs would be capped at the same level as a non-Medicare-eligible retirees' out-of-pocket costs. *Id.* § 2-509.1(d)(2)(i).
(2) The Maryland State Retiree Catastrophic Prescription Drug Assistance Program, available to retirees enrolled in a prescription drug benefit plan under Medicare, who entered into state service on or before June 30, 2011, and who retired on or after January 1, 2020. *Id.* § 2-509.1(e)(1)(i)–(ii). The program would cover additional out-of-pocket costs once the retiree entered the catastrophic phase of Part D. *Id.* § 2-509.1(e)(2).
(3) The Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program, available to any retiree who participates in either of the first two programs. *Id.* § 2-509.1(f)(1). Retirees would be reimbursed for out-of-pocket costs for life-sustaining medications covered through Maryland's prescription drug benefits but not covered by Medicare Part D. *Id.* § 2-509.1(f)(2).

The General Assembly's enactment of the 2019 legislation not surprisingly prompted a flurry of activity in this case. On September 4, 2019, the Court convened a status conference during which it directed Plaintiffs to amend their Complaint to account for the new legislation. ECF No. 82. On October 4, 2019, Plaintiffs filed a Motion to Expand the Scope of the Preliminary Injunction, seeking to have active employees protected by the Preliminary Injunction. ECF No. 83. Soon after, AFSCME moved to intervene and filed its own Motion to Expand the Scope of the Preliminary Injunction, seeking to have active employees represented by AFSCME covered by the injunction. ECF Nos. 91 & 92. The Court granted AFSCME's Motion to Intervene but denied both Motions to Expand the Scope of the Preliminary Injunction. ECF No. 105. The Fitch Plaintiffs

have since filed a Third Amended Complaint ("Fitch Complaint"), and AFSCME a First Amended

Complaint ("AFSCME Complaint").  ECF Nos. 123 & 131.

### 3.   Amended Pleadings

The Fitch Third Amended Complaint proceeds in no less than 15 counts, including counts

for: (I) Declaratory Judgment – Health Program; (II) Declaratory Judgment  – Trust Fund; (III)

Anticipatory Breach – Health Program; (IV) Breach of Contract; (V) Government Taking – Health

Program; (VI) Government Taking – Trust Fund; (VII) Unconstitutional Impairment of Contracts

– U.S. Constitution; (VIII) Unconstitutional Impairment of Contracts – Maryland Constitution;

(IX) Breach of Contractual Fiduciary Duty – Trust Fund; (X) Breach of Trust – Trust Fund; (XI)

Equal Protection; (XII-A)[5] Petition for Issuance of Writ of Mandamus, or in the alternative,

Preliminary and Permanent Injunction/Specific Performance – Health Program; (XII-B) Petition

for Issuance of Writ of Mandamus, or in the alternative, Preliminary and Permanent

Injunction/Specific Performance – Trust Fund; (XIII) Constructive or Resulting Trust; and (XIV)

Accounting. *See* Fitch Compl. ¶¶ 1–177.

The Fitch Plaintiffs' claims appear to be divisible into two basic categories: (1) claims

predicated on the alleged breach or impairment of contractual rights conferred by SPP §§ 2-508

and 2-509.1, including constitutional claims; and (2) claims related to the management of the Trust

Fund.

AFSCME's Complaint seeks similar relief on behalf of its active employee-members, all

of whom began their state service on or before June 30, 2011, and all of whom, they submit, would

qualify for state-subsidized prescription drug benefits if they retired. Like the Fitch Plaintiffs,

---

[5] The Fitch Complaint includes two Count XII's. The first, which pertains to the retiree prescription benefit program, will be redesignated as Count XII-A, and the second, which pertains to the Trust Fund, as XII-B.

AFSCME contends that the statutory provisions set forth at "SPP §§ 2-501 *et seq.*" and "representations made by the State to its employees," (AFSCME Compl. ¶ 46), "create a contract between [AFSCME and] the State of Maryland that obligate[s] the State to provide [them] a prescription drug benefit plan" upon retirement. *Id.* ¶ 15. Count I of the AFSCME Amended Complaint thus seeks a declaratory judgment regarding "the rights, duties, privileges and obligations of the parties under applicable laws, including . . . the validity or constitutionality" of SPP § 2-509.1. *Id.* ¶ 50. Count II of the AFSCME Amended Complaint is styled anticipatory breach and Count III is styled unconstitutional impairment of contracts (U.S. Constitution). Both counts track counts in the Fitch Third Amended Complaint.

Defendants have moved to dismiss all claims asserted against them, arguing that neither the Fitch Plaintiffs nor AFSCME has set forth cognizable causes of action. They ask the Court to dismiss both pleadings as a matter of law.

## II.

Federal Rule of Civil Procedure 8(a) prescribes "liberal pleading standards," requiring only that plaintiff submit a "short and plain statement of the claim showing that [he or she] is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court must accept factual allegations in the complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Indeed, the court need not accept legal conclusions

couched as factual allegations or "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

## III.

All parties agree that this case turns principally on whether SPP §§ 2-508 and 2-509.1 in their various iterations confer upon State retirees a contractual right to prescription drug benefits. The Court concludes that, as to employees who retired on or before June 30, 2011, with 16 years or at least 5 years of creditable service, or employees who retired between July 1, 2011 and December 31, 2018, with 16 years or at least 5 years of creditable service, or any employee on disability retirement of any duration during those time periods, it does confer such a right. As to any employee who retired after December 31, 2018, and as to all currently active employees, it does not.

## A.

Analysis begins with consideration of the statutory text, SPP §§ 2-508 and 2-509.1. It is well settled that when determining whether a statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985) (quoting *Dodge v. Bd. of Educ. of City of Chicago*, 302 U.S. 74, 78 (1937)); *see also Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 104 (1938) ("Where the claim is that the state's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract."). That inquiry, in the Court's view, leads to the conclusion that the General Assembly bestowed an enforceable right upon certain qualified retirees. That is, the General Assembly created a unilateral contract that became binding upon the fulfillment by the retirees of specific conditions.

In 2004, the General Assembly explicitly made prescription drug benefits part of the healthcare options available to retirees. The General Assembly's intention to do so was spelled out in crystal clear terms: "[Maryland] shall continue to include a prescription drug benefit plan in the health insurance benefit options . . . available to retirees under §§ 2-508 and 2-509 of this subtitle." 2004 Md. Laws. ch. 296 (codified at SPP § 2-509.1). The statute's cross-reference to SPP § 2-508 was important, since that provision declared that qualified individuals would be "*entitled*" to "the same State subsidy allowed a State employee"—or some prorated portion of the same. *Id.* (emphasis added).

Despite the primacy of the statutory language, Defendants fail to appreciate, much less come to terms with, the significance of the particularly potent word selected by the General Assembly: that eligible retirees would be "*entitled*" to certain subsidies. The plain meaning of that word reveals all one needs to know about the General Assembly's intent. To "entitle" means to "grant a legal right to or qualify for." Black's Law Dictionary (11th ed. 2019); *see also* Cambridge Dictionary ("to give someone the right to do or have something"); *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021) ("'Entitle' means 'to give . . . a title, right, or claim to something.'" (quoting Random House Dictionary of the English Language 649 (2d ed. 1987))); *cf. Cabell Huntington Hosp. v. Shalala*, No. Civ. 94-0345, 1995 WL 812799, at *6 (S.D.W. Va. Nov. 8, 1995) ("[E]ntitle has the additional meaning of 'to give (one) a right to do or have something.' . . . The word 'entitled' thus encompasses more than being eligible or qualified by meeting certain requirements. In the context of the Medicare Proxy, it means, in addition, that one has a right to have Medicare benefits provided."), *aff'd sub nom. Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996). The definition of the noun "entitlement" fortifies this understanding: "An

absolute right to a (usu. monetary) benefit, such as social security, granted immediately upon meeting a legal requirement." Black's Law Dictionary (11th ed. 2019).

The history of SPP §§ 2-508 and 2-509.1 is fairly clear. Through it, the General Assembly conveyed to certain retirees that they had a "right" to the same healthcare subsidies as active employees, or some portion of the same. That right, according to the General Assembly, included the right to prescription drug benefits.

1.  Enforceable Contract Right

The question, then, is whether there is a right on the part of at least some State retirees to prescription drug benefits that can be enforced in contract. The answer is yes.  To construe "entitled" as meaning anything other than conferring an enforceable legal right would be to ignore the plain meaning of the word and rewrite the statute. That the Court will not do.

Defendants make much of the lack of conventional "contractual" language in the statute— viz., such time-worn phrases as "we hereby covenant and agree." In the absence of such buzzwords, they suggest, a contract cannot exist. The Court disagrees. No precise language is necessary to create a binding contract. A party can clearly manifest an intent to bind itself to a contract with another when a definite promise is made in exchange for performance, establishing what is known as a unilateral contract.

Unlike bilateral contracts, unilateral contracts are "accepted not by traditional acceptance, but by performance." *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 153 n.7 (1996). As Williston has instructed:

> [A]n offer for a unilateral contract generally requires an act on the part of the offeree to make a binding contract. This act constitutes both the consideration for the promise contained in the offer and an outward manifestation of the offeree's assent to the offeror's proposed terms, and, if the other requirements necessary for a binding obligation exist, *the performance of the act by the offeree with the intent to accept will create a contract*.

2 Williston on Contracts § 6:2 (4th ed.) (emphasis added). These principles can be fairly applied in this case: upon an eligible retiree's fulfillment of conditions set out in SPP § 2-508, a binding contract is formed and the retiree's entitlement vests.[6]

Like a unilateral contract, SPP §§ 2-508 and 2-509.1 require the performance of certain conditions before the "right" to subsidized benefits vests; the person must have (1) commenced service on or before June 30, 2011, (2) must be actually retired, and (3) must have accrued at least 5 years of "creditable service" (or be retired on disability as of that date). *See* SPP § 2-508. Although the amount of the subsidy depends on the length of the individual's service, in all instances the amount will be tethered to the subsidy available to active state employees. *See id.* These conditions, in the Court's view, clearly and unmistakably set forth, in writing, the terms of a unilateral contract.

Case law from the State of Maryland lends support to this analysis. In *BarGale Industries, Inc. v. Robert Realty Co.*, 275 Md. 638 (1975), the plaintiff sought to recover a finder's fee after successfully obtaining a mortgage loan on a landowner's behalf.  The Maryland Court of Appeals deemed a letter from the landowner to the plaintiff to be a binding and enforceable unilateral contract.  In it, the landowner specifically promised that he would pay a finder's fee if plaintiff (1) arranged mortgage financing of at least $200,000, and (2) did so within 30 days. *Id.* at 646. The Court of Appeals held that, upon "compliance with both conditions precedent specified therein," the plaintiff had an enforceable right to the finder's fee. *Id.* at 646–47.

---

[6] Defendants also argue, in passing, that Maryland has not waived sovereign immunity for any form of contract that does not bear "a signature of a duly authorized person." ECF No. 140-1 at 35. Their implicit contention is that because SPP §§ 2-508 and 2-509.1 themselves do not bear a signature, they cannot be considered a "written contract." This argument, asserted somewhat halfheartedly when first made, seems to have gotten lost somewhere in the wilderness of Defendants' cellulose pulp.

Given the intimate relationship that exists between employers and employees, the circumstances in the present case are at least as compelling. As an employer, Maryland made a clear and definite promise to certain of its retirees that if they fulfilled certain conditions, they would enjoy prescription drug benefits coextensive or pro-rated with those provided to active employees. SPP §§ 2-508, 2-509.1.

While the Court is mindful of the caution against construing statutes as contractual obligations, *see, e.g.*, *Atchison*, 470 U.S. at 465-66, that caution yields when an undeniable right is bestowed upon State employees. Moreover, unlike the typical statutory contracts case, SPP §§ 2-508 and 2-509.1 go well-beyond mere policy statements;[7] they make a direct offer to state employees. In this context, the Legislature has acted not only as the Government, but as an employer. Its promises in exchange for performance by the employees, embedded in statute, gave rise to a binding and enforceable contract.

Decisions of various state supreme courts that have considered the enforceability *vel non* of postretirement benefits to state employees invite comparison. *See, e.g.*, *Born v. City of Slidell*, 180 So. 3d 1227, 1234 (La. 2015) ("As this court has stated, 'when an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise but a vested right in the employee to the promised benefit.'"); *Schwegel v. Milwaukee Cty.*, 360 Wis. 2d 654, 675 (1991) ("[U]pon an employer's conditional promise of a benefit, an employee becomes eligible for the benefit. The eligibility for the benefit

---

[7] In *Atchison*, certain railroads sued Amtrak challenging the constitutionality of a federal statute requiring the railroads to reimburse Amtrak for free pass privileges the railroads had granted to employees. *See Atchison*, 470 U.S. at 455-457. The railroads argued that the statute suggesting Congress intended to withdraw from certain regulatory oversight was not merely a regulatory policy, but a binding contractual agreement between the United Statutes and the railroads. The Supreme Court, consistent with the general proposition that laws are not intended to create private or vested rights but merely declare a policy to be pursued until the legislature might order otherwise, found that the statute in question amounted to nothing more than a statement of policy, not a binding obligation of Congress.

vests as a contract right when the employee meets all the conditions the employer established to confer the benefit."); *cf. State ex rel. City of Wheeling Retirees Ass'n, Inc. v. City of Wheeling*, 185 W. Va. 380, 383 (1991) ("A general consideration of *W.Va.Code*, 8–12–8 [1986] makes it abundantly clear that the retirees in this case are to be entitled to the same cost for the same insurance coverage as that of the regular employees."); *River City Fraternal Ord. of Police Lodge 614, Inc. v. Kentucky Ret. Sys. by & through Bd. of Trustees*, 999 F.3d 1003, 1006 (6th Cir. 2021) ("Kentucky law . . . formed an "inviolable contract" with the officers to provide free retirement health insurance and to refrain from reducing their insurance benefits."). While the facts in these cases are admittedly not on all fours with the case at bar, the unifying concept remains the same: where a statute confers a right to state retirees in exchange for their performance, that right may be enforced in contract.

### 2. Reasonable Modifications to Contractual Rights

As Defendants correctly note, however, while an enforceable contract may exist as to certain of its retired employees, that is not the end of the analysis. Under Maryland law, the State is still allowed to make reasonable modifications to the contractual rights of its retirees. As explained by the Maryland Court of Special Appeals:

> The contractual or vested rights of the employee in Maryland are subject to a reserved legislative power to make reasonable modifications in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition.

*City of Frederick v. Quinn*, 371 A.2d 724, 726 (1977). *Quinn* teaches, however, that contract "modifications [by the state] must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change." *Id.* at 727 (quoting *City of Downey v. Board of Admin., Pub. Emp. Retire. Sys.*, 121 Cal. Rptr. 295, 303 (Cal. Dist. Ct. App. 1975)). Thus, although the Court holds that SPP §§ 2-508 and 2-509.1 give rise to an enforceable contract, the

State may nevertheless avoid liability if it demonstrates that its subsequent modifications were or will be "reasonable." Presumably, the State intended its May 25, 2019 legislation creating the three alternative prescription drug benefits plans to be a reasonable modification of whatever it had promised retirees theretofore.

The Court has already noted the fact-specific nature of this inquiry, having stated at the October 10, 2018 hearing:

> And one issue that really has not been explored here, and in many ways is the reason to go forward, is, Could the State have acted less drastically with regard to its modification? That's one of the factors . . . . We have no idea about that. There has been no exploration of that point. What else could have been done? Why, in effect, and I don't mean to overstate it, but why do you pick on these folks to cut the benefits? Why aren't you looking somewhere else? . . . We don't know any of that at this stage.

10/10/18 Hr'g Tr. 88:1-13. Nevertheless, Defendants now argue that, even if a contract existed, their modifications were reasonable as a matter of law because the benefits currently available under Medicare Part D are substantially the same.[8] While that may or may not be the case, without factual development, the Court is in no position at this juncture to resolve the issue. On summary judgment, should they choose, the parties will have the opportunity to present evidence and argument as to why or why not the State's replacement plan is consistent with its initial promise.

**B.**

It should be clear, in view of the foregoing, that not all Plaintiffs share the same contract right under SPP §§ 2-508 and 2-509.1. Given the General Assembly's amendments to those

---

[8] In the same breath, however, Defendants appear to admit that the benefits presently available are not the same. *See* ECF No. 140-1 at 43 ("This is not to say that the two [plans] are equivalent for all retirees. Depending on their medication needs and which Medicare plan options they select, some retirees will see costs go up[.]").

provisions beginning in 2004, Plaintiffs in this case would seem to be divisible into at least four

sub-categories: (1) currently active employees; (2) Plaintiffs who retired on or before June 30,

2011; (3) Plaintiffs who retired between July 1, 2011 and December 31, 2018; and (4) Plaintiffs

who retired on or after January 1, 2019.

1. Active Employees

There is no escaping the plain meaning of SPP §§ 2-508 and 2-509.1: whatever right those

statutes grant, it extends only to retirees. That proves consequential with respect to any Plaintiffs

who are still active State employees, including one Fitch Plaintiff, Deborah Garlitz, and all

AFSCME Plaintiffs.[9]  By virtue of their current employment status, active State employees have

no vested entitlement to the prescription drug benefits promised in SPP §§ 2-508 and 2-509.1. This

is because SPP § 2-508 expressly limits entitlement to "retirees," defined as:

1. *a former State employee* who receives a retirement allowance
   under Division II of this article;
2. *a former employee* of the Medical System Corporation, as
   defined in § 13-301 or § 13-401 of the Education Article, who
   receives a retirement allowance from the Employees'
   Retirement System of the State of Maryland or the Employees'
   Pension System of the State of Maryland under Title 22 or Title
   23 of this article; or
3. *a former employee* of the Maryland Transit Administration who
   receives a Maryland Transit Administration retirement
   allowance under § 7-206 of the Transportation Article.

SPP § 2-508(a)(3)(i)–(ii) (emphases added).  By these unambiguous terms, there is no sensible

way to find active employees to be entitled to prescription drug benefits, even if all other conditions

are met.  SPP § 2-508.

The Maryland Court of Appeals recently considered a somewhat similar question in a case

where Baltimore City sought to terminate pension benefits of retired police and firefighters,

---

[9] *See* AFSCME Amended Compl. ¶¶ 9–11 ("AFSCME represents many current employees").

finding that an "employee must satisfy all conditions precedent set forth in the [pension] Plan (*i.e.*, the defined contingencies) to become *entitled* to receive the promised benefits." *Cherry v. Mayor & City Council of Baltimore City*, --- A.3d ---, No. 36 Sept. Term 2020, 2021 WL 3611768, at *17 (Md. Aug. 16, 2021) (emphasis added). Such "defined contingencies" may include "the death of a member in service from injuries sustained in the line of duty," or "*the retirement of a police officer 'in good standing' who had served on the force for a period of 20 consecutive years (or for a shorter period of time)*." *Id.* at 23 (emphasis added). The clear implication is that, without satisfaction of all conditions precedent, there could be no entitlement.

In the present case, SPP § 2-508 makes retirement before June 30, 2011, with at least 5 years of creditable service, necessary conditions for entitlement to the benefit. And, as the Court will discuss presently, employees who retired after June 11, 2011 but before January 1, 2019, may be able to pursue their own breach of contract claim, albeit one somewhat different in nature. The State's obligation, therefore, is not triggered if the would-be beneficiary remained actively employed on or after January 1, 2019. In that instance, because all conditions precedent would not have been met, there would be no contract to enforce. The State remained free to amend its offer. For that reason, the contract claims of all active employees fail.

Based on their alleged contractual right in AFSCME's Amended Complaint, the active employees have also asserted related constitutional claims for (1) substantial impairment of contract in violation of the Contract Clause of the U.S. Constitution, Art. 1, § 10; and (2) governmental taking in violation of the Takings Clause of the U.S. Constitution, 5th Am. and the Maryland Constitution, Art. III § 40. *See* Fitch Compl. ¶¶ 127–148; AFSCME Compl. ¶¶ 57–59. Both claims, however, are rooted in the assumption that the active employees are in one way or another "entitled" to benefits conferred under SPP §§ 2-508 and 2-509.1, and that Defendants have

either impaired that right or taken away their interest without compensation. But, in the Court's view, the active employees do not make it past the first step: they cannot show that their claimed right of contract existed to begin with. No entitlement was ever bestowed upon them and no right ever vested.  No contract, therefore, was violated and, no taking was involved.

For these reasons, Defendants' Motion to Dismiss is **GRANTED** as to all active employees. AFSCME's Amended Complaint is **DISMISSED** in its entirety.  Counts I, III, IV, V, VII, and XII-A of the Fitch Third Amended Complaint are **DISMISSED** as to all active employees.

### 2.   Plaintiffs Who Retired On or Before June 30, 2011

The situation is different for Plaintiffs who retired on or before June 30, 2011 with at least 5 years of creditable service (or who had retired on disability).  At the time of their retirement, the State, had not begun its effort to walk back its promise of providing prescription drug benefits essentially coextensive with those of active employees, as it declared it could do for those who retiring on or after July 1, 2011. *See* 2011 Md. Laws ch. 397.  SPP §§ 2-508 and 2-509.1 provided a clear and definite "entitlement" to State-funded benefits—so long as the retiree fulfilled the conditions set out in SPP § 2-508. Were they to do so, the retiree's right would have fully vested, and the State's obligation would have become enforceable in contract such that any subsequent modification would need to be reasonable. Accordingly, this category of Plaintiffs may maintain their claim for breach of contract. Defendants' Motion to Dismiss is therefore **DENIED** as to the breach of contract claim (Count IV) [10] asserted by these Plaintiffs.  Furthermore, because ancillary

---

[10] The Court notes that, although the Fitch Plaintiffs' Breach of Contract claim (Count IV) is primarily aimed at allegations concerning the Trust Fund's purported mismanagement, elsewhere in the Complaint, which is incorporated in Count IV, Plaintiffs also allege breach of contract based on Maryland's purportedly unreasonable modifications to the prescription drug benefits program. *See* Fitch Complaint Introductory Statement (stating the Plaintiffs have a vested right, *i.e.*, contractual right, to the prescription drug program and that "[t]he Defendants have or will breach their contracts with the Plaintiffs").

or equitable relief may ultimately be appropriate in connection with the breach of contract claim, the Motion is also **DENIED** with respect to the  causes of action potentially related to the breach of contract claim: viz., for Declaratory Judgment – Health Program (Count I); Anticipatory Breach – Health Program (Count III);  and Petition for Issuance of Writ of Mandamus, or Preliminary and Permanent Injunction/Specific Performance – Health Program (Count XII-A).

But there is more.

This category of Plaintiffs has also asserted the same two constitutional claims raised by the active employees: violation of the Contract Clause of the U.S. Constitution (Count VII) and violation of the Takings Clause of the U.S. Constitution and the Takings Clause of the Maryland Constitution (Count V).   As to these clauses, however, the Fourth Circuit has provided clear guidance. Where a litigant maintains "the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause." *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014). If the law at issue does not "prevent[] the plaintiffs from pursuing a state law breach of contract claim, nor shield[] the [Government] from its obligation to pay damages should it be found in breach of contract," there is no constitutional claim. *Id.* Because Plaintiffs who retired on or before June 30, 2011 do have the right to seek recovery for breach of contract, they are not in a position at this time to make a constitutional case out of it.

The Fourth Circuit has also advised that when dealing with claims for breach of contract and unconstitutional taking, the better course is to hold the takings claim in abeyance pending resolution of the contract claim. *Id.* at 374 n.6 ("[T]he district court may wish to hold any proceedings regarding the Takings Clause claim in abeyance pending the resolution of related contractual issues.").  The Court will follow that directive here.

19

Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to Plaintiffs' claims under the Impairment of Contract Clause (Counts VII) but **DENIED** as to the Takings Clause (Count V).

### 3.   Plaintiffs Who Retired Between July 1, 2011 and December 31, 2018

Defendants contend that the General Assembly's declaration in 2011—that it would "discontinue prescription drug benefits for retirees in fiscal year 2020"—precludes any individual who retired on or after July 1, 2011,[11] from claiming a vested contract right to state-funded prescription drug benefits, *i.e.*, any employee who retired on or after July 1, 2011 would not be "entitled" to any of those benefits. The Court is not entirely in agreement with Defendants. Their argument might be more compelling if the 2011 amendment had immediately eliminated the prescription drug benefits program *in toto*. But it did not. Rather, under the 2011 legislation, potential retirees arguably retained a vested contractual right to at least some drug benefit subsidy until at least the beginning of fiscal year 2020 (*i.e.*, July 1, 2019), a date later advanced to January 1, 2019. *See* 2011 Md. Laws ch. 397; 2018 Md. Laws ch. 10. Moreover, although no party has raised it, the 2011 amendment had at least one notable difference from the statute presently in effect: it was silent as to whether various Medicare-eligible beneficiaries, including spouses, dependents, and survivors, would be required to transition to Medicare Part D. Perhaps for that reason, the General Assembly, in 2018, required that those individuals also transition to Part D, if eligible. *See* 2018 Md. Laws ch. 10. Whatever the case may be, at this stage, this category of

---

[11] While the provision setting forth the planned termination of the prescription benefit plan, SPP § 2-509.1, took effect on June 1, 2011, the provision actually authorizing the State, for the first time, to offer a drug prescription benefit plan that could differ from that provided to active employees provided for some changes to the program beginning July 1, 2011. *See* SPP § 508 (d). It was on July 1, 2011, therefore, that some changes to the entitlement actually took effect, though the promise of *some* entitlement remained.

Plaintiffs has at least presented a colorable claim that the State may have acted unreasonably in modifying potential benefits.[12]

In sum, Plaintiffs who retired on or before December 31, 2018, have adequately pleaded a breach of contract claim, again, subject to a demonstration by Defendants that their proposed modification was and is reasonable. Defendants' Motion to Dismiss is therefore **DENIED** as to Counts I, III, IV, and XII-A – the breach of contract and ancillary claims of the Fitch Third Amended Complaint with respect to those retirees. As set forth in the previous section, the Motion is **GRANTED** as to Plaintiffs' claims under the Impairment of Contract Clause (Counts VII), and **DENIED** as to the Takings Clause (Count V).

### 4.   Plaintiffs Who Retired On or After January 1, 2019

One final sub-category of retirees remains: State employees who retired on or after January 1, 2019. As set forth in SPP § 2-509.1, beginning January 1, 2019, the General Assembly withdrew its offer of the prescription drug benefits for any Medicare-eligible persons who retired on that date or thereafter. *See* SPP § 2-509.1. Accordingly, when those Plaintiffs retired or will retire, they would be entitled to the same benefits promised to them as of January 1, 2019—no more, no less. Thus, the program, as it presently stands, appears to be no more than what these Plaintiffs were promised; they cannot pursue a claim for unreasonable modification. Nor can they say that their right vested at any earlier point because only upon retirement could they satisfy all conditions precedent.

These Plaintiffs, therefore, have failed to allege any basis for a contracts-based claim, whether styled breach of contract, declaratory judgment, anticipatory breach, or specific

---

[12] The constitutional claims of these Plaintiffs—under the Contract Clause (Counts VII) and Takings Clause (Count V)—are no different from those of the Plaintiffs who retired on or before June 30, 2011. Thus Count VII will be dismissed, but Count V will, for now, remain in the case.

performance. Likewise, they have no claim for unconstitutional impairment of contract or takings because what they were offered as of January 1, 2019 was the sum and substance of what was promised, and is precisely what these retirees will get. Accordingly, as to Plaintiffs who retired on or after January 1, 2019, Defendants' Motion to Dismiss the Fitch Third Amended Complaint is **GRANTED**, and Counts I, III, IV, V, VII, and XII-A are **DISMISSED**.

## IV.

### A.  Claims Concerning Management of the Trust Fund

Although no model of clarity, the Fitch Plaintiffs' claims relating to the management of the Trust Fund—Counts II, VI, IX, X, XII-B, XIII, and XIV—assert in essence that they are entitled to have all prescription drug liabilities pre-funded. Plaintiffs seem to suggest that the General Assembly's budgetary decisions to appropriate funds from certain sources constitutes a "violation of Maryland Code State Personnel & Pensions § 34-101(c)." ECF No. 144 at 6. The Court is unpersuaded.

The Fitch Plaintiffs appear to misapprehend the nature of the Trust Fund and their relationship to it. SPP § 34-101, one of the provisions establishing the Trust Fund, states that its "purpose . . . is to *assist* the State in financing the postretirement health insurance subsidy." *Id.* § 34-101(c) (emphasis added). The statute provides no guarantee of future funding, nor does it in any way establish a private right of action for enforcement of its provisions. Simply put, the Fitch Plaintiffs have not articulated any cognizable basis to challenge management of the Trust Fund.

In any event, the Court finds the Fitch Plaintiffs lack standing to pursue their challenge. To establish Article III standing, a plaintiff must demonstrate: (1) that he or she suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent; (2) that there is a causal connection between the injury and the conduct complained of; and (3) that the injury would likely

be redressed by the requested judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). The "threatened injury must be certainly impending to constitute injury in fact" because allegations of "possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). To date, the Fitch Plaintiffs have demonstrated no injury from the alleged mismanagement of the Trust Fund; they have shown no concrete and particularized, actual or imminent injury, much less have they demonstrated any injury causally related to the purported mismanagement. The Fitch Plaintiffs have continued to receive such benefits as they are entitled to receive, without regard to any action or inaction on the part of the Trust Fund.

Accordingly, the Fitch Plaintiffs' claims relating to the management of the Trust Fund—Counts II, VI, IX, X, XII-B, XIII, and XIV—are **DISMISSED**.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Fitch Third Amended Complaint, ECF No. 140, is **DENIED IN PART** and **GRANTED IN PART**.

It is **DENIED** as to Count I (Declaratory Judgment – Health Program); Count III (Anticipatory Breach – Health Program); Count IV (Breach of Contract); Count V (Takings Clause); and Count XII-A (Petition for Issuance of Writ of Mandamus, or Preliminary and Permanent Injunction/Specific Performance – Health Program), insofar as they may apply to Plaintiffs who retired on or before December 31, 2018.  Defendants' Motion to Dismiss, ECF No. 140 is **GRANTED** as to all other Counts of the Fitch Third Amended Complaint and as to all other Fitch Plaintiffs.[13] Defendants' Motion to Dismiss AFSCME's Amended Complaint, ECF No. 140, is **GRANTED** in its entirety.

---

[13] Although Count VIII is entitled "Unconstitutional Impairment of Contracts," it actually alleges a substantive due process claim. That is, Plaintiffs submit that elimination of the prescription drug benefit plan constituted a deprivation of property "without due process of law in violation of Article 24 of the Maryland Constitution."  Plaintiffs contend that the legislative process may not be adequate in the case of

There still remains of course, the need to explore the extent to which Defendant's proposed replacement plans are reasonable, as to any Plaintiff who has been held to have an enforceable contract right. Counsel shall immediately consult with one another and advise the Court in writing within 30 days as to how the case should proceed from this point, *e.g*., with discovery, evidentiary hearing, supplemental motions, or the like.

Moreover, Counsel for the parties shall immediately consult with one another with regard to how to handle the Preliminary Injunction, *e.g*., Should it remain in effect for a certain period of time before it is dissolved? Or should it be immediately dissolved pending the filing of a motion to stay?

A joint written submission to the Court with respect to the Preliminary Injunction shall also be made within 30 days, during which time the Preliminary Injunction will remain in effect and the Court's Order herein will be stayed.

Within the same 30 days, the Fitch Plaintiffs, AFCSME, and any Defendants may file a motion to stay enforcement, for a reasonable period of time, of the Order issued in conjunction with this Memorandum Opinion, to allow the parties time to transition their current prescription drug benefit program to an appropriate alternative program and/or to consider an interlocutory appeal.  Within 30 days thereafter, the parties may file oppositions to any motion to stay and, within 15 days after that, parties may file replies.

---

a contract, stating "It is likely that the due process for a contractual obligation is different for the due process for a mere governmental benefit." Whatever Plaintiffs may have in mind as to this proposition, they cite no authority for it. At most, it would seem to duplicate their impairment of contracts claim (Count VII), and the Court sees no reason to keep it in the case.

As for the Equal Protection claim (Count XI), Plaintiffs have in no way attempted to substantiate it. In any event, "it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment." *See Murphy v. Edwards*, 325 Md. 342, 353 (1992) (collecting cases).  Count VIII (Unconstitutional Impairment of Contracts – Maryland Constitution, Art. 24), and Count XI (Equal Protection), are therefore **DISMISSED**.

Date: December 30, 2021

_____
PETER J. MESSITTE