IN THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

KENNETH FITCH, ET AL.,          *

          *Plaintiffs*,          *

      v.          *          No. 1:18-cv-02817-PJM

           *

STATE OF MARYLAND, ET AL.,          *

          *Defendants*.          *

    *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND FOR
DISSOLUTION OF PRELIMINARY INJUNCTION**

ANTHONY G. BROWN
Attorney General of Maryland

/s/ John J. Kuchno
_____

JOHN J. KUCHNO
Federal Bar No. 04211
RYAN R. DIETRICH
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
jkuchno@oag.state.md.us
(410) 576-7847
(410) 576-6955 (facsimile)

February 24, 2023          Attorneys for Defendants

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ................................................................. 2

    Maryland's State Employee and Retiree Health and Welfare Benefits
        Program .................................................................. 2

    Mechanics of the State Prescription-Drug Program ..................................... 4

    Congress Enacts Medicare Part D and Federally Financed Retiree
        Prescription-Drug Benefits, but with the "Doughnut Hole" .............. 5

    Maryland General Assembly Reacts to the Passage of Medicare Part
        D ......................................................................... 7

    Congress Enacts the Affordable Care Act, Which Closes the
        "Doughnut Hole" by 2020 ................................................... 7

    Facing "Unsustainable" Growth of Its Employee and Retiree Benefits
        Costs, Maryland Considers Benefits Reform ..................................... 8

    With the "Doughnut Hole" Closing, the General Assembly Enacts
        Legislation that Eventually Transitions Retirees to Federally
        Provided Prescription-Drug Benefits ............................................... 13

    Maryland Begins Providing Retiree Prescription-Drug Benefits
        Through an Employer Group Waiver Plan, Which "Wraps" the
        State Prescription-Drug Benefit Around Medicare Part D
        Coverage ..................................................................... 15

    The Federal Government Accelerates the Closing of the "Doughnut
        Hole," and the State Follows Suit ...................................................... 16

    The Fitch Plaintiffs File Suit, and this Court Enjoins the State's Plan
        to Discontinue Retiree Prescription-Drug Benefits ......................... 17

    Maryland Enacts Legislation Supplementing Retiree Prescription-
        Drug Benefits Available Under Medicare Part D ............................. 18

    AFSCME Intervenes in the Litigation ......................................................... 19

    This Court's Decision on the State Law Breach of Contract Claims .......... 20

This Court's Decision on the Takings Clause Claims .................................. 23

The Inflation Reduction Act ........................................................................ 23

Fourth Circuit's Decision in AFSCME Council 13 v. State of
    Maryland ........................................................................................... 24

STANDARD OF REVIEW ................................................................................. 26

ARGUMENT ..................................................................................................... 26

THE FOURTH CIRCUIT'S HOLDING THAT §§ 2-508 AND 2-509.1 DO NOT CREATE A
    CONTRACT BETWEEN THE STATE OF MARYLAND AND ITS EMPLOYEES OR
    RETIREES IS DISPOSITIVE AS TO ALL OF PLAINTIFFS' CLAIMS. ............................. 26

CONCLUSION .................................................................................................... 28

IN THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KENNETH FITCH, ET AL., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:18-cv-02817-PJM |
| STATE OF MARYLAND, ET AL., | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND
DISSOLUTION OF PRELIMINARY INJUNCTION**

In its December 30, 2021 memorandum opinion, this Court concluded that certain Maryland statutes gave rise to a contractual relationship between the State and retirees who had retired prior to July 1, 2011 (and, to a more limited extent, retirees who had retired between July 1, 2011 and December 31, 2018), relating to prescription-drug benefits. This Court, however, noted that, under Maryland law, the existence of a contractual relationship was "not the end of the analysis," and that "the State is still allowed to make reasonable modifications to the contractual rights of its retirees." (ECF 148 at 14.) Thus, this Court left for another day the determination of whether the State's proffered modifications were reasonable under Maryland law. (ECF 148 at 14-15.)

On February 21, 2023, however, the Fourth Circuit issued its decision in *AFSCME Maryland Council 3 v. State of Maryland*, No. 22-1362, 2023 WL 2125139 (4th Cir. Feb. 21, 2023). In that published opinion, the Fourth Circuit addressed the exact issue that this Court had considered in its December 30, 2021 decision: whether the statutes at issue

created a contract with state employees.  The Fourth Circuit concluded that they did not.
*Id*. at *6.  Because the Fourth Circuit's decision controls the analysis here, summary judgment should be granted in favor of the State as to all claims, and the preliminary injunction issued by this Court on October 16, 2018 should be lifted.

## STATEMENT OF FACTS

### Maryland's State Employee and Retiree Health and Welfare Benefits Program

In 1966, the Maryland General Assembly enacted a plan through which the State contributed a flat $1.5 million annually to fund state employee health benefits. 1966 Md. Laws ch. 660 (then-codified at Md. Ann. Code art. 64A, § 48).  This statutory scheme did not specify either how the program was to be administered or the nature and extent of the benefits to be provided.

Almost 20 years later, in 1984, the State extended statutory coverage for state employee health benefits to include retiree health benefits.  1984 Md. Laws ch. 290 (then-codified at Md. Ann. Code art. 64A, §§ 48B, 48C).  The 1984 legislation, which applied generally to all retirees (even those who had retired before the law went into effect), adopted a formula pegging a state retiree's eligibility for the subsidy to the retiree's years of service:

> A beneficiary and their designated beneficiaries are eligible to receive the subsidy provided by the State for the cost of the Program on the following basis:
>
> (i) If a beneficiary had at least 5 years of creditable service, the beneficiary and their designated beneficiaries shall receive five-sixteenths of the subsidy provided to a State employee;

(ii) In addition, if a beneficiary had more than 5 but less than 16 years of creditable service, the beneficiary and their designated beneficiaries shall receive one-sixteenth of the subsidy for each year of creditable service that is more than 5 but less than 16 years.

(iii) If a beneficiary had 16 years or more of creditable service, the beneficiary and their designated beneficiaries shall receive the same subsidy that is provided to a State employee.

1984 Md. Laws ch. 290, p. 1805 (then-codified at Md. Ann Code art. 64A, § 48B(c)(1), now codified in substantively similar form at Md. Code Ann., State Pers. & Pens. § 2-508(b)(4) (LexisNexis 2015)).  Retirees who were not eligible for the full subsidy had to "pay the part of the cost of the program . . . not provided" under the state subsidy.  1984 Md. Laws ch. 290, p. 1806 (then-codified at Md. Ann. Code art. 64A, § 48B(d)).  As with state-employee health benefits, the legislation did not specify either the amount or level of the state-retiree subsidy or the benefits that would be provided to retirees.

In 1993, the General Assembly recodified the provisions for state employee and retiree health benefits, 1993 Md. Laws ch. 10, and added language formally establishing the program.[1]  For the first time, the statutory scheme set forth the "scope of [the] program" and gave broad discretion to the Secretary to "include the health insurance benefit options established by the Secretary [of Budget and Management]" and "any other benefit option that the Secretary considers appropriate."  1993 Md. Laws ch. 10, p. 761-62 (then-codified at State Pers. & Pens. § 8-102(b)).  Although the 1993 legislation retained the reference to a state "subsidy" (and provisions for retirees' eligibility), it did not address the amount of

---

[1] "There is a State Employee and Retiree Health and Welfare Benefits Program, to be developed and administered by the Secretary [of Budget and Management]," 1993 Md. Laws ch. 10, p. 761 (then-codified at State Pers. & Pens. § 8-102(a)).

the subsidy or the benefits to which that subsidy might be applied.  1993 Md. Laws ch. 10, p. 769-70 (then-codified at State Pers. & Pens. § 8-108(c)).

Other than being recodified in 1996 to its current location at Title 2, subtitle 5 of the State Personnel and Pensions Article, 1996 Md. Laws ch. 347, the program remained substantively unchanged until the events in 2004 described below.

### Mechanics of the State Prescription-Drug Program

During this time, Maryland began providing prescription-drug benefits to both active employees and retirees under the broad legislative delegation of authority to the Secretary.  Although the specific benefits and terms of the benefit have varied throughout the years, the basic mechanics of the program have been as follows.

*From the Retiree's Perspective*

A retiree seeking to take advantage of prescription-drug coverage would first enroll in, and thereafter pay monthly premiums for, the State's retiree prescription-drug program.[2] When a retiree fills a prescription at a participating pharmacy,[3] the retiree pays a co-pay. The amount of the co-pay depends primarily on whether the drug is a generic drug, a brand-

---

[2] For example, for the current calendar year 2023, the monthly premiums are: $67.34 (for retiree only), $89.48 (retiree and child), $111.76 (retiree and spouse), and $134.66 (retiree and family).  *See 2023 Health Benefits: Employee and Retiree Rate Sheets Effective 01/01/2023 thru 12/31/2023* ("2023 Benefits Guide"), at 2, available at https://dbm.maryland.gov/benefits/Documents/CY23%20Benefits%20Guide.pdf.

[3] Most pharmacy chains and many independent pharmacies participate in the State's program.  (*See, e.g.*, 2023 Benefits Guide at 25.)  However, in the event a retiree uses an out-of-network pharmacy, they will pay full price for the drug, but then may submit a claim for reimbursement (in which the State would reimburse up to the amount it would have paid to the in-network pharmacy, minus the otherwise applicable co-pay).  (2023 Benefits Guide at 25).

name drug, or other specialty medication.[4]  Since 2005, the State has capped the amount of out-of-pocket co-pay costs a retiree can incur under the program.

*From the State's perspective*

From its beginnings, the State's prescription-drug program for retirees (as well as active employees) has been self-insured.  In other words, after a retiree fills a prescription (and pays only the co-pay), the pharmacy then bills the State for the full cost of the medication.  *See* Department of Budget and Management, *Your Prescription Benefits Handbook* at 2 (2022).[5]  This means that, with the exception of the monthly premiums and co-pays that a retiree pays, the State incurs the total cost of providing prescription drugs to its retirees.

### Congress Enacts Medicare Part D and Federally Financed Retiree Prescription-Drug Benefits, but with the "Doughnut Hole"

In 2003, Congress enacted the Medicare Modernization Act, which created Medicare Part D, a federal program for retiree prescription-drug benefits that took effect on January 1, 2006.  For the first time, retirees who had attained the age of 65 would be eligible to obtain outpatient prescription-drug coverage by enrolling in one of the plans

---

[4] For calendar year 2023, the co-pays for up to a 45-day supply are: $0 for certain generic drug classes; $10 for all other generic drugs; $25 for brand-name drugs; and $40 for specialty medications.  (2023 Benefits Guide at 21.)  For a 46-to-90 day supply, the co-pays are doubled.  (2023 Benefits Guide at 21.)  In addition, if a generic drug is available, but the retiree or their doctor requests brand-name medication, the retiree will pay the brand-name level co-pay plus the full difference in cost between the brand-name medication and the generic equivalent.  (2023 Benefits Guide at 20.)

[5] This document is available online at https://dbm.maryland.gov/benefits/Documents/CY22%20Prescription%20Benefits%20Handbook.pdf.

offered under Medicare Part D and making the premium payments required under the selected plan. As enacted, the Medicare Part D program included four phases: (1) an initial deductible phase, where the participant would be responsible for the entire cost of drugs; (2) an initial coverage phase, where, after exceeding the deductible (originally set at $250), participants would pay only a 25% coinsurance for drugs up to an "initial coverage limit" (originally set at $2,250); (3) a coverage gap, known colloquially as the "doughnut hole," whereby participants would no longer receive any coverage; and (4) a "catastrophic" phase, where coverage would resume once a participant's out-of-pocket expenses reached a higher level (originally set at $3,600), and participants would pay only a 5% coinsurance,[6] Congressional Budget Office, *A Detailed Description of CBO's Cost Estimate for the Medicare Prescription Drug Benefit*, at viii (July 2004).[7] During the initial coverage phase, the selected Part D plan (which would receive subsidies from the federal government) would cover the 75% of the costs of the drugs not covered by the plan recipient. But when a recipient reached the catastrophic phase, the federal government would incur 80% of the costs of the prescription drugs (with the plan covering the remaining 15%). The legislation also provided a federal subsidy for low-income participants so that these individuals paid relatively few costs, even as they passed through the "doughnut hole" coverage gap.

---

[6] This is the structure of the Medicare Part D "standard benefit" package. Although the individual plans offered by private insurers under Part D must provide a benefit structure that is at least "actuarially equivalent" to this structure, private insurers may offer plans that are more generous (but that are usually accompanied by a higher monthly premium).

[7] Available at https://www.cbo.gov/sites/default/files/108th-congress-2003-2004/reports/07-21-medicare.pdf.

**Maryland General Assembly Reacts to the Passage of Medicare Part D**

Motivated by concerns over the limitations of Medicare Part D at its initial roll-out, in particular, the gap in coverage encompassed by the "doughnut hole," the General Assembly enacted legislation directing that, "notwithstanding the enactment of [Medicare Part D]," the State "shall continue to include a prescription drug benefit plan in the health insurance benefit options" available to retirees. 2004 Md. Laws ch. 296 (codified at State Pers. & Pens. § 2-509.1). The legislation did not, however, define a "prescription drug benefit plan" nor mandate any specific level or type of benefits be provided in any such plan.

**Congress Enacts the Affordable Care Act, Which Closes the "Doughnut Hole" by 2020**

On March 23, 2010, President Obama signed into law the Affordable Care Act. Among other things, the Affordable Care Act altered Medicare Part D to eliminate the "doughnut hole" coverage gap by 2020, thus reducing costs to Part D participants with relatively high drug utilization. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, §§ 3301 – 3315 (2010). In other words, instead of having no coverage within the "doughnut hole," participants would, as of 2020, pay the same coinsurance for prescription drugs (i.e., 25%) as during the initial phase, until reaching the catastrophic phase (where, as under the original plan, Part D recipients would pay a 5% coinsurance).[8] Thus, from the participant's perspective, under the standard benefit there

---

[8] The Affordable Care Act "closed the doughnut hole" gradually by reducing the percentage of costs for which a participant would be responsible each year until the percentage reached 25% as of 2020.

would be no change in cost responsibility when out-of-pocket costs exceeded the initial coverage phase and the participant entered what had formerly been the coverage cap. From a funding perspective, the Affordable Care Act accomplished this result by increasing manufacturer rebates and federal government subsidies.

### Facing "Unsustainable" Growth of Its Employee and Retiree Benefits Costs, Maryland Considers Benefits Reform

Also in 2010, the Maryland General Assembly convened a "Public Employees' and Retirees' Benefit Sustainability Commission" to evaluate the fiscal health of Maryland's state employee pension and benefits system and, pertinent to this case, the affordability of its current retiree health and prescription-drug plans. *See* Public Employees' and Retirees' Benefit Sustainability Commission, 2010 Interim Report, at iii (January 2011) ("2010 Interim Commission Report").[9] The Commission noted that costs for employee and retiree benefits, including health benefits, were "growing much faster than the State's general fund revenues" and therefore were "unsustainable." (2010 Interim Commission Report at ix.) The Commission stated that "[t]hese trends cannot continue without imposing very significant cuts in other vital State programs and employee compensation." (2010 Interim Commission Report at ix.)

The Commission evaluated several ways to save costs. For example, to reduce the costs of providing health insurance to *active* employees, the Commission recommended a combination of reductions in state subsidies as well as structural plan design changes that

---

[9] The 2010 Interim Commission Report is available online at https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/013000/013730/unrestricted/20110557e.pdf.

would have reduced certain benefits. And with respect to state *pension* costs, the Commission put forward several recommendations, including increasing the amount of time needed for new and non-vested employees to vest, increasing the age at which participants would be able to begin benefits, and requiring vested employees to choose from various options that would either (1) protect accrued benefits while providing a lesser benefit going forward, or (2) allow members to retain their current benefit structure going forward in exchange for a higher contribution rate. (2010 Interim Commission Report at xiii.)[10]

The Commission also focused on the costs of providing *retiree* health benefits. And the Commission not only considered the raw annual costs of providing these benefits, but how these costs could impact the State's fiscal health in the long term. In 2004, the Governmental Accounting Standards Board (GASB) had changed the accounting standards that govern the way in which state and local governments account for and report the fiscal

---

[10] Although the General Assembly enacted legislation in 2011 in response to the Commission's efforts, some of the recommendations set forth above were not adopted. For example, with regard to active employee health costs, the General Assembly did not reduce the state subsidy; instead, it increased the co-pays that applied to prescription drugs and raised, through the regulatory process, the out-of-pocket caps on prescription-drug costs. *See* Public Employees' and Retirees' Benefit Sustainability Commission, 2011 Final Report, at 2-3 (July 15, 2011) ("2011 Final Commission Report"), available at https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/013000/013987/unrestricted/20110811e.pdf. With regard to state pension costs, rather than providing a menu of options, the General Assembly increased the participant's contribution level from five percent to seven percent of earnable compensation. (2011 Final Commission Report at 6.) The bulk of the changes, however, affected new employees hired after June 30, 2011. These new employees would need to accrue more time before vesting (ten years versus five years) and would be subject to a less favorable formula for calculating the benefit they would receive in retirement. (2011 Final Commission Report at 6.)

liabilities associated with providing retiree health benefits and other non-pension post-employment benefits ("OPEB"). (2010 Interim Commission Report at 20.) Instead of reporting those obligations as an annual liability, the new standards required governments to report the present value of the cost of providing those benefits into the future. (2010 Interim Commission Report at 20.)

As it stood for Maryland in 2010, the present value of providing retiree health benefits was calculated at $15.9 billion. (2010 Interim Commission Report at 21.) The practical effect of this figure was that, to comply fully with the GASB standards and avoid showing significant liabilities on its books, the State would be required to prefund these liabilities through an Annual Required Contribution ("ARC"), rather than simply pay for the costs as they were incurred. (2010 Interim Commission Report at 20-21.) And to meet that obligation for fiscal year 2011, the State would be required to incur not only $379 million in *actual* retiree health costs, but would also be required to dedicate another nearly $850 million to account for *future* costs (for a total ARC of $1.2 billion). (2010 Interim Commission Report at 21, 27.)

Although the GASB standards do not have the force of law, it has long been state policy to follow those standards. (2010 Interim Commission Report at 20.) And more importantly, state compliance with the GASB standards is considered by bond rating agencies in evaluating states' creditworthiness. (2010 Interim Commission Report at 20.) The Commission thus recognized that the failure to reduce retiree healthcare costs "may endanger the State's AAA bond rating, resulting in higher costs to borrow money for

important infrastructure projects and other State needs." (2010 Interim Commission Report at 25.)

To address these funding shortfalls, the Commission suggested several changes for the retiree health benefits program. First, the Commission recommended that the State, through the regulatory process, implement the same structural plan design changes for retirees as it had recommended for active employees. (2010 Interim Commission Report at 25.) Second, the Commission recommended several statutory changes regarding retiree eligibility: (1) that employees with less than 15 years of creditable service as of June 30, 2010, (a) should be required to earn 15 years of service credit (up from five) to qualify for participation in the state health insurance plan, and (b) should be required to earn 25 years of service credit with the State (up from 16) to qualify for the maximum premium subsidy (with the subsidy prorated for those between 15 and 25 years of service); and (2) that employees should, in the future, be required to retire directly from state service in order to qualify retiree health benefits.[11] (2010 Interim Commission Report at 25-26.) Finally, and pertinent to this case, the Commission "recommend[ed] that the State establish in statute a requirement that, by the year 2020, all Medicare-eligible State retirees must join Medicare Part D for prescription drug coverage[.]" (2010 Interim Commission Report at 26.)

---

[11] The General Assembly did not adopt these recommendations as proposed; instead, as discussed *infra*, the Legislature changed the eligibility requirements only for those employees who began service after July 1, 2011.

The Commission also broke down the effect of the proposed changes on the State's OPEB liabilities:

| Effect of Proposed Changes on the State's OPEB Liability ($ in Thousands) | | |
| --- | --- | --- |
| | Unfunded Liabilities | ARC |
| **Baseline Valuation Results** | **$15,915,214** | **$1,225,206** |
| A. Implement plan design changes | -1,301,440 | -106,779 |
| B. Raise necessary eligibility years of service from five to 15 | -255,008 | -43,407 |
| C. Maximum subsidy at 25 years; prorate if less | -302,891 | -40,107 |
| D. Eliminate eligibility through deferred retirement | -385,291 | -36,229 |
| E. Shift all Medicare-eligible retirees to Medicare Part D in 2020 | -5,503,519 | -420,894 |
| **Valuation Results After Implementing A-E** | **$8,167,065** | **$577,790** |

(2010 Interim Commission Report at 27 Ex. 3.2.)

As this chart demonstrates, among the proposed options, by far the largest reduction in unfunded liabilities ($5.5 billion) and the annual required contribution ($420 million) would be from "shift[ing] all medicare-eligible retirees to Medicare Part D in 2020." (capitalization adjusted). (2010 Interim Commission Report at 27.)

### With the "Doughnut Hole" Closing, the General Assembly Enacts Legislation that Eventually Transitions Retirees to Federally Provided Prescription-Drug Benefits

In 2011, the General Assembly acted on several—but not all—of the Commission's cost-saving recommendations. Pertinent to this case, the 2011 legislation adopted the Commission's recommendation to realize billions in cost-savings by ending the retiree prescription-drug program in fiscal year 2020, which in Maryland began on July 1, 2019.[12] 2011 Md. Laws ch. 397. Instead, consistent with the Commission's understanding that Part D would provide substantively equivalent benefits, all Medicare-eligible retirees would, on that date, be required to transition to obtaining their prescription drugs directly through the Medicare Part D program. Again, this change was projected to save $420 million in annual and structural costs, and would erase more than $5.5 billion of unfunded liabilities from the State's books for accounting purposes. (2010 Interim Commission Report at 27.)

The 2011 legislation also contained other provisions affecting retiree health benefits, though they are only tangentially related to this case. First, the 2011 legislation expressly authorized the State to "establish separate health insurance benefits options for retirees that differ from those for active employees."[13] 2011 Md. Laws ch. 397, p. 2307

---

[12] "The State shall discontinue prescription-drug benefits for Medicare-eligible retirees in fiscal year 2020," 2011 Md. Laws ch. 397, p. 2310 (codified at State Pers. & Pens. § 2-509.1(b)).

[13] This provision was significant in that it provided express authority for the State to take advantage of federal subsidies through an employer group waiver plan, which is discussed in the next section.

13

(codified at State Pers. & Pens. § 2-508(d)(1)).  Second, the 2011 legislation set forth provisions that would ostensibly apply, going forward, to the health benefit options available to retirees.  The legislation provided that retirees who qualified for the maximum state subsidy would be required to pay 25% of the premium for the prescription-drug benefit,[14] but would otherwise have the same co-pays, coinsurance, and deductible as active employees.  2011 Md. Laws, ch. 397, p. 2307 (codified at State Pers. & Pens. § 2-508(d)(2)(i)-(ii)).  Moreover, the law provided that retirees would have a cap on out-of-pocket prescription-drug costs of $1,500 for the retiree only or $2,000 for the retiree and family.  2011 Md. Laws, ch. 397, p. 2307 (codified at State Pers. & Pens. § 2-508(d)(2)(iii)).

These provisions, however, were expressly subject to the new statutory language that provided for the discontinuation of the state prescription-drug program for Medicare-eligible retirees in fiscal year 2020.  2011 Md. Laws, ch. 397, p. 2307 (codified at State Pers. & Pens. § 2-508(d)(2)).  This limitation had two practical effects, depending on whether a retiree was eligible for Medicare.  For Medicare-eligible retirees, it meant that the provisions would apply to their prescription-drug benefits until such time as the state prescription-drug program was discontinued in fiscal year 2020.  But for retirees who are not eligible for Medicare, however, it meant that these provisions would continue to apply indefinitely until the Legislature deemed otherwise.

---

[14] Retirees who did not qualify for the maximum subsidy would instead be required to pay a proportional additional amount based on their years of service.  2011 Md. Laws, ch. 397, p. 2307 (codified at State Pers. & Pens. § 2-508(d)(2)(ii)(2)).

Finally, the General Assembly also achieved cost savings through stricter eligibility requirements for retiree health benefits that applied to new employees.  For individuals beginning state employment on or after July 1, 2011, the 2011 legislation increased the years of service necessary to begin receiving the state subsidy that could be applied to available health insurance options during retirement.  Rather than eligibility beginning after five years, an employee hired after July 2011 will have to have ten years of service to become eligible.   Moreover, an employee hired after July 2011 would also need to have 25 years of service (rather than 16 years) to achieve the maximum subsidy.  2011 Md. Laws ch. 397, pp. 2305-06 (codified at State Pers. & Pens. § 2-508(b)).   Although these heightened eligibility requirements are not necessarily pertinent to this case, the practical (and intended) effect of this change was that any employee who began state service on or after July 1, 2011 would not be eligible for prescription-drug benefits under the state plan in retirement (unless they were not Medicare-eligible).[15]

### Maryland Begins Providing Retiree Prescription-Drug Benefits Through an Employer Group Waiver Plan, Which "Wraps" the State Prescription-Drug Benefit Around Medicare Part D Coverage

Building on the authority to establish separate health insurance benefits options for retirees, in 2014 the State changed the way in which it provided prescription-drug benefits to retirees.  To take advantage of subsidies available under the Medicare program, the State

---

[15] For example, an employee who began service on July 1, 2011 would have had only eight years of service on June 30, 2019, when the prescription-drug benefit was to be discontinued for Medicare-eligible retirees.  As a result, even if that employee had retired (non-disability) prior to June 30, 2019, they would not have met the heightened ten-year eligibility requirement, and therefore would not have been eligible for the prescription-drug benefit.

began providing benefits through an Employer Group Waiver Plan ("EGWP").  *See* Department of Budget and Management, "Guide to Your Health Benefits:  January 2014 to December 2014" ("2014 Benefits Guide"), at 3 ("Effective January 1, 2014, our current prescription drug benefit will 'wrap around' the Medicare Part D Standard prescription-drug plan.  This is called an Employer Group Waiver Plan—or EGWP.").[16]  Authorized by the original Medicare Part D legislation, an EGWP allows an employer to act much like the operator of a Medicare Part D insurance plan, but without the requirement—applicable to ordinary plans—that enrollment be open to the (otherwise eligible) public.  The EGWP model thus allows an employer to offer a plan that is tailored to its employees while receiving the subsidies that an ordinary Part D insurer would receive.  Nonetheless, like an ordinary insurance provider, the State was still responsible for setting the scope of the benefits to be provided and incurring the costs of providing the drugs.

From the retiree's perspective, however, there was no practical change.  Indeed, the state retiree saw no change in how benefits were provided, as the State's coordination with Medicare occurred seamlessly "behind the scenes."  (2014 Benefits Guide at 3.)

### The Federal Government Accelerates the Closing of the "Doughnut Hole," and the State Follows Suit

By 2018, the federal government had enacted new measures that required manufacturers to provide increased discounts in the Medicare program, which had the result of accelerating the closure of the "doughnut hole" to January 1, 2019, i.e., six months

---

[16]     The 2014 benefits guide is available online at https://dbm.maryland.gov/benefits/Documents/Benefits%20Guide%202014.pdf.

earlier than initially projected.  *See* Bipartisan Budget Act of 2018, codified in relevant part at 42 U.S.C. § 1395w-114A.  On April 5, 2018, the General Assembly adjusted Maryland's plan accordingly, enacting legislation that moved up to January 2019 the date by which all Medicare-eligible retirees would transition to receiving benefits directly from Part D.  2018 Md. Laws ch. 10 (codified at State Pers. & Pens. § 2-509.1(b)).[17]  The legislation required the Department of Budget and Management to notify retirees of the six-month change in the transition period, 2018 Md. Laws ch. 10, which it did in a series of three mailings in May, June, and July of 2018.

### The Fitch Plaintiffs File Suit, and this Court Enjoins the State's Plan to Discontinue Retiree Prescription-Drug Benefits

On September 10, 2018, a group comprised mostly of state retirees (the "Fitch plaintiffs") filed suit in the Circuit Court for Baltimore City and sought preliminary injunctive relief.  The complaint alleged that the planned transition to Medicare Part D violated the retirees' contractual and constitutional rights under the Contract Clause, Takings Clause, and Equal Protection Clause of the United States Constitution to receive state-funded retiree prescription-drug benefits.[18]  (ECF 1-1.)  After the State removed the

---

[17] This legislation also clarified (1) that a Medicare-eligible dependent would also be required to shift to Medicare Part D, but that (2) a non-Medicare eligible spouse, surviving spouse, dependent child, or surviving dependent child of a Medicare-eligible retiree could remain enrolled in the state prescription-drug plan even if the retiree is no longer eligible.  2018 Md. Laws ch. 10 (codified at State Pers. & Pens. § 2-509.1(b)-(c)).

[18] The Fitch plaintiffs also asserted contractual and constitutional claims against the State relating to the management of the Postretirement Health Benefits Trust Fund, a statutorily created fund formed "to assist the State in financing the postretirement health insurance subsidy."  State Pers. & Pens. § 34-101(c).  This Court rejected those claims.  (ECF 148 at 22-23.)

case, this Court entered a preliminary injunction barring the State from discontinuing prescription-drug benefits for retirees and their dependents as set forth in State Personnel & Pensions Article § 2-509.1(b). (ECF 31.) In accordance with the preliminary injunction, still presently in effect, the State has continued to provide prescription-drug benefits through the state-administered program to all otherwise-eligible retirees.

### Maryland Enacts Legislation Supplementing Retiree Prescription-Drug Benefits Available Under Medicare Part D

In its 2019 session, the Maryland General Assembly enacted three new prescription-drug benefit programs that would replace the previously provided benefit in the event that the injunction in this case were to be dissolved. 2019 Md. Laws ch. 767 (effective May 25, 2019). Two of these programs are relevant to this case.[19]

The first—the Maryland State Retiree Prescription Drug Coverage Program (the "2019 reimbursement program")—was made available to those retirees who "retired on or before December 31, 2019," 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(d)(1)(ii)). Under this program, a Medicare-eligible retiree's out-of-pocket costs will

---

[19] The irrelevant program—the Maryland State Retiree Catastrophic Prescription Drug Assistance Program—is available to retirees who entered into state service on or before June 30, 2011 and retire on or after January 1, 2020. 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(1)(ii)). It would cover any additional out-of-pocket costs once a Medicare-eligible retiree enters the "catastrophic" phase of Medicare Part D coverage. 2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(e)(2)). This program is not relevant here because of this Court's conclusion that, to the extent that a contract existed, it applied to individuals who retired by June 30, 2011 (or by December 31, 2018 at the latest). (ECF 148 at 18-21.) Because this second program applies only to those who retired *on or after January 1, 2020*, it would have no impact on the retirees that are now the focus of this litigation. Moreover, the changes embodied in the Inflation Reduction Act, discussed *infra*, would render this program superfluous.

18

be capped at the same level as a non-Medicare-eligible retiree's out-of-pocket costs, which is currently set forth in statute as $1,500 for individuals and $2,000 for families.[20]  2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(d)); *see also* State Pers. & Pens. § 2-508(d)(2)(iii).  In other words, the maximum that a retiree would pay for prescription drugs during a plan year would be $1,500 (or $2,000 for the retiree and family).

The other program—the Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program—reimburses retirees for any out-of-pocket costs for life-sustaining medications that are covered through the State's health insurance benefit options but are not covered under the Medicare Part D program in which the retiree is enrolled.  2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2-509.1(f)(2)(i)).

The 2019 legislation specified that these programs would not be implemented unless and until the injunction in this case (which is still in effect) is dissolved.  2019 Md. Laws ch. 767, § 2.  Accordingly, these programs have yet to be implemented.[21]

**AFSCME Intervenes in the Litigation**

The addition of these supplemental benefit options prompted AFSCME to intervene in this litigation.  (ECF 91.)  As a representative of many *active* state employees, AFSCME

---

[20] The Secretary is authorized by statute to establish a higher out-of-pocket limit for a retiree who qualifies for a partial state subsidy.   2019 Md. Laws ch. 767 (codified at State Pers. & Pens. § 2 509.1(d)(2)(ii)).

[21] Although in light of the injunction the specific mechanics of the programs have not been finally determined, the General Assembly has expressed its "intent" that the programs be implemented "in a manner that allows retirees to access reimbursement at the time of prescription drug purchase, through a mechanism such as debit cards."  2019 Md. Laws, ch. 767, § 4.

alleged that the offering of these supplemental programs forced upon some of its members a difficult choice: retire before the end of 2019, and continue receiving benefits similar to those they had received as employees, or continue working and risk receiving less generous benefits if the changes to the State's program were upheld. As with the Fitch plaintiffs' complaint, AFSCME presented claims that were grounded in both contract and constitutional theories.

### This Court's Decision on the State Law Breach of Contract Claims[22]

On August 13, 2020, the State moved to dismiss the operative complaints of both the Fitch plaintiffs and the AFSCME plaintiffs. (ECF 123; ECF 131; ECF 140.) On December 30, 2021, this Court denied the State's motion in part and granted it in part. (ECF 148.) This Court first concluded that State Personnel & Pensions §§ 2-508 and 2-509.1 together conferred upon state retirees a contractual right to prescription-drug benefits. As to the mechanics of the contract, this Court interpreted those statutory provisions as "creat[ing] a unilateral contract that became binding upon the fulfillment by the retirees of specific conditions." (ECF 148 at 9.) This Court then articulated those

---

[22] Plaintiffs also asserted claims under the Contracts Clause of the United States Constitution. This Court dismissed these claims as to all parties, and therefore those claims are no longer before this Court. First, as to those plaintiffs that fell outside of the scope of contract as found by this Court, this Court dismissed their federal Contract Clause claims on the simple basis that they lacked a contractual relationship that could be impaired. (ECF 148 at 17-18.) As to those plaintiffs for which this Court concluded a contract existed, this Court dismissed those claims on the basis that those retirees were not entitled to maintain a federal claim because they were able to pursue a state law breach of contract claim. (ECF 148 at 19 ("Where a litigant maintains 'the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause.'" (citing *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014)).)

specific conditions upon which the right to prescription-drug benefits would "vest": "the person must have (1) commenced service on or before June 30, 2011, (2) must be actually retired, and (3) must have accrued at least 5 years of 'creditable service' (or be retired on disability as of that date)."  (ECF 148 at 12.)  Based on those conditions, this Court divided the plaintiffs into four groups and discussed the impact on its conclusion on each:

*Active Employees*

Applying a "plain meaning" analysis to State Personnel & Pensions §§ 2-508 and 2-509.1, this Court concluded that, "whatever right those statutes grant, it extends only to retirees."  (ECF 148 at 16.)  In other words, this Court determined that "[State Personnel & Pensions] § 2-508 makes retirement before June 30, 2011, with at least 5 years of creditable service, necessary conditions for entitlement to the benefit."  (ECF 148 at 17.) This Court therefore concluded that active employees (i.e., the AFSCME plaintiffs) fell outside of the contractual promise embodied in those statutes.

*Employees Who Retired on or Before June 30, 2011*

Because those employees who retired on or before June 30, 2011 had retired before the State had announced, through Chapter 397 of the 2011 Laws of Maryland, that it was discontinuing prescription-drug benefits as of fiscal year 2020, these retirees fell squarely within the scope of the contract and thus would be entitled to maintain their breach of contract claims.  (ECF 148 at 18-19.)

*Employees Who Retired Between July 1, 2011 and December 31, 2018*

This Court concluded that, because the State (through Chapter 397 of the 2011 Laws of Maryland) had discontinued retiree drug benefits as of fiscal year 2020 (rather than

immediately upon the law's enactment), employees who retired during this period "retained a vested contractual right to at least some drug benefit subsidy until at least the beginning of fiscal year 2020 (i.e., July 1, 2019), a date later advanced to January 1, 2019." (ECF 148 at 20.)

### Employees Who Retired on or After January 1, 2019

This Court concluded that this class of individuals "would be entitled to the same benefits promised to them as of January 1, 2019—no more, no less." (ECF 148 at 21.) And because, as of that date, the State had discontinued prescription-drug benefits for retirees, this Court concluded that they had no right to any such benefits. (ECF 148 at 21-22.)

### State Permitted to Show Reasonable Modification to Contractual Rights

As part of its ruling, this Court noted that, under Maryland case law, notwithstanding the existence of a contract, "the State is still allowed to make reasonable modifications to the contractual rights of its retirees." (ECF 148 at 14.) Thus, although it denied the State's motion to dismiss as to any plaintiff who retired on or before June 30, 2011 (and, to a more limited extent, those who retired between July 1, 2011 and December 31, 2018), this Court acknowledged that the State should nonetheless be afforded an opportunity to show that the programs embodied in Chapter 767 of the 2019 Laws of Maryland constituted "reasonable modifications" to those retirees' contractual rights.[23] (ECF 148 at 14-15.)

---

[23] On the other hand, because this Court concluded that the active employees (and those who retired on or after January 1, 2019) had no contractual rights to retiree

**This Court's Decision on the Takings Clause Claims**

Also before this Court were plaintiffs' Taking Clause claims. As to those plaintiffs that this Court found not to have a contractual relationship with the State, this Court dismissed their Takings Clause claims because, without a valid contractual entitlement, they lacked any cognizable property interest that fell within the protection of the Takings Clause. (ECF 148 at 17, 22.) As for those plaintiffs who had been determined to have a valid contractual claim, this Court, citing Fourth Circuit precedent, held the Takings Clause claims in abeyance pending resolution of the contract claims. (ECF 148 at 19 (citing *Cherry*, 762 F.3d at 374 n.6).)

**The Inflation Reduction Act**

On August 16, 2022, the Inflation Reduction Act was signed into law. Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022). This Act significantly improves Medicare Part D coverage by, among other things, allowing Medicare to negotiate prices for certain prescription drugs, adding coverage for vaccines and insulin, and changing the Part D standard plan design. But the most significant aspect of the Inflation Reduction Act, as pertinent to this case, is that, beginning in calendar year 2025, a participant's out-of-pocket costs will be subject to a $2,000 out-of-pocket spending cap (which includes the amount paid toward the deductible).

---

prescription-drug benefits, no "reasonable modification" analysis with respect to those plaintiffs would be necessary, thus allowing those plaintiffs' claims to be dismissed outright.

Because the Inflation Reduction Act's out-of-pocket cap of $2,000 per retiree is higher than the out-of-pocket caps under the State's 2019 reimbursement program, state retirees' out-of-pocket costs would be unaffected by the Inflation Reduction Act's caps. However, because Medicare will now be responsible for the costs that exceed the caps, the State would see significant additional savings. In other words, whereas under the 2019 reimbursement program alone, the State would be responsible for all out-of-pocket drug costs above either the $1,500 individual or $2,000 family threshold, under the Inflation Reduction Act the State would only be responsible for the amount of retirees' out-of-pocket expenditures between the $1,500/$2,000 State limits and where the $2,000 federal limit takes over.[24]

**Fourth Circuit's Decision in *AFSCME Council 13 v. State of Maryland***

As noted above, this Court dismissed the claims of active employees, concluding that those employees were not covered under the terms of the contract as found by this Court. Pursuant to Federal Rule of Civil Procedure 54(b), this Court entered a final order of judgment as to its dismissal of the claims of active employees (ECF 164), to which AFSCME noted an appeal to the Fourth Circuit (ECF 166).

---

[24] For example, assuming an individual state retiree has actual out-of-pocket costs of $5,000, the breakdown would be as follows: (1) the retiree would only incur out-of-pockets of $1,500 under the 2019 state reimbursement program, (2) the State would incur the next $500 of costs up to the $2,000 federal cap, and (3) the Medicare program would incur the remaining $3000 (for which the State would have otherwise been responsible under just the 2019 reimbursement program). Because each retiree must sign up for a Medicare Part D plan on an individual basis, the calculations get somewhat more complicated when applied to a family under the state plan. In any event, under any scenario where an individual retiree exceeds $2,000 in out-of-pocket drug costs, the Inflation Reduction Act will result in savings to the State.

On February 21, 2023, the Fourth Circuit issued its decision in a published opinion. *AFSCME Maryland Council 3 v. State of Maryland*, No. 22-1362, 2023 WL 2125139 (4th Cir. Feb. 21, 2023).  Although the Fourth Circuit affirmed the notion that a statute could give rise to a contractual relationship if "both [the contract's] existence and the authority to make it . . . clearly and unmistakably appear [in the statutory language]," the Fourth Circuit nonetheless concluded that the statutes at issue here did "not include any unmistakable contract language," and thus, as a general matter, "do not create a contract between the State of Maryland and its employees or retirees."  *Id*. at *4-6.  First, the Fourth Circuit concluded that these statutes did not use the language of contract, and instead merely set forth state policy.  *Id*. at 5.  Moreover, the Fourth Circuit concluded that these statutes failed to satisfy Maryland's "general contract standard," in that they were not "sufficiently definite" and did "not define the type or amount of benefits that will be available to a retiree[.]"  *Id*.  In other words, although the Fourth Circuit affirmed this Court's conclusion that the active employees did not have a contract with the State for prescription-drug benefits in retirement, it did so not on the basis that the active employees fell outside of the terms of an otherwise-extant contract (as this Court had determined), but because no such contract existed for anyone.  *See id*. at 6 ("We hold that Sections 2-508 and 2-509.1 do not create a contract between the State of Maryland and its employees or retirees.").

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "facts must be viewed in the light most favorable to the non-moving party," but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

### THE FOURTH CIRCUIT'S HOLDING THAT §§ 2-508 AND 2-509.1 DO NOT CREATE A CONTRACT BETWEEN THE STATE OF MARYLAND AND ITS EMPLOYEES OR RETIREES IS DISPOSITIVE AS TO ALL OF PLAINTIFFS' CLAIMS.

As set forth above, this Court concluded in its memorandum opinion that the State had entered into a contract regarding prescription-drug benefits with retirees who had retired on or before June 30, 2011 (and, to some lesser extent, those who had retired between July 1, 2011 and December 31, 2018). Anchored by this premise, this Court denied the State's motion to dismiss those retirees' contract and other claims. (ECF 148.)

This premise has now been entirely negated. Addressing the identical issue, in the identical factual context, the Fourth Circuit stated plainly: "We hold that Sections 2-508 and 2-509.1 [of the State Personnel and Pensions Article] do not create a contract between the State of Maryland and its employees or retirees." *AFSCME Maryland Council 3 v. State of Maryland*, No. 22-1362, 2023 WL 2125139, at *6 (4th Cir. Feb. 21, 2023). This holding is dispositive here.

26

Indeed, if §§ 2-508 and 2-509.1 "do not create a contract between the State of Maryland and its employees or retirees," the plaintiffs in this case simply cannot maintain a state law breach of contract claim. Consequently, there is no longer any need for this Court to engage in a "reasonable modification" analysis under *City of Frederick v. Quinn*, 35 Md. App. 626 (1977), or *Cherry v. Mayor & City Council of Baltimore City*, 475 Md. 565 (2021). Instead, in the absence of a contractual relationship, this Court should grant summary judgment in favor of the State on plaintiffs' state law contract claims.

The absence of a contract also dooms plaintiffs' Takings Clause claims. As this Court noted in its memorandum opinion, plaintiffs' Takings Clause claims are "rooted in the assumption that [they] are in one way or another 'entitled' to benefits conferred under SPP §§ 2-508 and 2-509.1, and that [the State has] either impaired that right or taken away their interest without compensation." (ECF 148 at 17-18.) But because the Fourth Circuit's decision means that all plaintiffs "cannot show that their claimed right of contract existed to begin with," it in turn means that "[n]o entitlement was ever bestowed upon them and no right ever vested." (ECF 148 at 18.) Accordingly, "no taking was involved" (ECF 148 at 18), and summary judgment should be granted in favor of the State.

Moreover, for the reasons set forth above, the injunction issued by this Court on October 16, 2018 (ECF 31), and which currently remains in effect, should be lifted. Like all of plaintiffs' claims, the injunction was premised on the existence of a contract between the State and its retirees. Because the Fourth Circuit's decision makes clear that no such contracts exists, there is no basis for the injunction to continue.

27

**CONCLUSION**

The motion for summary judgment should be granted, and the preliminary injunction lifted.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ John J. Kuchno
_____
JOHN J. KUCHNO
RYAN R. DIETRICH
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
jkuchno@oag.state.md.us
(410) 576-7847

February 24, 2023                   Attorneys for Defendants