IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KENNETH FITCH, *et al.*, | *<br>* |
| Plaintiffs, | *<br>* |
| v. | *<br>*     Civil No. **18-2817 PJM** |
| STATE OF MARYLAND, *et al.*, | *<br>* |
| Defendants. | *<br>*<br>*<br>* |

## MEMORANDUM OPINION

### I.   INTRODUCTION

This case arises from the State of Maryland's attempt to transition certain retired state employees from a state-subsidized prescription drug benefit program to a combination of drug benefit programs available under a new state program and under Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, 117 Stat. 2066 (codified at 42 U.S.C. § 1395w-101 *et seq.* ("Part D")). The matter is before the Court on Defendants' Motion for Summary Judgment and for Dissolution of the Preliminary Injunction previously issued by the Court in favor of Plaintiffs, ECF No. 196. Plaintiffs have moved for leave to file a third motion for certification of a putative class ECF No. 197. For the following reasons, Plaintiffs' Motion is **DENIED**, and Defendants' Motion for Dissolution of the Preliminary Injunction is **GRANTED**. The Court's ruling on Defendants' Motion for Summary Judgment is **DEFERRED** pending consideration of whether Plaintiffs can state claims of fraud or restitution against Defendants, as set forth in the accompanying Order.

## II. BACKGROUND

### A. History of Federal and State Prescription Drug Coverage

In 2003, Congress created Medicare Part D ("Part D"), which enabled Medicare Enrollees to sign up for privately administered prescription drug coverage plans. 117 Stat. 2066. While Part D became somewhat infamous for the coverage gap in its initial standard plan design known as the "doughnut hole," more relevant to Plaintiffs' claims is that all Part D plans — from the program's inception to the present day — have covered a maximum of 95% of enrollees' out-of-pocket costs after reaching a final "catastrophic coverage" phase, currently set at $7,400 in total drug costs. *See* 42 U.S.C. § 1395w-102.

After the passage of Part D, the 2004 Maryland General Assembly reaffirmed its commitment to providing state retirees the option to purchase subsidized prescription drug coverage through the State Employee and Retiree Health and Welfare Benefits Program ("the State Program"). *See* Md. Code Ann, State Pers. & Pens. § 2-509.1 (West 2004). But after Congress gradually closed the Part D "doughnut hole" over the course of the last decade under the Affordable Care Act, Maryland reversed course. In 2011, the General Assembly passed legislation requiring state retirees to enroll in Part D coverage starting July 1, 2019. *See* 2011 Md. Laws Ch. 397; § 2-509.1 (West 2011). In fact, after Congress accelerated the Affordable Care Act's closure of the coverage gap in 2018, the General Assembly followed suit and moved up the timeline for state retirees' transition to Part D. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 64; 2018 Md. Laws Ch. 10; § 2-509-1 (West 2018). In May 2018, state retirees therefore received notices informing them that they would need to enroll in Part D during the Fall enrollment period to receive coverage starting January 1, 2019. (ECF No. 123 at 11). The present lawsuit followed.

2

After Plaintiffs filed suit, the Court granted their Motion for Preliminary Injunction, which to date has maintained the status quo by preventing the State from ending state retirees' access to the State Program. (*See* ECF Nos. 30-31). Under that program, enrollees in the prescription drug coverage plan pay no deductible, and their expenses are capped at either $1,500 out-of-pocket for individuals or $2,000 for families. *See 2022 Summary of Benefits*, CVS Caremark (2022), https://www.caremark.com/portal/asset/SoMD_BAAG_Retiree_Medicare.pdf. For seniors whose medications to fight certain cancers or treat chronic conditions such as Hepatitis C might cost more than $200,000 a year without insurance, the State Program's caps on out-of-pocket spending have meant savings of tens of thousands of dollars in costs annually compared to what Part D would cover. *See* Juliette Cubanski, Tricia Neuman, and Anthony Damico, *Millions of Medicare Part D Enrollees Have Had Out-of-Pocket Drug Spending Above the Catastrophic Threshold Over Time*, Kaiser Family Foundation (Jul. 23, 2021), https://www.kff.org/medicare/issue-brief/millions-of-medicare-part-d-enrollees-have-had-out-of-pocket-drug-spending-above-the-catastrophic-threshold-over-time/.

### B.   Developments in State Coverage and Part D Since 2019

Once the Court's Preliminary Injunction was in place, the 2019 General Legislature substantially walked back the 2011 General Assembly's transition plan by creating three programs that it believed would approximate the prescription drug benefits retirees currently receive:

(1) The Maryland State Retiree Prescription Drug Coverage Program, which is available to retirees who "retired on or before December 31, 2019." SPP § 2-509.1(d)(1)(ii). Under this program, Medicare-eligible retirees' out-of-pocket costs are capped at the same level as non-Medicare-eligible retirees' out-of-pocket costs, which mirrors the State's existing policy. § 2-509.1(d), (a).
(2) The Maryland State Retiree Catastrophic Prescription Drug Assistance Program, which is available to retirees who entered state service on or before June 30, 2011, and retired on or after January 1, 2020. *Id.* § 2-509.1(e)(1)(ii). This program would cover additional out-of-pocket costs once a Medicare-eligible retiree enters the catastrophic phase of Part D. § 2-509.1(e)(2).

3

   (3) The Maryland State Retiree Life-Sustaining Prescription Drug Assistance Program, which is available to any retiree who participates in the first two programs. § 2-509.1(f)(2)(i). This program reimburses retirees for any out-of-pocket costs for life-sustaining medications that are covered through Maryland's health insurance benefit options but not covered in Part D.[1] *Id.*

2019 Md. Laws Ch. 767 § 2 (collectively "the Replacement Programs"). The General Assembly also mandated a transition period of at least one full calendar year after the Preliminary Injunction is lifted before the Replacement Programs go into effect, during which time state retirees will continue to have access to the State Program. *Id.*

Where the language of the Replacement Programs differs from the existing State Program is that enrollees under the Replacement Program will be "reimbursed" for out-of-pocket costs after reaching their annual coverage cap. *See* § 2-509.1(d), (f). Importantly, however, in the very same bill creating the Replacement Programs, the State indicated that it intends for the Department of Management and Budget to reimburse enrollees "at the time of prescription drug purchase, through a mechanism such as debit cards." 2019 Md. Laws, ch. 767, § 4. Other key provisions of the State Program remain in place: the ability of retires to provide coverage to non-Medicare eligible spouses and family members carries forward. *See* § 2-509.1(c).

While the General Assembly has promised to continue to allow retirees to purchase prescription drug coverage comparable to what they currently receive through the Replacement Programs, Congress in effect provided a fairly comprehensive backstop to retirees when it overhauled Part D coverage pursuant to the Inflation Reduction Act ("IRA"). *See* Pub. L. No. 117-169 § 11201, 136 Stat. 1818, 1877-95. Starting in 2024, enrollees' out of pocket prescription drug

---

[1] Part D typically requires that a minimum of two drugs are covered for each therapeutic category and class. 42 CFR § 423.120(b)(2)(i). Enrollees have the option to ability to apply an exception, either for which drugs are covered or how those drugs may be used. *Exceptions*, Centers for Medicare & Medicaid Services, https://www.cms.gov/Medicare/Appeals-and-Grievances/MedPrescriptDrugApplGriev/Exceptions.

expenses under the IRA are capped at $3,333; in 2025, the first year that the Replacement Programs could go into effect, the IRA reduces that cap to $2,000. *Id.* Other changes should also operate to ease the burden on retirees: among other measures to reduce drug costs, the IRA caps monthly insulin costs at $35, requires the federal government to negotiate the prices of certain high-cost drugs, and expands the Part D Low-Income Subsidy Program. *See* Juliette Cubanski, Tricia Neuman, and Meredith Freed, *Explaining the Prescription Drug Provisions in the Inflation Reduction Act*, Kaiser Family Foundation (Jan. 24, 2023), https://www.kff.org/medicare/issue-brief/explaining-the-prescription-drug-provisions-in-the-inflation-reduction-act/.

### III. PROCEDURAL HISTORY

#### A. Initial Complaint and AFSCME Intervention

This suit began on September 10, 2018, when the Fitch Plaintiffs, a group of state employees who began service on or before June 30, 2011, and retired on or before December 31, 2018, alleged that the State's attempted transition to Medicare Part D violated their contractual and constitutional rights to receive state-subsidized prescription drug benefits. On October 10, 2018, the Court granted Plaintiffs' Motion for Preliminary Injunction and directed that the State continue providing prescription drug benefits to both state retirees and any eligible employees who might retire during the pendency of this case. (*See* ECF Nos. 30-31). Following the General Assembly's passage of the Replacement Programs, referenced above, the American Federation of State, County, and Municipal Employees, Council 3 ("AFSCME") successfully moved to intervene, seeking to have active employees of the State represented by AFSCME also covered by the Preliminary Injunction. (ECF Nos. 91, 92, & 105).

The Fitch Plaintiffs' Third Amended Complaint, the core of which is still in place today, originally proceeded in no less than 15 counts, each of which was premised upon the State's breach

5

of either a purported contract to provide prescription drug coverage to state retirees or upon the State's breach of an alleged duty to manage the Other Post-Employment Benefits Trust Fund ("OPEB Trust"). (ECF No. 123). AFSCME filed an Amended Complaint that mirrored the Fitch Plaintiffs' key contract claims. (ECF No. 130). Defendants thereafter moved to dismiss all counts in both complaints. (ECF No. 140).

### B.     The Court's Ruling on Defendants' Motion to Dismiss

On December 30, 2021, the Court issued a Memorandum Opinion granting in part and denying in part Defendants' Motion to Dismiss for Failure to State a Claim. (ECF No. 148). The Court found that the General Assembly's use of the word "entitled" in SPP Section 2-508 created a unilateral contract offer that was accepted by Plaintiff-employees who met certain "vesting criteria" and who retired on or before December 31, 2019. The Court therefore denied Defendants' Motion to Dismiss as to the contract-based claims of Plaintiffs who had retired by December 31, 2019. However, the Court also found that the State's amendments to Section 2-508 and 2-509.1 in effect withdrew any contract offer as to individuals who retired on or after Jan. 1, 2019, and thus granted Defendants' Motion to Dismiss as to all claims made by Plaintiffs who had *not* retired by December 31, 2019, including the AFSCME Plaintiffs. The Court further granted Defendants' Motion to Dismiss as to several constitutional claims and all claims related to the OPEB Trust.

### C.     The Fourth Circuit's Ruling in *AFSCME Maryland Council 3*

Following the Court's dismissal of all the claims of the state employees who were not retired as of Jan. 1, 2019, AFSCME filed an appeal. On February 21, 2023, the Fourth Circuit affirmed the Court's dismissal of AFSCME's claim, but it did so not because the State's offer with withdrawn, but rather on the grounds that the General Assembly had not created a contract with

6

either current employees or retirees through Sections 2-508 and 2-509.1 in the first place. *AFSCME Maryland Council 3 v. Maryland*, 61 F.4th 143, 151 (4th Cir. 2023).

The Fourth Circuit declared that legislatures, including the Maryland General Assembly, must make unmistakably clear that they intend to create a binding contract which future legislative sessions cannot undo. The court relied principally upon *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451 (1985), which states that "the party asserting the creation of a contract must overcome [the] well-founded presumption" that "a law is not intended to create private contractual or vested rights but merely declare a policy to be pursued until the legislature shall ordain otherwise." *AFSCME Maryland Council 3 v. Maryland*, 61 F.4th at 149 (quoting *Atchison*, 470 U.S. at 645-66). While the Supreme Court had found that laws expressly create a contract where they "provide[] for the execution of a written contract on behalf of the state" or where "the [state] 'covenant[s] and agree[s]' with anyone to do anything," the Fourth Circuit found that the General Assembly's use of the word "entitled" in the present case did not suffice to clear that high bar. *Id.* at 150 (quoting *Atchison*, 470 U.S. at 466, 470).

## IV. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no *genuine* dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed.

7

R. Civ. P. 56(e)). "Courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

## V. ANALYSIS

All of Plaintiffs' remaining claims derive from the theory that the 2004 General Assembly created a contract with State employees in Section 2-508 and 2.509.1. (ECF No. 123). There is no wiggle room here. This Court is bound by the Fourth Circuit's decision in *AFSCME Maryland Council 3*, which held that no contract exists. 61 F.4th at 151. As a result, the Court is constrained to find that there is no longer a substantial likelihood the Plaintiffs will prevail on the merits of their claim.

### A. All *Winter* elements require the immediate dissolution of the Preliminary Injunction.

The Supreme Court has required that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008). Notwithstanding the Fourth Circuit's ruling in *AFSCME Maryland Council 3*, each of the other three elements now militate in favor of the immediate dissolution of the Preliminary Injunction.

Crucially, the General Assembly's designed transition period to the Replacement Programs would still allow Plaintiffs to access coverage through the State Program through the end of 2024 and prevent any immediate risk of irreparable harm. *See* 2019 Md. Laws Ch. 767 § 2. Moreover, lifting the Preliminary Injunction without delay would best protect the interests of both Plaintiffs

and the public by giving the state the longest possible runway to successfully launch the Replacement Programs. With this in mind, the Court **GRANTS** Defendants' Motion for Dissolution of the Preliminary Injunction, effective immediately.

### B. Plaintiffs have been given leave to brief the Court on other causes of action.

Plaintiffs' counsel asserted at the June 29 Motions Hearing that alternative causes of action for fraud or perhaps restitution might be justified based on the theory that Plaintiffs may have paid in advance for benefits that they never received. The Court has given Plaintiffs until July 31 to submit additional briefing on such claims. Defendants may respond in normal course. Pending the Court's consideration of these briefs, it will **DEFER** ruling on Defendants' Motion for Summary Judgment, which Defendants may supplement as part of their response to Plaintiffs' additional briefing.

Before the Court makes that decision, there is a very important caution. It appears that both the State's creation of the Replacement Programs in 2019 and Congress's changes to Part D in the Inflation Reduction Act should function to protect fixed-income retirees in much the same way as the State Program has. When enacted, the Replacement Programs will contain the same caps on out-of-pocket costs that retirees are currently subject to. *See* § 2-509.1(d). Retirees will also still be able to provide coverage to their spouses and dependents who are not themselves Part D-eligible. *See* § 2-509.1(c). Further, Part D's formulary requirements and the Replacement Programs should continue to provide multiple coverage options to treat almost every medical condition. 42 CFR § 423.120(b)(2)(i); Md. Code Ann., State Pers. & Pens. § 2-509.1(f). While there are some outstanding questions as to whether retirees with Part D-eligible spouses may face net-higher cost caps, the other provisions of the IRA — requiring the federal government to negotiate the cost

of some of the most expensive drugs, capping the cost of insulin, and expanding the Part D Low-Income Subsidy Program — may yet combine to offset that risk. *See* Juliette Cubanski, Tricia Neuman, and Meredith Freed, *Explaining the Prescription Drug Provisions in the Inflation Reduction Act*, Kaiser Family Foundation (Jan. 24, 2023), https://www.kff.org/medicare/issue-brief/explaining-the-prescription-drug-provisions-in-the-inflation-reduction-act/.

Of course, it remains to be seen how effectively and efficiently the State will administer the Replacement Programs. In particular, the word *reimbursement* may occasion some apprehension on the part of some retirees, especially those with existing reservations about whether the State really has their best interests in mind. However, such concerns have not actually materialized. The text of the Replacement Programs makes clear that the State does intend to provide coverage at the time that state retirees pick up their prescriptions, not after they are required to request a refund. 2019 Md. Laws, ch. 767, § 4. Governor Wes Moore and nearly all other key decisionmakers responsible for shaping how those policies will be enacted have all been elected or appointed within the past year,[2] while the State Department of Management and Budget has nearly a decade of technical experience running the State Program as a Part D "wrap around" plan in a manner similar to the way in which the Replacement Programs are likely to be administered. *Guide to Your Health Benefits: January 2014 to December 2014*, Maryland Department of Budget and Management (2014), https://dbm.maryland.gov/benefits/Documents/Benefits%20Guide%202014.pdf. As a result, the Court has no reason to believe the State plans to treat retirees with the cold disregard that some of

---

[2] Governor Moore will also be working with a General Assembly that has almost entirely turned over since 2011: nearly 80% of General Assembly members were not in office when the legislation transitioning state retirees to Part D was initially passed. *See General Assembly*, Maryland Manual On-line (Mar. 22, 2023), https://msa.maryland.gov/msa/mdmanual/07leg/html/ga.html. However, a supermajority of those responsible for reinstating state retiree benefits by passing the Replacement Programs remain in office. *See Id.*

10

them anticipate. If the State's chosen reimbursement method turns out to be so arbitrary or ineffective as to effectively deny retirees their benefits, a new lawsuit may well be warranted.

### C. Plaintiffs' proposed Third Motion for Class Certification would be futile.

While Plaintiffs assert in their Memorandum in Support of their Motion for Leave to File the Third Motion for Class Certification that an outstanding question of material fact remains about whether the Replacement Programs are a reasonable modification to a contract between the State and its retirees, again the Fourth Circuit's decision in *AFSCME Maryland Council 3* clearly establishes that there is no contract for the Court to analyze. 61 F.4th at 151. Any claims under this theory and any class action would also be foreclosed. Accordingly, the Court **DENIES** Plaintiffs' Motion for Leave to File the Third Motion for Class Certification.

## VI. CONCLUSION

For the forgoing reasons, Defendants' Motion for Dissolution of the Preliminary Injunction, ECF No. 196, is **GRANTED**. Plaintiffs' Motion for Leave to File Third Motion for Class Certification, ECF No. 197, is **DENIED**. The Court's ruling on Defendants' Motion for Summary Judgment is **DEFERRED** pending consideration of whether Plaintiffs can state claims for fraud or restitution against Defendants, within the timeline set forth in the accompanying Order.

A separate Order will **ISSUE**.

Date: July 19, 2023

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE